# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         EASTERN DIVISION
4    ELVIS TOLBERT,        )
5         Plaintiff,   )
6    vs.              ) CIVIL ACTION NO.
7    BRIGGS AND STRATTON   ) 3:05cv1149-MHT
8    CORPORATION, ROBERT   )
9    WESPHAL, HAROLD SMITH, )
10        Defendants.   )
11
12        DEPOSITION OF ELVIS TOLBERT
13
14        In accordance with the Federal
15    Rules of Civil Procedure, as Amended,
16    effective May 15, 1988, I, Maya Rose, am
17    hereby delivering to TOM DAVIS, the
18    original transcript of the oral testimony
19    taken on the 27th day of June, 2006, along
20    with the exhibits.
21        Please be advised that this is
22    the same and not retained by the Court
23    Reporter, nor filed with the Court.

Page 2

1         STIPULATIONS
2         IT IS STIPULATED AND AGREED, by
3    and between the parties, through their
4    respective counsel, that the deposition of
5    ELVIS TOLBERT may be taken before MAYA
6    ROSE, Commissioner, Court Reporter and
7    Notary Public, State at Large.
8         IT IS FURTHER STIPULATED AND
9    AGREED that the signature to and the
10   reading of the deposition by the witness
11   is waived, the deposition to have the same
12   force and effect as if full compliance had
13   been had with all laws and rules of Court
14   relating to the taking of depositions.
15        IT IS FURTHER STIPULATED AND
16   AGREED that it shall not be necessary for
17   any objections to be made by counsel to
18   any questions, except as to form or
19   leading questions, and that counsel for
20   the parties may make objections and assign
21   grounds at the time of trial, or at the
22   time said deposition is offered in
23   evidence, or prior thereto.

Page 3

1         IT IS FURTHER STIPULATED AND
2    AGREED that the notice of filing of the
3    deposition by the Commissioner is waived.

Page 4

1         APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Ms. Juraldine Battle-Hodge
5    Attorney at Law
6    207 Montgomery Street, Suite 215
7    Montgomery, Alabama  36104
8
9    FOR THE DEFENDANT:
10   Mr. Thomas A. Davis
11   Ms. Tamula R. Yelling
12   Attorneys at Law
13   Constangy, Brooks & Smith, LLC
14   One Federal Place, Suite 900
15   1819 Fifth Avenue North
16   Birmingham, Alabama  35203
17
18   Mr. Scott P. Langelin
19   Senior Counsel-Briggs & Stratton Corp.
20   Employment Law & Labor Relations
21   Post Office Box 702
22   Milwaukee, Wisconsin  53201
23

# FREEDOM COURT REPORTING

Page 5

1          I N D E X

2

3           PAGE

4 EXAMINATION BY MR. DAVIS:................7

5 EXAMINATION BY MS. BATTLE-HODGE:.......148

6 REEXAMINATION BY MR. DAVIS:............149

7

8       E X H I B I T S

9 DEFENDANT'S NO.          PAGE

10 Exhibit 1...............................21

11 Exhibit 2..............................59

12 Exhibit 3..............................96

13 Exhibit 4.............................101

14 Exhibit 5.............................126

15 Exhibit 6.............................127

16 Exhibit 7.............................131

17 Exhibit 8.............................138

18 Exhibit 9.............................146

19

20

21

22

23

Page 6

1     I, Maya Rose, a Court Reporter of

2 Birmingham, Alabama, and a Notary Public

3 for the State of Alabama at Large, acting

4 as Commissioner, certify that on this

5 date, pursuant to the Federal Rules of

6 Civil Procedure and the foregoing

7 stipulation of counsel, there came before

8 me at 207 Montgomery Street, Suite 215,

9 Montgomery, Alabama, on the 27th day of

10 June, 2006, commencing at 10:13 a.m.,

11 ELVIS TOLBERT, witness in the above cause,

12 for oral examination, whereupon the

13 following proceedings were had and done:

14

15       ELVIS TOLBERT,

16 being first duly sworn, was examined and

17 testified as follows:

18

19    THE REPORTER: Usual

20 stipulations?

21     MS. BATTLE-HODGE: Usual

22 stipulations.

23    MR. DAVIS: Yes, please.

Page 7

1 EXAMINATION BY MR. DAVIS:

2    Q. Could you state your name,

3 please?

4    A. Elvis Tolbert.

5    Q. Is that your full name?

6    A. Elvis O'Neal Tolbert.

7    Q. Is it O -- spell it.

8    A. Apostrophe n-e-a-l.

9    Q. Okay. Mr. Tolbert, my name is

10 Tom Davis. I'm a lawyer for Briggs &

11 Stratton. I'll be asking you some

12 questions today; is that okay?

13    A. Yes.

14    Q. Okay. Have you ever given a

15 deposition before?

16    A. No.

17    Q. Okay. Have you ever testified

18 under oath before?

19    A. No.

20    Q. Have you ever signed any papers

21 where you said I assert this is true or

22 any kind of sworn testimony of any type?

23    A. Joining the military.

Page 8

1    Q. Okay. Anything else that you

2 recall?

3    A. Not to my knowledge.

4    Q. Okay. I'll be asking you some

5 questions and if at any point in time you

6 don't understand a question, will you let

7 me know?

8    A. Sure.

9    Q. Okay. And can we agree that if

10 I ask you a question and you answer it,

11 you're testifying -- you agree, at least,

12 that you understood the question?

13    A. Yes. To the best of my

14 knowledge, yes.

15    Q. I understand. I just want you

16 to testify based on what you know. And

17 can we also agree that if I ask you a

18 question and you answer it, you're

19 testifying truthfully?

20    A. Yes.

21    Q. Okay. Is there any reason you

22 couldn't testify truthfully today?

23    A. No, not to my knowledge.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  Q.  Are you taking any sort of
2  medications?
3      A.  Sinus medicines, occasionally
4  ibuprofen, 800 milligrams, you know, but
5  nothing, you know, major, pain-killers or
6  nothing like that.
7      Q.  Are you suffering from any sort
8  of impairment or any medical condition
9  that would affect your ability to testify
10 truthfully?
11     A.  Not to my knowledge.
12     Q.  What have you done to prepare
13 for the deposition?
14     A.  Just consulted with my lawyer.
15     Q.  Okay.  I don't want to know
16 what you two talked about, but did you
17 look at any documents?
18     A.  Other than the one that was
19 prepared that I -- you know, like I said,
20 that was presented to me from my lawyer.
21     MS. BATTLE-HODGE:  We looked at
22 the complaint.
23     MR. DAVIS:  Okay.

Page 10

1      MS. BATTLE-HODGE:  That's what
2  he means.  Just --
3      MR. DAVIS:  Okay.
4      Q.  We'll go over that later on.
5  Any other documents?
6      A.  No.
7      Q.  Okay.  Did you talk to anyone,
8  any current or former employees of Briggs
9  & Stratton?
10     A.  Occasionally I run into some
11 former employees, you know, out and about.
12     Q.  Did you talk to any of them to
13 prepare yourself for the deposition?
14     A.  No.
15     Q.  Okay.  And I'll get to that
16 later on.  What is your date of birth?
17     A.  May 24th, 1964.
18     Q.  And your social security
19 number?
20     A.  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.
21     Q.  Have you ever had a different
22 social security number?
23     A.  No, I haven't.

Page 11

1      Q.  Do you know what your Alabama
2  driver's license number is?
3      A.  4891560.
4      Q.  Are you married?
5      A.  No.
6      Q.  Have you ever been married?
7      A.  Yes.
8      Q.  To whom?
9      A.  Janet Williams.
10     Q.  Is that your only marriage?
11     A.  Yes.
12     Q.  Do you have children?
13     A.  Yes.  We didn't have children
14 together.
15     Q.  Okay.  You do have children.
16 You did not have children with Ms.
17 Williams?
18     A.  No.
19     Q.  Did you have children with
20 anyone else?
21     A.  Yes.
22     Q.  Who was that?
23     A.  The kids' names or the mother?

Page 12

1      Q.  The mother.
2      A.  Karen Merritt.
3      Q.  Karen Merritt?
4      A.  Yes.
5      Q.  M-e-r-r --
6      A.  I-t-t.
7      Q.  Okay.  Any --
8      A.  Deborah Holloway.
9      Q.  Deborah Holloway.
10     A.  Well, Deborah Ford now.
11     Q.  How many children do you have?
12     A.  Two.
13     Q.  One with Ms. Merritt, one with
14 Ms. Ford?
15     A.  Yes.
16     Q.  How old are your children?
17     A.  Twenty-three and eighteen.
18     Q.  Where do they live?
19     A.  Camp Hill, Alabama, and
20 Jacksonville, Florida.
21     Q.  Okay.  Who lives at Camp Hill?
22     A.  Deborah Ford.
23     Q.  Okay.  What does Ms. Ford do?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 13 |
|---|
| 1　　A.　What do you mean? |
| 2　　Q.　What does your daughter do or |
| 3　your child who lives at Camp Hill? |
| 4　　A.　Oh, she's currently unemployed. |
| 5　　Q.　Did she ever work? |
| 6　　A.　Yes. |
| 7　　Q.　Where did she work? |
| 8　　A.　I believe with -- they make the |
| 9　athletic apparel in Alex City. |
| 10　　Q.　Russell? |
| 11　　A.　Russell. |
| 12　　Q.　Okay.　How about Deborah Ford, |
| 13　Deborah Holloway Ford, where did she work? |
| 14　　A.　I have no idea. |
| 15　　Q.　Do you keep up with her? |
| 16　　A.　Yes.　We talk. |
| 17　　Q.　Okay.　Do you keep up with your |
| 18　eighteen year-old? |
| 19　　A.　Yes. |
| 20　　Q.　Do you provide her any sort of |
| 21　child support or financial support? |
| 22　　A.　Child support. |
| 23　　Q.　How about the twenty-three |

| Page 14 |
|---|
| 1　year-old? |
| 2　　A.　No. |
| 3　　Q.　Do you keep up with the |
| 4　twenty-three year-old? |
| 5　　A.　Yes. |
| 6　　Q.　Is it a boy, two girls? |
| 7　　A.　Two girls. |
| 8　　Q.　What is the twenty-three |
| 9　year-old's name? |
| 10　　A.　Laquanda. |
| 11　　Q.　And the eighteen year-old? |
| 12　　A.　Keisha. |
| 13　　Q.　Do you keep up with Ms. |
| 14　Merritt? |
| 15　　A.　Yes. |
| 16　　Q.　Do you have any other relatives |
| 17　around the Montgomery, Lee County area? |
| 18　　A.　Yes.　I have, to my knowledge, |
| 19　two, three cousins that lives here in |
| 20　Montgomery. |
| 21　　Q.　What are their last names? |
| 22　　A.　I do not know.　I'm not sure. |
| 23　It may be Wilson.　I'm not sure. |

| Page 15 |
|---|
| 1　　Q.　Okay.　Any other relatives |
| 2　other than cousins? |
| 3　　A.　No. |
| 4　　Q.　Okay.　Let me back into this. |
| 5　Where did you grow up? |
| 6　　A.　Camp Hill and Lafayette. |
| 7　　Q.　Are your parents still living? |
| 8　　A.　Father is deceased.　My mother |
| 9　lives -- well, I live with my mother in |
| 10　Opelika. |
| 11　　Q.　You live with your mother? |
| 12　　A.　Right. |
| 13　　Q.　And your mother's last name is? |
| 14　　A.　Tolbert. |
| 15　　Q.　Okay.　Do you have any brothers |
| 16　or sisters? |
| 17　　A.　Yes. |
| 18　　Q.　Okay.　What are their last |
| 19　names? |
| 20　　A.　Pitts. |
| 21　　Q.　Hicks? |
| 22　　A.　Pitts. |
| 23　　Q.　Pitts.　A sister named Pitts? |

| Page 16 |
|---|
| 1　　A.　Are you asking their last names |
| 2　or their first names? |
| 3　　Q.　Their last names. |
| 4　　A.　Pitts. |
| 5　　Q.　Is that your sister or brother? |
| 6　　A.　My mother's? |
| 7　　Q.　Okay.　Let me back up here. |
| 8　You live with your another in Opelika; |
| 9　correct? |
| 10　　A.　Right. |
| 11　　Q.　Okay.　Do you have any |
| 12　siblings? |
| 13　　A.　Yes. |
| 14　　Q.　Okay.　What are their names? |
| 15　　A.　Ruth. |
| 16　　Q.　Tell me their whole names. |
| 17　　A.　Ruth Tolbert. |
| 18　　Q.　Okay.　Where does Ruth work? |
| 19　　A.　Intercontinental Packaging. |
| 20　　Q.　In? |
| 21　　A.　Opelika, Alabama. |
| 22　　Q.　Do you have any other siblings? |
| 23　　A.　Victor Tolbert, my younger |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  brother. He's a welder. Don't know the
2  name of the company. And my younger
3  sister, Cassandra Tolbert, she lives in
4  Santa Monica, California.
5      Q.  Other relatives in the Opelika
6  area?
7      A.  Yeah.
8      Q.  Just give their last names.
9      A.  Jimmy -- what's Jimmy's last
10  name? Rowe. And what is -- I don't
11  remember right off. I mean, I have
12  relatives, but I don't -- I can't think of
13  their last names right off now.
14      Q.  Okay. What's the address in
15  Opelika that you live at?
16      A.  3501 Birmingham Highway,
17  Apartment 1003, Opelika.
18      Q.  Who else lives there besides
19  you and your mother?
20      A.  My sister and my niece.
21      Q.  How old is your niece?
22      A.  Eighteen.
23      Q.  How long have you lived there?

Page 18

1      A.  Since 2000. I think it's
2  January of 2000.
3      Q.  Do you pay rent?
4      A.  Yes.
5      Q.  How much is your rent a month?
6      A.  Five forty-five a month.
7      Q.  You pay that yourself? Is your
8  portion or the total rent?
9      A.  That's the total rent.
10      Q.  Do you pay that yourself?
11      A.  Yes, I pay that and then of
12  course my sister splits it with me.
13      Q.  Okay. So you pay half?
14      A.  Half the rent.
15      Q.  When did you and Ms. Williams
16  get divorced?
17      A.  I don't know. I'm not sure.
18  It was probably, I'm guessing, late
19  1980's.
20      Q.  Okay. Where did you live
21  before you lived with your mother in
22  Apartment 1003?
23      A.  In Apartment -- Tall Oaks

Page 19

1  Apartments in Opelika.
2      Q.  Okay. Have you lived in
3  Opelika all your life, or Camp Hill or
4  Opelika?
5      A.  Yes, excluding my military
6  time.
7      Q.  Correct. And we'll get through
8  that. I understand you were born in Camp
9  Hill; correct?
10      A.  Lafayette.
11      Q.  Lafayette.
12      A.  Yeah.
13      Q.  And then where did you go to
14  high school?
15      A.  I graduated from -- most of my
16  high school years was at Lafayette High
17  School, and my senior year I transferred
18  to Edward Bell in Camp Hill.
19      Q.  Okay. Kind of walk me through
20  after high school, where did you go?
21      A.  After high school, September
22  1982 I joined the Navy, went active Navy.
23  Do you want my course of history in the

Page 20

1  military?
2      Q.  No. Just tell me -- I just
3  want to know what you did up to Briggs &
4  Stratton.
5      A.  Okay. Right after high school,
6  joined the military from '82 to '90. From
7  '90 to '98 or so, or '96, I was employed
8  with Diversified Products. In '91 I also
9  started working with Auburn University up
10  until 1996. And somewhere in that course
11  of time, I think I worked briefly
12  seasonally with Wal-Mart.
13      Q.  Okay. So you were full duty
14  Navy from '82 to '90?
15      A.  Yes.
16      Q.  And is that when you went in
17  the reserves in '90?
18      A.  In January or February of '92 I
19  went active -- I mean, I went reserves,
20  so --
21      Q.  What did you do? You were full
22  time and you worked for Diversified
23  Products?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    A.  During that time, and I don't
2  know exactly, but I was attending Southern
3  Union, probably working part-time.  I
4  think at that particular time I was
5  working Diversified Products and going to
6  school.  Then along the way, I was
7  employed -- (reviewing document.)
8    Q.  Is that your resume?
9    A.  Yeah.
10   Q.  Why don't we just make that an
11 exhibit so I can get a copy?
12      MS. BATTLE-HODGE:  That's fine.
13      MR. DAVIS:  This will help me
14 here.  Now, I'm going to mark it as
15 Exhibit 1.
16      MS. BATTLE-HODGE:  Okay.
17      MR. DAVIS:  Do you have any
18 problem with that?
19      MS. BATTLE-HODGE:  No, I don't
20 have a problem with that.
21      (Whereupon, Defendant's
22      Exhibit 1 was marked
23      for identification.)

Page 22

1    Q.  My next question is related to
2  your education.  Did you receive any other
3  sort of -- after high school, did you
4  receive a diploma or a degree from
5  anywhere?
6    A.  I received a diploma from ITT
7  Technical Institute in La Mesa,
8  California, associates of applied science
9  in electronic engineering.
10   Q.  Okay.  So I assume that was
11 when you were in the Navy?
12   A.  Yes.
13   Q.  Okay.  And did they pay for
14 that?
15   A.  Yes, they did.
16   Q.  And it seems like you have here
17 a B.S. at Troy University?
18   A.  Yes, I do.
19   Q.  Is that an anticipated degree
20 or an actual degree?
21   A.  Actual degree.
22   Q.  You've received a degree since
23 you left Briggs?

Page 23

1    A.  Yes, I have.
2    Q.  Who's been paying for that?
3    A.  I have.
4    Q.  You have been paying that from
5  savings or has the military paid for any
6  of that?
7    A.  No.  Student loan primarily.
8    Q.  And is that in Montgomery or
9  on-line?
10   A.  Phenix City.
11   Q.  Phenix City.  Okay.
12   A.  And my ITT degree, I don't
13 remember exactly, but that was during the
14 time when the military was paying a
15 portion, so it might have -- depend -- it
16 was kind of complex at that time, but they
17 was paying up to fifty percent or
18 seventy-five percent, depending on -- so
19 depending on what type of educational
20 programs were available, whether they was
21 employing at that time.
22   Q.  Okay.  Did you prepare this
23 yourself?

Page 24

1    A.  Yes.
2    Q.  Have you given this out to
3  prospective employers?
4    A.  Yes, I have.
5    Q.  Is everything on here correct,
6  true and correct?
7    A.  Yes, to my knowledge.
8    Q.  Did you have anybody help you
9  write this or did you type it yourself?
10   A.  I pretty much typed it myself.
11 Now, I did get input, you know, from
12 various samples off the Internet.  I have
13 friends, also, that -- in the job market
14 or were in the job market that kind of,
15 you know, gave me some pointers and little
16 verbiage and that kind of thing.
17   Q.  Did you have any help at Troy
18 University with that?
19   A.  With preparing this resume?
20   Q.  Yes.
21   A.  No.
22   Q.  Did you have a career
23 counseling center or anything?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    A.  I'm not sure what type of
2  programs that they offer as far as
3  employment or whatnot or what have you.
4  The only experience that I remember having
5  is having to prepare a resume for a class.
6    Q.  Now, who have you sent that out
7  to?  Do you have a list of that by any
8  chance?
9    A.  No.  No, I don't.  It's posted
10  on Careerbuilders.com, on Monsters.com,
11  Militaryrecruiting.com.  I've also issued
12  out some last week to various employers at
13  a job fair I attended in Atlanta.  Another
14  company has a copy, Universal Forest
15  Products.  You know, it's just several,
16  several people.
17    Q.  Okay.  Now, when did you enroll
18  in Troy University?  You must have
19  recently got a degree.  So how long were
20  you enrolled there?
21    A.  I enrolled at Troy University,
22  I believe, October 2003.
23    Q.  So you were going to Troy while

Page 26

1  you were employed at Briggs?
2    A.  Yes.
3    Q.  Okay.  And you just continued
4  that three-year degree part-time, I
5  assume?
6    A.  No.  Most -- I think most of my
7  time at Troy University was full time with
8  the exception of maybe one summer.
9    Q.  Okay.  Have you ever been
10  arrested for anything?
11    A.  No.
12    Q.  Now, you're presently in the
13  Navy reserve?
14    A.  Yes.
15    Q.  What are your commitments with
16  regard to that service?
17    A.  I don't know exactly.  Maybe
18  three years ago I re-enlisted for six
19  years, so my current ID has an expiration
20  date of 2009.
21    Q.  Okay.  Do you have a monthly --
22  a weekend a month or two weeks in the
23  summer --

Page 27

1    A.  Yes.
2    Q.  -- or do you have any sort of
3  time commitment?
4    A.  We -- I'm committed to one
5  weekend a month and two weeks of active
6  duty a year.
7    Q.  Okay.  Now, at some point
8  during your employment at Briggs &
9  Stratton you went back full time --
10    A.  Yes.
11    Q.  -- do you recall?  Can you tell
12  me about that, what led to that?
13    A.  I don't know exactly what the
14  call was, whether it was Operation Freedom
15  or what, but it was a presidential recall.
16  In February of 2002 I was called back to
17  active duty and I was stationed in
18  Kingsville, Texas until 2000 -- February
19  of 2003.  And from that point, I was
20  transferred to Athens, Georgia.  And I
21  don't know exactly when was my discharge
22  date, whether it was in June or July.
23    Q.  So everything was domestic?

Page 28

1    A.  Yes.
2    Q.  Okay.  And as I understood it,
3  Briggs -- you were paid something from the
4  military and Briggs made up the
5  difference; is that --
6    A.  Well, it started -- well, no.
7  No.  No.
8    Q.  How does that work?  I saw
9  paperwork on that effect.
10    A.  Yeah.
11    Q.  How did that work?
12    A.  They initially -- because I
13  hadn't submitted all of the necessary
14  paperwork, they was trying to offset my
15  pay to make up the difference.
16    Q.  Right.
17    A.  But the money that I was making
18  at Briggs, there was no -- so I think once
19  I got back, what little money that they
20  had given me prior to me submitting all
21  this other paperwork, they recouped that
22  anyway.  So they got that back.
23    Q.  From who?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 29

1   A.  Me.
2   Q.  What was your understanding of
3 what their -- did they make any sort of
4 representation to you of what they would
5 do when you went out?
6   A.  No.  You know, it was just kind
7 of like one of those hugs-and-kisses
8 things and be careful, you know, and take
9 care of yourself.  But I do remember
10 asking Tim some questions concerning --
11 but I don't remember, and I think it was
12 more or less my benefits or maybe pay or
13 some concerning that, but I'm not sure.
14   Q.  So that was 2002, 2003.  And
15 then you came back to work at Briggs --
16   A.  Yes.
17   Q.  -- is that right?  Okay.  And
18 you started at Briggs in '96; correct?
19   A.  Correct.
20   Q.  And kind of walk me through --
21 let me back up.  Diversified Products,
22 just to kind of cut to the chase, didn't
23 they go out of business?

Page 30

1   A.  Yes.
2   Q.  Okay.  Is that why your
3 employment ended there?
4   A.  No.  I was actually laid off
5 there in -- because like I said, it was
6 seasonal work.
7   Q.  Okay.
8   A.  And I don't know when they
9 exactly closed their doors, but I was
10 permanently laid off in, what, '98, I
11 believe?  Yeah, '98.
12   Q.  Have you ever been terminated
13 from a job other than Briggs?
14   A.  No.
15   Q.  Have you ever received any sort
16 of discipline in the military for any sort
17 of --
18   A.  No.
19   Q.  -- infraction of any type?
20   A.  No, no MPJ's, no court-martial,
21 all good evals.
22   Q.  Okay.  So what led you to apply
23 for a job at Briggs?

Page 31

1   A.  Ironically enough, I was just
2 riding by and I looked at -- you know,
3 because it was different than any facility
4 that we've had in that area at that
5 particular time and it just looked like a
6 good place to work.
7   Q.  Okay.
8   A.  So I initially had to go
9 through the temp service just to even, you
10 know, have an opportunity to be employed
11 there.
12   Q.  So were you unemployed before
13 you applied?
14   A.  No.  I -- if my memory serves
15 me correctly, I think I was in school at
16 the time and working at Auburn University.
17   Q.  Okay.  I'm just looking at your
18 resume here.  It looks like you were also
19 working at Diversified Products.
20   A.  May -- may have.  Well, if
21 that's so, then it may be just a conflict.
22 Because I don't remember -- unless of
23 course I was working third shift.  Well,

Page 32

1 then, like I said, it could be the dates
2 are not correct as far as Diversified
3 Products is concerned.  But I don't
4 remember working the same time at
5 Diversified Products and Briggs &
6 Stratton.  But I know I was working at
7 Auburn University and Briggs & Stratton at
8 the same time.
9   Q.  Okay.  So you were working
10 somewhere and you applied for what type of
11 job at Briggs?
12   A.  As an operator.
13   Q.  As an operator.
14   A.  Well, I mean, really I didn't
15 apply, per se.  I went to the -- I think
16 at that time it was Kelly Employment
17 Services and they placed me out there.
18 And at that particular time, after working
19 or based on work experience or based on
20 work performance, I was offered a job as
21 an operator at Briggs.
22   Q.  Okay.  And kind of walk me
23 through your employment at Briggs.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1  A. Like I said -- I'm not exactly
2  sure of the employment agency, but, like I
3  said, I started out at Briggs through the
4  temp agency. And after "X" amount of
5  time, I was offered a position as a
6  production operator. Shortly after that,
7  I was promoted I'd say within two months,
8  three months, to what's considered a setup
9  position. But by the end of the year, the
10  November time frame, I was offered a job
11  in management as a supervisor, so --
12  Q. In '96?
13  A. Same year. From May -- from my
14  time of employment with Briggs & Stratton,
15  May to November, I went from being a
16  temporary employee to a supervisor.
17  Q. A supervisor, is that what they
18  call coach?
19  A. Coach, team leader.
20  Q. Okay. I've seen it as coach.
21  Is it also called team leader?
22  A. Once upon a time, we was
23  considered team leaders as well.

Page 34

1  Q. Okay. So you were a coach from
2  '96 until you left Briggs?
3  A. Yes.
4  Q. So you worked as a coach from
5  1996 to 2002 without taking any sort of
6  breaks or anything from military service?
7  A. Other than --
8  Q. Other than the two weeks.
9  A. -- two weeks.
10  Q. Right.
11  A. But other than that, if I was
12  gone for an extended period of time, it
13  was either military or a medical reason.
14  Q. Okay. Well, I'm trying to
15  break things up into time periods. So we
16  have what I'll refer to as the '96 to 2003
17  period; okay? That's from when you
18  started at Briggs, you took off some time
19  for military --
20  A. 2002.
21  Q. -- 2002, 2003, for that period
22  of time, and then you came back in '03 --
23  A. Correct.

Page 35

1  Q. -- until you left the company;
2  okay? Does that make -- do you understand
3  what I'm -- those two time periods.
4  A. Right.
5  Q. Okay. Let's talk about the '96
6  to 2003; okay? You were either at Briggs
7  or in the Navy --
8  A. Okay.
9  Q. -- okay? Are you comfortable
10  with that period?
11  A. Yes.
12  Q. Okay. During that period of
13  time, do you have any complaints with
14  anything about your employment at Briggs?
15  A. Yes. Some of the things that
16  went on as far as the practices, in my
17  opinion, should have been dealt with or
18  handled differently.
19  Q. Okay. Let me -- and I want to
20  hear everything you say, but let me ask my
21  question a little bit more specifically.
22  During the 1996 to 2003 time period, is
23  there anything in your lawsuit you're

Page 36

1  complaining of that occurred during that
2  time period?
3  A. That probably is the bulk of
4  the situation, in my opinion.
5  Q. The '96 to 2003?
6  A. Yes.
7  Q. Okay.
8  A. Could be.
9  Q. Tell me what happened during
10  those seven years that relate in any
11  shape, fashion, or form to your lawsuit
12  here today.
13  A. Well, one that comes to my mind
14  is that during the wrap-up stages, which
15  means that more people were being added to
16  the department, I had an opportunity to
17  select what we called at the time lead
18  setups or basically maintenance guys or
19  people that would be your right-hand
20  person that was, you know, in my absence
21  as a coach to kind of make sure that
22  things ran properly. And that was one of
23  the tasks that was left up to the coaches

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  of each department provided, you know,
2  through a process that was submitted, you
3  know, applications or whatever for that
4  particular position. And, you know, the
5  other coaches of the assembly lines or
6  whatever selected their people, you know,
7  on their own criteria or on their own
8  bases.
9      However, I had other -- you
10  know, I had people in -- that I had looked
11  at and I wanted to use in my department
12  that I felt like was good candidates for
13  the position. And, you know, I had other
14  members of management, supervisors,
15  managers that was trying to curtail my
16  choices. And they were not the people
17  that I had chosen.
18      As a matter of fact, there
19  was -- I even had to go back after making
20  the selection, had to kind of discount or
21  not even be allowed to select one of the
22  people that I had chosen to be. And the
23  people that they wanted me to select was

Page 38

1  all white males. And I was like, well,
2  did -- who was involved with you guys as
3  far as selecting your, you know,
4  candidates or possible, you know, the
5  maintenance here. And it was not only
6  that, but I was one of the -- I had one of
7  the more popular or best-selling products
8  in the plant, meaning that we had a large
9  production. But when it came down to me
10  having these extra people that I needed --
11      (Off-the-record.)
12      Q. (BY MR. DAVIS:) All right.
13  Mr. Tolbert, we were talking about the --
14  just to make sure we're all on the same
15  page, the 1996 to 2003 time period;
16  correct?
17      A. Correct.
18      Q. Okay. And you were telling me
19  about -- well, let me back up. You were
20  in the assembly area then; correct?
21      A. Yes.
22      Q. Okay. And you were telling me
23  about the lead setup time; correct?

Page 39

1      A. The process, the selection
2  process.
3      Q. Correct. Now, I heard what you
4  were saying. How does that situation
5  relate to your lawsuit against Briggs &
6  Stratton?
7      A. Okay. That situation led me to
8  believe that, you know, the discrimination
9  process was that everybody else was
10  allowed to select their candidates without
11  any assistance or whatever. Then all of a
12  sudden because the two guys that I was
13  selecting that I felt were the two best
14  candidates was black guys, then all of a
15  sudden that was -- well, it appeared to
16  me, too, that they already --
17      Q. Well, let's stick with the
18  question; okay? You need to listen to my
19  question. I'll give you an opportunity to
20  tell me everything that you want to tell
21  me, but explain -- connect that situation
22  to your lawsuit here today.
23      A. Okay. That, to me, was a

Page 40

1  situation that all the other supervisors
2  or whatnot or what have you at that time
3  was white. They chose their own
4  candidates. When it came time for me to
5  select my candidates, I needed all kinds
6  of assistance, so --
7      Q. Okay. You were a coach in the
8  assembly area; correct?
9      A. Correct.
10      Q. And you were the only
11  African-American coach in the assembly
12  area?
13      A. Yes.
14      Q. Okay. And I think kind of in a
15  nutshell you're saying that they provided
16  you some guidance or instruction on who
17  your setup should be; is that fair to say?
18      A. Yes.
19      Q. Now, in that process were you
20  ever disciplined?
21      A. Were I disciplined?
22      Q. Yes. Were you ever reprimanded
23  or disciplined or penalized in any shape,

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1 fashion, or form in determining your
2 setup?
3     A.  No.
4     Q.  Did they do anything other than
5 provide guidance for you and instruction
6 on who to pick?
7     A.  They declined one of my
8 selections.
9     Q.  Okay.  But did they take any
10 actions against you as a result of who you
11 picked or --
12     A.  Well, that, in my opinion, was
13 against me because that was my selection.
14     Q.  Okay.  Did it affect you in any
15 other shape, fashion, or form other than
16 them not picking the person you wanted?
17     A.  It started to raise my eyebrows
18 toward that particular process, why was my
19 selections questioned.
20     Q.  Okay.  So it's my
21 interpretation, and tell me if I'm correct
22 or you'll agree with this, that that
23 raised a suspicion in your mind about

Page 42

1 something and that's how it's connected to
2 the lawsuit; would that be fair to say?
3     A.  Not exactly.  My question was
4 about the whole situation was, as a member
5 of management, as a supervisor, as a
6 person placed in that position and given
7 the responsibility to select my choices,
8 which probably fell under the guidelines
9 of all the other coaches, but when it
10 comes to me selecting mine, then there's a
11 question about my choices.
12     Q.  Now, you've told me that, Mr.
13 Tolbert, several times.  Now connect that
14 to this lawsuit.
15     A.  The white coaches had a chance
16 to choose their candidates without
17 question.  Mine -- I wasn't allowed to
18 choose mine without question.
19     Q.  Okay.  Is there any other
20 connection --
21     A.  No.
22     Q.  -- to this lawsuit?  Okay.
23 Now, who did you want to select?  Who were

Page 43

1 the two people that you wanted to select?
2     A.  James Johnson and Robert --
3 what's Robert's last name?  I don't -- I
4 can't think of Robert's last name right
5 now, but he's currently employed there.
6     Q.  So you've got James Johnson and
7 Robert somebody?
8     A.  Robert -- Robert --
9     Q.  If you remember during the
10 deposition, let me know.
11     A.  Okay.  I will.
12     Q.  Now, who were your setups?
13     A.  James Johnson and Eddie
14 Bridges.
15     Q.  Okay.  Is James Johnson black
16 or white?
17     A.  Black.
18     Q.  Okay.  And Eddie Bridges?
19     A.  Black.
20     Q.  So the two people you selected
21 were black?
22     A.  Right.
23     Q.  And they didn't want you to

Page 44

1 select black people?
2     A.  It appeared to.
3     Q.  But you ended up selecting
4 black people?
5     A.  Right.
6     Q.  Okay.
7     A.  Because the people that they --
8 well, offered as candidates was all
9 whites.
10     Q.  So they offered whites as
11 candidates and you picked blacks?
12     A.  Correct.
13     Q.  So at the end of the day, you
14 picked two blacks as your lead setup; is
15 that fair to say?
16     A.  I picked the two people that I
17 felt were best qualified for the position.
18     Q.  Right.  And they were black
19 men?
20     A.  Black men.
21     Q.  Okay.  Anything else happen in
22 that 1996 to 2003 time period while you
23 were employed at Briggs & Stratton that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 45

1  relate in any shape, fashion, or form to
2  this lawsuit?
3      A.  I remember coming over to the
4  Model 20 assembly line, and part of that
5  area, the office that I would occupy was
6  upstairs.  And at that time I believe it
7  was unoccupied or wasn't set up, you know,
8  for things that I would need to run that
9  particular department such as a desk,
10  chair, that kind of thing.
11      Well, anyway, we scrounged up a
12  desk from within the plant and -- but we
13  didn't have a chair, a suitable chair.  I
14  think the only thing they had was like
15  little metal folding chairs throughout the
16  plant.  Well, in organizing my office, I
17  went through the little office catalog
18  book that they normally order from and,
19  you know, the chairs was, in my opinion,
20  ridiculously high.  So in sitting down
21  with my area manager at the time, Randy
22  Petasi.  I said, Randy, these chairs are
23  kind of expensive, man, and, you know, I

Page 46

1  really don't want to spend five, six
2  hundred dollars for a chair.  So he said,
3  well, I'll tell you what.  When you come
4  in in the morning, I'll have you a chair.
5  And basically what he did was he went in
6  the conference room, took one of those
7  chairs and put it at the bottom of the
8  stairs.  You know, I took the chair up to
9  my office, used it for two, three years.
10  Nobody never even said anything about it
11  or whatever.
12      Well, for whatever reason at
13  some point in time, and I'm not for sure
14  he was the one that mentioned it, but one
15  of the area managers had come up there
16  where I occupied the place.  But, anyway,
17  he noticed the chair, I'm assuming.  Then
18  all of a sudden, the chair is missing from
19  inventory or it shouldn't be up there or,
20  you know, we did an inventory and it's
21  missing.  So, anyway, they took my chair.
22  I had no place to sit.  I mean, this is a
23  chair that's been up there for two, three

Page 47

1  years and all of a sudden it's missing
2  from inventory.  I said, well, what am I
3  supposed to sit in?  You know, I'm a
4  supervisor, I'm a manger.  I have to --
5  part of my job is to sit here at this desk
6  and do the work.  Well, they didn't care
7  about that.  They took the chair.  I
8  said -- you know, I let my manager know
9  and I went back and took the chair back up
10  there.  They took the chair back again.
11  I'm like, well, you know, what is this?
12  Where am I supposed to sit, what am I
13  going to do, you know?  The least I can do
14  is have a chair to sit at to do my work.
15  Why?  Why --
16      Q.  Did you ever get a chair?
17      A.  Well, yes, I did.  I took my
18  own money, went down to Office Max, I
19  believe, and bought a chair.
20      Q.  Did you take that chair when
21  you left?
22      A.  No, I didn't.  Actually I
23  requisitioned it on a reimbursement

Page 48

1  voucher and I eventually got my money
2  back.
3      Q.  Okay.  So you bought a chair
4  and they paid you back for it?
5      A.  Right.
6      Q.  And you sat in that chair until
7  you left?
8      A.  Exactly.
9      Q.  Well, until you went --
10      A.  To the machining department.
11      Q.  Well, you were in that chair
12  until you went to the Navy.  We haven't
13  gotten back yet.  We're just in the --
14      A.  True.
15      Q.  -- assembly area.
16      A.  Right.
17      Q.  We're talking -- '96 to '03,
18  you're in the assembly area.
19      A.  Right.
20      Q.  Okay.  So you were -- upstairs
21  you were in the assembly department;
22  correct?
23      A.  Correct.

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1   Q.  Okay.  So we've got the
2   situation with this chair.  Do you know
3   how chairs were assigned to other coaches?
4   Do you have any knowledge of how they
5   selected their chairs?
6       A.  No, not to my -- I mean, I
7   think the process was --
8       Q.  Just listen to my question.  Do
9   you know?
10      A.  No.
11      Q.  Okay.  Let's move on now.
12  Anything else from that '96 to 2003 time
13  frame?
14      A.  Yes.
15      Q.  Okay.
16      A.  I've had -- well, I've seen an
17  e-mail, one of the managers that I had to
18  work with quite often said he had a
19  hard-on for me.  And I'm like, I'm not a
20  female so why you got a hard-on for me?
21      Q.  Okay.  I think you've produced
22  that e-mail.  We'll go over that.
23  Anything else in that '96 to 2003 time

Page 50

1   frame that relate to this lawsuit?
2       A.  There was a situation where I
3   had disciplinary problems with one of my
4   setups at that time and --
5       Q.  Who was the setup?
6       A.  Daniel Reeves.
7       Q.  Okay.  Go ahead.
8       A.  Okay.  I had instructed him to
9   carry out certain duties or whatnot or
10  what have you, and he flat out refused.
11  And normally, in my opinion -- well,
12  normally in Briggs, that's automatic
13  termination.  Well, I wrote the guy up and
14  it was witnessed by several other
15  employees, and Daniel Reeves is a white
16  guy.  Okay.  And mind you, he's not the
17  only person that I've ever written up or
18  had to take disciplinary actions on.  So
19  when I did do this, and because assuming
20  that he was a setup or whatever vested
21  interest that they may have had, I mean,
22  there was no question about his actions.
23      Well, the HR manager, Tim

Page 51

1   Beasley, wanted to talk to my manager and
2   question why this guy is being written up.
3   And it never was submitted or put in his
4   records.  So I'm like, you know, if that
5   had been anybody else, you know, this guy
6   would have been automatically terminated.
7   But because of the severity of it, he
8   should have been terminated.  Not only
9   that didn't happen, they didn't even enter
10  the information into his record.  So it
11  was just basically shoved under the rug.
12  And that tells me that, okay, you know,
13  yes, I'm a black guy and I'm his manager,
14  but, you know, you're only limited to
15  writing up who we desire you -- your
16  actions is limited based on what we desire
17  you to do.
18      Q.  Well, did you ever look at his
19  personnel file?
20      A.  Oh, of course I do.  I always
21  go and pull people's records and take a
22  look at --
23      Q.  You have access?  Do you

Page 52

1   know -- did you ever terminate any other
2   people other -- did you ever suggest,
3   other than Daniel Reeves, did you ever
4   suggest anyone else be fired from this '96
5   to 2003 time period?
6       A.  Nothing that sticks out in my
7   mind.  However, I'm pretty sure that
8   there's people that was terminated for
9   various reasons, whether it be
10  attendance --
11      Q.  Let me -- listen to my
12  question.  Did you ever recommend, other
13  than Daniel -- to have anyone other than
14  Daniel Reeves terminated?  It would be a
15  yes or no answer to that question.
16      A.  Not to my knowledge.
17      Q.  Okay.  Now, this would be a yes
18  or no answer to this question as well.
19  Are you aware of anyone, any other coach
20  in the assembly area that made any
21  recommendation with regard to terminating
22  an employee?
23      A.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 53

1     Q.  Who?
2         (Off the record.)
3     Q.  I was asking you what other
4   coaches within the assembly area for the
5   '96 to 2003 time period recommended
6   terminating an employee?  And you said you
7   were aware of some people and you were
8   giving me that list.  Can you identify
9   anyone other than yourself?
10    A.  I don't know.  I have to sit
11  down and think about some of those --
12  those situations because I don't remember
13  names or exact occasions, but I can.  When
14  I do, I'll give you that information.
15    Q.  But at this time you can't tell
16  me anybody?
17    A.  Right.
18    Q.  So there was -- and the only
19  situation you can tell me about, the
20  situation that relates to yourself is the
21  situation that relates to Daniel Reeves?
22    A.  That's the one that sticks out
23  of my mind because of the circumstances.

Page 54

1     Q.  And you felt that he should
2   have been fired and Tim Beasley and your
3   manager at the time disagreed with you;
4   correct?
5     A.  I felt like Tim Beasley
6   disagreed with me.
7     Q.  Who was your manager at the
8   time?
9     A.  I believe it was Doug Glass.
10    Q.  Okay.  Did Tim ever explain to
11  you why he disagreed with you?
12    A.  Tim never made any contact with
13  me about the situation at all.
14    Q.  Do you know what factors
15  influenced him, if any?
16    A.  No, I don't.
17    Q.  Okay.  So you made a
18  recommendation and the head of HR of that
19  facility disagreed with you, and that's as
20  much as you know about it?
21    A.  Yes.
22    Q.  Okay.  Any other event,
23  situation, experience from the 1996 to

Page 55

1   2003 time period that you contend relates
2   to your lawsuit here today other than the
3   four situations you've told me about?
4     A.  At this time, yeah.  If I can
5   think of any others, I'll let you guys
6   know.
7     Q.  Yeah, I think your answer --
8   let me ask it again.  I asked --
9     A.  No, sir.  No.
10    Q.  Your answer is no.  So we've
11  talked about four situations; correct?
12    A.  Yes.
13    Q.  That relate for the time period
14  1996 to 2003 --
15    A.  Correct.
16    Q.  -- that you contend relate to
17  your lawsuit here today?
18    A.  Right.
19    Q.  Okay.  And then let's move
20  forward.  When you came back in 2003 from
21  being on active duty in the military,
22  okay, you were assigned to -- now you're
23  dropped back -- you returned to Briggs,

Page 56

1   and in what capacity?
2     A.  As a supervisor on second
3   shift.
4     Q.  So we're at 2003 until
5   termination and you were a coach; correct?
6     A.  Coach, yes.
7     Q.  Supervisor, coach on the second
8   shift.  In what department?
9     A.  Machining department.
10    Q.  That would be -- that could
11  also be called the production department?
12    A.  I think -- I don't know exactly
13  what the exact terminology is, but I was
14  working --
15    Q.  Well, let's just call it the
16  machine department.
17    A.  Flywheels and crankshafts.
18    Q.  Okay.  That area, the machine,
19  flywheel area is different than the
20  assembly line; correct?
21    A.  Yes.
22    Q.  So your prior experience dealt
23  with assembling --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1    A.  Correct.
2    Q.  -- motors; correct?
3    A.  Assembly of the engines.
4    Q.  Excuse me.  Assembly of the
5  engines.  And when you came back from the
6  Navy in '03 you were machining parts to be
7  assembled; would that be fair to say?
8    A.  Correct.
9    Q.  Okay.  And what are the hours
10 of the second shift?
11   A.  From three until ten or three
12 to eleven.
13   Q.  Three to eleven.  Eight-hour
14 shift; right?
15   A.  Correct.
16   Q.  And what shift were you on in
17 the assembly area?
18   A.  First shift.
19   Q.  What is the first shift?
20   A.  First shift generally begins at
21 about seven o'clock.  However, when I did
22 start in assembly, I started on second
23 shift back in, I guess, '96 or whatever.

Page 58

1    Q.  Now, let me finish up some
2  questions here.  On the '96 to 2003 time
3  period, did you make any sort of
4  complaints to anyone at Briggs about
5  racial discrimination, any shape, fashion,
6  or form?
7    A.  I had conversations with my
8  area manager.
9    Q.  Who was that?
10   A.  Randy Petasi.
11   Q.  About the situation you've told
12 me about?
13   A.  Randy Petasi and/or Doug Glass.
14   Q.  About the situation you've told
15 me about?
16   A.  Yes.
17   Q.  Anything else?
18   A.  Not to my knowledge, unless it
19 was just on a day-to-day basis or
20 something.  But, like I said, I don't
21 remember every little instance.
22   Q.  Did Randy or Doug resolve those
23 complaints to your satisfaction?

Page 59

1    A.  No.
2    Q.  Can you be specific on what you
3  told them or what their responses were?
4    A.  Well, I guess Doug, to a
5  certain degree, gave me permission to go
6  ahead and purchase a chair.  Randy Petasi
7  eventually transferred out and on his way
8  out, he basically -- well, he told me, you
9  know, to watch -- watch your butt, watch
10 your back.
11   Q.  Did you have any further
12 discussions with him about what he meant?
13   A.  No, I didn't.
14   Q.  Now, let me mark Defendant's
15 Exhibit 2.  Tell me if that's your
16 signature.
17        (Whereupon, Defendant's
18        Exhibit 2 was marked
19        for identification.)
20   A.  (Reviewing document.)
21   Q.  Is that your signature?
22   A.  Yes, it is.
23   Q.  Okay.  Now, that's an

Page 60

1  acknowledgment of receiving an employee
2  handbook; is that right?
3    A.  Yes.
4    Q.  Did you receive an employee
5  handbook at Briggs?
6    A.  Yes.
7    Q.  Did you have an opportunity to
8  read it?
9    A.  Yes.
10   Q.  Take it with you?
11   A.  Yes.  On -- well, one of many
12 variations.
13   Q.  Right.  That's the most recent
14 one I found.  There may have been --
15 periodically they would update it or
16 change it; is that fair to say?
17   A.  Add to, take away, change.  I
18 mean, those changes was varied.
19   Q.  Were you aware of the company
20 having a nondiscrimination policy?  Do you
21 remember seeing that in the handbook?
22 Would there be posters about that, do you
23 remember anything about that?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  A.  I remember seeing the EEOC
2  poster in the -- which is required by law,
3  in the break room.
4  Q.  Right.  And there was another
5  posting in there as well.  Do you remember
6  that area?
7  A.  Yeah, that -- I don't know
8  exactly what they may have been, but, yes,
9  there was other postings in that area.
10  Q.  Okay.  Now, let's go forward
11  now from 2003 to the termination.  Who
12  were your supervisors?
13  A.  Doug Glass, or was he?  Doug
14  Glass and Robert Wesphal.
15  Q.  Now, any other supervisors?
16  A.  Temporary basis, whether it be
17  a day or so, John France.
18  Q.  Anyone else?
19  A.  I don't know.  Jeff might have
20  overseen the department, you know, during
21  vacation times.
22  Q.  But Douglas Glass and Robert
23  Wesphal remained --

Page 62

1  A.  Primary.
2  Q.  And pre-2003 to 2000, let's
3  say, your supervisors in assembly were
4  who?
5  A.  Randy Petasi.  And prior to
6  Randy, I'm not sure.  I mean --
7  Q.  Was he your most recent one
8  when you went on active duty again,
9  Petasi?
10  A.  To my knowledge, I think he
11  was --
12  Q.  Okay.
13  A.  -- the most recent one.
14  Q.  In the assembly area; correct?
15  A.  Yes.
16  Q.  Did you have any complaint or
17  problems with him as your supervisor?
18  A.  No.
19  Q.  Did you have any complaints or
20  problems with Douglas Glass as your
21  supervisor?
22  A.  I really didn't appreciate or
23  like the way that he handled the chair

Page 63

1  issue.
2  Q.  Right.  Okay.  Anything else
3  other than that?
4  A.  Maybe I didn't get all the
5  support or the training after the fact
6  looking back on the situation, you know,
7  that kind of thing.  I just felt like a
8  lot of times it was like, hey, this is
9  what we need to do, let's do it without
10  resources.
11  Q.  More kind of on-the-job
12  training then?
13  A.  No, not necessarily on-the-job
14  training.  Like I said, this is just the
15  situation like, you know, throw you in the
16  fire and say, say, hey, let's get it down,
17  let's make it happen.
18  Q.  And he supervises many areas,
19  many coaches; correct?
20  A.  I -- I don't know exactly what
21  their assignments were.  At that
22  particular time, I don't know whether we
23  had gone to a two-coach per assembly or

Page 64

1  not.
2  Q.  Oh, this is in the assembly
3  area when he was your supervisor; right?
4  A.  Right.
5  Q.  Okay.  Did you feel that he
6  trained other people more than you or just
7  that he didn't provide people training
8  generally?
9  A.  Probably they had a little bit
10  more access to resources, perhaps -- now,
11  can I identify them?  No.  But, you know,
12  we -- we still was accomplishing -- we did
13  what we had to do.
14  Q.  And this was in the assembly
15  area; correct?
16  A.  In the assembly area.
17  Q.  Okay.  Let's talk about the
18  production area, or the machine area in
19  2003 forward; okay?
20  A.  Okay.
21  Q.  And your supervisors in that
22  area were, again, Douglas Glass and Robert
23  Wesphal?

16 (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 65

```
 1      A.  I don't think Doug was ever
 2   over the machine area.
 3      Q.  Okay.  So who were your
 4   supervisors?
 5      A.  Robert Wesphal.
 6      Q.  Anyone else that you can
 7   recall?
 8      A.  On a permanent basis, that's
 9   who it was.
10      Q.  So 2003 until you left Briggs,
11   you were in the machine area; isn't that
12   right?
13      A.  Yes.
14      Q.  Okay.  And you started off on
15   the second shift, and then you moved to
16   the first shift; is that correct?
17      A.  I started out on second,
18   progressed to first.  When I came back
19   from my military duty, I was placed on
20   second shift.
21      Q.  Right.  Had you moved to the
22   machine area before you went on
23   military --
```

Page 66

```
 1      A.  No.
 2      Q.  Okay.  So when you came back
 3   from military duty in '03, that was your
 4   first time in the machine area; correct?
 5      A.  Correct.
 6      Q.  Okay.  And you started off in
 7   '03 on the second shift; correct, if you
 8   recall?
 9      A.  That I recall, yes.
10      Q.  Okay.  And when you left --
11      A.  I mean, I may have been on
12   first shift maybe like a week or so until
13   they reacclimated into the system.  But my
14   primary duties began on second shift in
15   the machining area.
16      Q.  And at some point you moved to
17   the first shift; correct?
18      A.  Yes.
19      Q.  Okay.  And Robert Wesphal was
20   your supervisor the whole time?
21      A.  To my knowledge.
22      Q.  Now, when you were in the
23   machine area, which is 2003 forward, did
```

Page 67

```
 1   you have any situations, complaints, or
 2   anything that relate to your lawsuit here
 3   today?
 4      A.  Yes.  The question that I have
 5   about that situation in retrospect is that
 6   when I went to that area, it was already a
 7   disaster, okay, and basically it was a
 8   project or basically save a sinking boat.
 9   My accomplishments was many -- many.  And,
10   okay, I was terminated because the
11   situation supposedly was relevant to my
12   performance.
13         Now, the question that I asked
14   was -- well, I was asking is, well, you've
15   got a guy already over here and this
16   situation is the situation that it is, but
17   he was allowed to move to another
18   department of lesser stress and whatever
19   the case may have been and maintain his
20   job, a white guy.
21      Q.  Who was that?
22      A.  Jim Moran.
23      Q.  Jim Moran?
```

Page 68

```
 1      A.  Jim Moran.
 2      Q.  Okay.  Just so I understand it,
 3   now, 2003 until you left the company, I
 4   understand your complaint about your
 5   termination; okay?
 6      A.  Yes.
 7      Q.  Okay.  Is there anything else
 8   that you're complaining about other than
 9   your termination during that time period?
10      A.  Perhaps -- and this is not for
11   sure, but compensation pay.  You know, I
12   don't -- don't know for sure, but I'm
13   almost certain that raises, or whatever
14   the case may have been, may or may not
15   have been applied equally or justified.
16      Q.  Those are your -- that's your
17   opinion?
18      A.  Yes.
19      Q.  Okay.  You have no evidence or
20   facts to support that, do you?
21      A.  No.
22      Q.  Now, let me talk -- let's go
23   back to your -- let's kind of walk through
```

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1  just when you returned from the military,
2  from the Navy --
3      A.  Uh-huh.
4      Q.  -- okay, in '03.  Now, you had
5  been gone about a year; is that right?
6      A.  A little over a year, a year
7  and four months or so.
8      Q.  Do you have any knowledge
9  sitting here today of what sort of
10  vacancies, if any, existed -- what
11  coaching vacancies existed in the plant
12  during that time when you came back?
13      A.  There was some terminations.
14      Q.  Right.  Do you know what sort
15  of vacancies existed in the coaching job
16  title when you returned?
17      A.  Not that I remember at this
18  time.
19      Q.  Do you know how the situation
20  was made or who made the decision to put
21  you in the machine area?
22      A.  Well, this is what I
23  understood.

Page 70

1      Q.  Well, tell me what you know --
2      A.  Okay.
3      Q.  -- if you know anything and if
4  you --
5      A.  Well, from the conversation --
6      Q.  Okay.
7      A.  -- this is what I understood.
8  That per the laws or regulations, that all
9  they had to do was retain me in my
10  position that I was or that the comparable
11  pay when I left.
12      Q.  Okay.  And is that all you know
13  about how you -- about the reason you were
14  placed back -- you were placed as a coach
15  in the machine area?
16      A.  That's all I know.
17      Q.  Okay.  I would agree that
18  there's an obligation to put you back into
19  a job and that's the job they put you back
20  in; is that fair to say, a coach in the
21  machine area?
22      A.  Well, that's -- that's what I
23  was told.

Page 71

1      Q.  Okay.  That's what you were
2  told.  Do you have any information to
3  believe that what you were told was not
4  true?
5      A.  No.
6      Q.  Okay.  So you come back and put
7  in the machine area as a coach.  When you
8  came back, was Jim Moran in that job and
9  he moved?
10      A.  Yes, he was in that job.
11      Q.  Okay.  Where did he move?
12      A.  I believe he moved to the
13  blower housing area.
14      Q.  Was Jim Moran white or black?
15      A.  Jim Moran is a white guy.
16      Q.  Was he a coach?
17      A.  Yes.
18      Q.  Do you know the reason he was
19  moved?
20      A.  No.
21      Q.  Do you know who made the
22  decision to move him?
23      A.  No.

Page 72

1      Q.  Was he moved contemporaneous or
2  at the same time as when you returned or
3  was it done before you returned?
4      A.  It was done after I returned.
5      Q.  Okay.  So he was one of -- how
6  many coaches are there in the machine
7  area?
8      A.  Plantwide?
9      Q.  No.  In the machine area, in
10  the flywheel area, how many coaches are
11  there?
12      A.  At that particular time, three.
13      Q.  Okay.
14      A.  One per shift.
15      Q.  Okay.  So you come back in '03
16  to be a coach in the machine area, in the
17  flywheel area, and you were a coach.  Who
18  were the other two coaches?  You were a
19  coach on the second shift.  So then
20  there's first and third.  Who was the
21  coach on the first, if you know?
22      A.  I don't remember.
23      Q.  Okay.  Now, who was the coach

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 73 |
|---|

1  on the third?
2    A.  Golly, James, James, James -- I
3  don't remember James' last name.
4    Q.  Okay.  And then at some point
5  in time you moved to the first shift; do
6  you remember that?
7    A.  Yes.
8    Q.  Okay.  At the time you moved to
9  first shift, who was the coach -- if you
10  can remember, who was the coach on the
11  second shift?
12    A.  It may have been Michelle
13  Presley.
14    Q.  Michelle Presley?
15    A.  Yes.
16    Q.  Is she black or white?
17    A.  Black.
18    Q.  Okay.  And how about third
19  shift?
20    A.  The guy?
21    Q.  Whoever the coach was.
22    A.  James, he's a white guy.
23    Q.  James somebody?

| Page 74 |
|---|

1    A.  James, James --
2    Q.  So James was on third, you were
3  on first, Michelle was on second, to the
4  best of your recollection?
5    A.  That's correct.
6    Q.  Now, at the time you were
7  terminated, you were on first.  Who was on
8  second and who was on third, to the best
9  of your recollection?
10    A.  I know the guys, but --
11    Q.  Well, let's see.  Was Michelle
12  still on second?
13    A.  Not in that department.
14    Q.  She had moved out --
15    A.  To another machine department
16  area.
17    Q.  Okay.  She was not in flywheel
18  anymore?
19    A.  No.  I don't remember the guys'
20  names.
21    Q.  So you don't know who the other
22  coach -- area --
23    A.  Well, I know, but I don't

| Page 75 |
|---|

1  remember the names.
2    Q.  Now, where did Jim Moran fit in
3  here?  What shift did he work?
4    A.  Jim Moran was working first
5  shift.
6    Q.  Okay.  So would it be possible
7  that when you moved to first, he moved to
8  the other area?
9    A.  Yes.
10    Q.  Okay.  Was James white or
11  black?
12    A.  White.
13    Q.  Okay.  And Robert is the area
14  coach.  Was he just over flywheel or over
15  the whole machine area?
16    A.  I don't know all of his
17  responsibilities.
18    Q.  Okay.
19    A.  I don't even know.
20    Q.  He was your direct supervisor?
21    A.  Right.
22    Q.  Okay.  Now, during your
23  employment as -- in the assembly area,

| Page 76 |
|---|

1  okay, we're going back to the assembly
2  area.  Do you remember being talked to
3  about -- were you ever talked to about how
4  you managed people?  Do you recall any
5  conversations about that?
6    A.  From who?
7    Q.  From anyone, just about being a
8  manager and what things to do and perhaps
9  being firm with people, just some
10  leadership-type skills or conversations.
11  Do you remember anyone having those with
12  you?
13    A.  I -- no, I -- no.  No.  I
14  remember sitting down and having
15  conversations perhaps with Randy as to how
16  he would like to see things done.
17    Q.  Okay.
18    A.  Or where he would like to see
19  things go and perhaps maybe establish some
20  goals and objectives.
21    Q.  Now, tell me about the flywheel
22  area, what you did there.  Describe how
23  that area ran and what its purpose was

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1  just for someone that doesn't know
2  anything about engines.
3      A.  Basically you get somewhat of a
4  piece of raw material that is in the shape
5  of a flywheel and it is put through
6  various cycles to achieve, you know,
7  various specifications that are called out
8  and that can be quite rigorous -- I mean,
9  vigorous.  And basically you take a piece
10  of metal that's in the form or a shape of
11  a flywheel, raw material, place it in the
12  machine, and the machine cuts it to the
13  specifications, or it's supposed to.
14      Q.  Are there production goals --
15      A.  Of course.
16      Q.  -- for each shift?
17      A.  Yes.
18      Q.  What would an average
19  production goal be?
20      A.  The average production goal is
21  based on the requirements of the assembly
22  line.  I can remember it once being maybe
23  three hundred, five hundred, sometimes

1  eight hundred, depending on what the
2  production line requirements were.
3      Q.  Okay.  So we've got this.  I'm
4  just trying to kind of go -- start big and
5  go down.  So we've got a general goal of
6  producing a certain number of flywheels
7  each shift --
8      A.  Correct.
9      Q.  -- would that be fair to say?
10      A.  Uh-huh.
11      Q.  Okay.  Now, included in that
12  general goal is you want all the flywheels
13  to be produced safely; correct?  I mean,
14  isn't that -- they wouldn't want anything
15  going out -- a flywheel going out with any
16  defects in it; is that fair to say?
17      MS. BATTLE-HODGE:  I'm just
18  going to -- your form of your question,
19  I'm just going to object to the form.  He
20  can answer it.
21      MR. DAVIS:  If he doesn't
22  understand it, that's fine.
23      MS. BATTLE-HODGE:  Maybe if you

1  could rephrase it, the question.
2      Q.  Sure.  I mean, you have a goal;
3  correct?
4      A.  Correct.
5      Q.  And --
6      A.  The goal consists of --
7      Q.  They want you to produce safe
8  flywheels; isn't that fair to say?
9      A.  Of course.
10      Q.  Okay.  Was there any emphasis
11  on just meeting production only and not
12  worrying about the safety of the
13  flywheels?
14      A.  No -- I mean, no.
15      Q.  Okay.  And flywheels are made
16  up of various parts; is that right?
17      A.  Yes.
18      Q.  And those are machined in the
19  area?
20      A.  Flywheels are machined in the
21  area.  You have some manufactured parts
22  that goes onto the flywheel to make it a
23  completed part.

1      Q.  Right.  And are you -- tell me
2  the process of -- there are weights and --
3  and I'm not an expert on this.
4      MS. BATTLE-HODGE:  Oh, no, no.
5  No.  You're fine.
6      Q.  That's why I'm asking.  There
7  are weights and balances on the flywheel
8  that you machine; is that right?
9      A.  Well, the process includes
10  like, say, cutting away of excess
11  materials to bring the piece of material
12  or flywheel within specs, whether it be
13  the diameter, the balance of, or the
14  perpendicularity, centering it.  It --
15  it -- there is two, three pages of checks.
16      Q.  But there are parts that are
17  put on the flywheel that make it a
18  complete flywheel; isn't that right?
19      A.  There is a magnet placed on
20  there.
21      Q.  Right.
22      A.  And there's a fan.
23      Q.  Okay.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1    A.  A plastic fan.
2    Q.  So those are parts; right?
3    A.  Correct.
4    Q.  Okay.  And you're supposed to
5  keep track of where those parts are in the
6  production in the machining of the
7  flywheel?
8    A.  I'm -- I'm not sure what you're
9  asking.
10    Q.  Well, are you supposed to have
11  unidentified parts in your work area, in
12  the cell?
13    A.  Of course not.
14    Q.  Okay.  Now, you put the magnets
15  on the flywheel; right?
16    A.  Yes.
17    Q.  Okay.  And there's some -- tell
18  me the process of tracking or keeping
19  track of all the magnets, let's say,
20  throughout the process.  What would you
21  do?
22    A.  There was no tracking process.
23  They was poured into a container and the

Page 82

1  operator would take them and put them on
2  the flywheel.  So as far as tracking them,
3  whether there was a serial number or
4  something like that, quantity --
5    Q.  Have you ever heard of the term
6  "unidentified parts"?
7    A.  Yes.
8    Q.  Okay.  What does that mean to
9  you?
10    A.  Unidentified part means that
11  there's a part that -- let's just say this
12  was a bolt.
13    Q.  A can of Sprite.
14    A.  Right, whatever the case may
15  be.  That particular part has a part
16  number.  Okay.  If it's not in a container
17  that has that part number on it, or
18  whether it's in any kind of way labeled
19  letting you know that, okay, this is that
20  particular part, then that's what is
21  considered an unidentified part.
22    Q.  In addition to Robert Wesphal,
23  do you remember John France --

Page 83

1    A.  Yes.
2    Q.  -- working with you?
3    A.  On one occasion.
4    Q.  Do you remember Jeff Gargas
5  working with you?
6    A.  Vaguely.  You know, like I
7  said, those guys was temporary or for a
8  very short term.
9    Q.  Okay.  Do you have any
10  complaints or criticisms of John France?
11    A.  Absolutely.
12    Q.  You do?  Okay.  How about Jeff
13  Gargas?
14    A.  No.  No, not that I can think
15  of.  I mean, in working with Jeff, you
16  know -- I don't know.
17    Q.  You didn't have a problem with
18  him?
19    A.  That's -- that's all I was
20  required to maintain was a working
21  relationship.
22    Q.  How about Robert Wesphal, did
23  you have any problems with his leadership,

Page 84

1  his management towards you?
2    A.  I -- looking back on the
3  situation, it appears that he was all part
4  of the master plan, so, yes.
5    Q.  Okay.  Well, let's talk about
6  John France.  What problems, complaints do
7  you have about him as they relate to your
8  lawsuit here today?
9    A.  I remember distinctly, and the
10  reason I make that statement is because of
11  this one particular situation.  Robert,
12  for whatever reason, wasn't there that day
13  I had to leave or whatever.  And the
14  climate on that assembly line or pretty
15  much any department out there changes
16  constantly.  You don't never know what may
17  or may not go wrong.
18    But, anyway, John France was
19  assigned to another department, okay, and
20  just for reporting purposes, if anything
21  went wrong, at least that's what I was
22  told, that, you know, you go see John.
23  Nothing went wrong.  Well, evidently

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 85

1  something came down from upstairs. They
2  wanted to change over, or I don't remember
3  what the circumstance was.
4          But, anyway, this was a guy
5  that was not working in that particular
6  department at that time, came over and
7  insisted an order without sitting down
8  with me to make a change on my line. And
9  I'm like, you know, that's not the best
10  thing to do. And we disagreed. I said,
11  well, okay, if that's what you want to do,
12  then you can kind of -- because I didn't
13  agree. I wasn't going to have my
14  signature on his actions. So I said,
15  well, you know, you can go ahead and do
16  what you're going to do. You know, you're
17  assigned to this department this
18  particular day. And instead of him
19  saying, well, okay, I'll go out here and
20  whatever the case may be, because
21  basically, in my opinion, he was forcing
22  me to put my signature on something that I
23  didn't agree with. No, you do it. I told

Page 86

1  y'all I don't agree with that so I'm not
2  going to do that. I said it's not going
3  to hurt you to walk down there and tell
4  those people what you want them to do.
5  No, you either do it or you resign. I'm
6  like, where did that come from?
7          So I brought it up to Harold
8  Smith, the plant manager, of course. And,
9  you know, I told him about the situation.
10  He just shook his head. So of course we
11  sit down, me and him and John, and for
12  whatever reason I don't -- I didn't get
13  any satisfaction out of that meeting
14  either. Basically --
15      Q.  What year was that?
16      A.  I don't remember.
17      Q.  Any other complaint or
18  criticism or issue with John France as it
19  relates to your lawsuit here today?
20      A.  Not that I remember. Nothing
21  at this time.
22      Q.  How about Robert Wesphal?
23      A.  Like I say, I think it was a

Page 87

1  premeditated act as far as my termination
2  was concerned. And --
3      Q.  Anything -- we'll get to that.
4  Anything specific?
5      A.  No.
6      Q.  How about Harold Smith,
7  anything specific towards him?
8      A.  No.
9      Q.  Okay. We'll get to Robert.
10  Now, on a day-to-day basis, it was
11  Robert -- let's kind of go towards --
12  Robert got there, as I understand it, in
13  the middle of 2004.
14      A.  I don't know.
15      Q.  Do you have any reason to
16  dispute that?
17      A.  Like I said -- no, I don't. I
18  don't know.
19      Q.  I mean, when you came back from
20  the Navy, he wasn't your supervisor;
21  correct?
22      A.  He was or was not?
23      Q.  Was not, or do you know?

Page 88

1      A.  He was.
2      Q.  He was? Okay. On a day-to-day
3  basis, did Robert direct you what to do or
4  counsel you?
5      A.  No. I required little or no
6  supervision.
7      Q.  But he was your -- to the
8  extent you had any questions or anything,
9  he was your direct supervisor?
10      A.  Correct.
11      Q.  How many team members did you
12  supervise?
13      A.  During what particular time
14  frame?
15      Q.  As the coach in the flywheel
16  area, approximately.
17      A.  Approximately thirty, forty,
18  maybe even more.
19      Q.  Do you ever supervise -- how
20  many people do you supervise in the
21  assembly area?
22      A.  When the plant first started,
23  when I first was on second shift, as many

# FREEDOM COURT REPORTING

Page 89

1  as a hundred and thirty-five people, which
2  included permanent and temporary
3  employees.
4      Q.  Okay.  But in the -- moving to
5  the flywheel area, you supervised about
6  forty?
7      A.  Roughly.  Like I said, I can't
8  be specific.
9      Q.  Okay.  Do you remember Robert
10 discussing with you or having any problems
11 with your production, the number of
12 flywheels coming out of your area?
13     A.  No.  No.  Like I say, we may
14 have sat down as a unit, meaning the three
15 supervisors, and the production was based
16 on that area, not necessarily singled out
17 shifts.  As a matter of fact, my area or
18 my shift was one of the better above or
19 average production.  And to even amplify
20 that even more, the quality was head and
21 shoulders above the other two shifts.
22     Q.  So do you have any recollection
23 of Robert Wesphal talking to you about

Page 90

1  not -- there not being enough production
2  in your department --
3      A.  Not on --
4      Q.  -- to meet the assembly line
5  requirements?
6      A.  Not on an individual basis.
7      Q.  On a general -- on a --
8      A.  No, not on an individual basis.
9      Q.  How about on any basis
10 whatsoever?
11     A.  Like I say, we would have
12 coaches meetings and we would discuss
13 production requirements and needs and what
14 we needed to do to try to reach those
15 goals, but, no, not on an individual
16 basis.
17     Q.  But as part of a -- you and two
18 other coaches, the first and the second
19 and third-shift coaches --
20     A.  We have had production
21 meetings, yes.
22     Q.  Do you recall any meetings with
23 Robert or any conversations whatsoever

Page 91

1  about there being unidentified baskets or
2  unidentified parts in your cell?
3      A.  Perhaps.  Well --
4      Q.  Would that be a, yes, you
5  recall them talking to you about that?
6      A.  No.  No.  No.  And, like I say,
7  once again, all of these discrepancies or
8  whatever were discussed on a departmental
9  level.  Okay.  This is -- because a basket
10 doesn't only exist on first shift, it
11 exists on all three shifts.
12     Q.  Okay.  But at some level, he
13 discussed those with you; would that be
14 fair to say?
15     A.  He discussed it with the
16 coaches.
17     Q.  With the coach, right.  And you
18 were one of three coaches; correct?
19     A.  I was one of three coaches.
20     Q.  There was one other
21 African-American coach at that time; is
22 that correct, during -- at some point
23 during the time, Michelle you indicated?

Page 92

1      A.  Michelle -- Michelle works --
2  Michelle was on second shift.
3      Q.  Right.  She was -- Michelle
4  Presley, you told me earlier --
5      A.  Uh-huh.
6      Q.  -- was a second-shift coach in
7  the flywheel area.
8      A.  Right.  And --
9      Q.  Would she have been at one of
10 those meetings?
11     A.  I would assume so.
12     Q.  Okay.
13     A.  But, see, the time frames that
14 these -- these -- and I guess I can't
15 expect you to understand, but you get a
16 lot of shifting of coaches and
17 responsibilities and they fall under
18 different jurisdictionsas far as area
19 managers, which would be their immediate
20 bosses.  So the confusing aspect of it to
21 me is the time frames as well as who was
22 under whose management during that
23 particular time.  So that's why I cannot

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 93

1  be --
2      Q.  You don't know whether she was
3  there or not.  That's one of the reasons I
4  asked you earlier on to list me the
5  coaches at various points in time.
6      A.  Well, if -- if -- during that
7  time frame that she was assigned to that
8  particular department, yes, she would
9  be -- she would have been in those
10  meetings.
11      Q.  Well, how about this, why don't
12  you tell me -- we've got first shift,
13  second shift, third shift.  Tell me every
14  coach that you recall working in the
15  flywheel area at any point in time at any
16  shift other than yourself.
17      A.  Jackie -- what's Jackie's last
18  name?
19      Q.  Jackie somebody.  We already
20  talked about Michelle.
21      A.  Uh-huh.
22      Q.  We talked about James.  Do we
23  know James --

Page 94

1      A.  And the guy on second shift.
2  At once upon a time, James Ashton has
3  worked there.
4      Q.  And we've got Michelle.
5  Jackie, was she black or white?
6      A.  Jackie is a guy.
7      Q.  Jackie black or white?
8      A.  He's a white guy.
9      Q.  Okay.  Michelle we know is
10  black.  James Ashton, black or white?
11      A.  He's a white guy.
12      Q.  Okay.
13      A.  And, dang, there was another
14  guy on third shift.  Man, I don't know --
15  I remember those guys.  I remember faces
16  but not names.
17      Q.  Those are all you can remember?
18      A.  Namewise, yes.
19      Q.  Okay.  But if you were in the
20  flywheel area as a coach from 2003 until
21  you left, you generally would have
22  reported to Robert Wesphal; would that be
23  right?

Page 95

1      A.  Yes.
2      Q.  Okay.  So if he's having
3  conversations with all the coaches about
4  production and he was having them with
5  you, if Michelle or James or Jackie were
6  coaches at the time, they would most
7  likely be in those meetings; right?
8      A.  More than likely.
9      Q.  Okay.  Let me show you
10  something here.  And you would agree with
11  me as part of those general meetings with
12  the various coaches from the other shifts,
13  that there were conversations about
14  production; right?
15      A.  Yes.
16      Q.  There were conversations about
17  unidentified parts; right?
18      A.  Possibly, yes.
19      Q.  And there were conversations
20  about baskets of parts?
21      A.  Along with probably a million
22  other things.
23      Q.  Right.  And those issues were

Page 96

1  discussed.  Okay.
2          (Whereupon, Defendant's
3          Exhibit 3 was marked
4          for identification.)
5      Q.  I'll show you what I've marked
6  as Defendant's Exhibit 3.  This is a
7  letter from the EEOC to you care of your
8  lawyer.  Did you ever see this letter?
9      A.  No.
10      Q.  Okay.
11      A.  I never in my life seen this.
12      Q.  Okay.
13          MS. BATTLE-HODGE:  I don't
14  think I've seen this.
15      Q.  Well, let's walk through this.
16  This is -- I'll represent this is a letter
17  from the EEOC to your lawyer and their
18  conclusions with regard to your charge of
19  discrimination, okay, and we'll go through
20  these points.
21          Number one, it says it is
22  undisputed that you were hired in early
23  '96.  Do you have any reason to dispute

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 97

1 number one?
2   A. No.
3   Q. Okay. Number two, do you have
4 any reason to dispute that, their
5 conclusions with regard to number two?
6   A. No.
7   Q. Okay. Number three, do you
8 have any reasons to dispute that?
9   A. Yes.
10   Q. Okay. What do you disagree
11 with?
12   A. I was never counseled.
13   Q. You deny being counseled?
14   A. On an individual basis.
15   Q. Now, it doesn't say individual
16 basis. It says you were counseled. I
17 mean, it doesn't say you were counseled
18 individually. It just says you were
19 counseled. If Robert or someone else
20 testified that they met with the group on
21 those dates, would you have any reason to
22 disagree with that?
23   A. Oh, yes.

Page 98

1   Q. You would?
2   A. I don't -- I don't remember
3 being counseled, talked to, or signed any
4 documentation saying that I was counseled.
5   Q. I understand that. But
6 could -- do you have any reason -- if
7 other people, other coaches on the other
8 shifts -- if you had a group meeting on
9 those dates, and talked to you in addition
10 talking to two other folks collectively,
11 would you have any reason to dispute that?
12   A. I'm sorry. Say that again.
13   Q. I mean, if he talked to the
14 group about these things on -- Robert or
15 anyone else, on November the 15th or
16 sometime about these issues, would you
17 have any reason to dispute that?
18   A. Well, the thing about it is, I
19 don't even know whether these dates are
20 correct or any counseling took place. I
21 have no way, no documentation, other than
22 their assumptions here.
23   Q. I mean, if the company had

Page 99

1 documentations, you don't have any
2 documents to refute that, do you?
3   A. If he can show me where I had
4 signed documentations where I had been
5 counseled, then I would say, yes, that it
6 took place.
7   Q. But if Robert, let's say he
8 kept notes or kept records, would you have
9 any reason to dispute that?
10   A. Depending on what his motives
11 are.
12   Q. Do you have any reason to
13 believe that Robert would make up dates or
14 put dates --
15   A. Well, I don't know whether or
16 not he made up dates, but I think perhaps
17 he may have discriminated against whatever
18 practices took place. Because, like I
19 said, it was a three-shift operation and
20 it was very difficult to single out an
21 individual, so --
22   Q. Let's go to number four. Do
23 you have any reason to disagree with that?

Page 100

1   MS. BATTLE-HODGE: May I
2 interject here, if that's okay?
3   MR. DAVIS: Well, you can ask
4 him questions when we're finished or
5 something.
6   MS. BATTLE-HODGE: No. I just
7 want to make a statement. I don't want to
8 ask a question.
9   MR. DAVIS: I mean --
10   MS. BATTLE-HODGE: Because --
11 okay. I'll wait.
12   MR. DAVIS: Sure. Why don't
13 you just wait until you can ask him
14 questions.
15   MS. BATTLE-HODGE: Well, I want
16 to make a statement. I don't want to --
17   MR. DAVIS: Okay.
18   MS. BATTLE-HODGE: -- ask a
19 question. I just want to, for the record,
20 say that I did not receive this document.
21 The address is not correct. That's all I
22 wanted to say. He can still answer.
23   MR. DAVIS: That's fine. I'm

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1  not asking him about --
2       MS. BATTLE-HODGE: No -- no, I
3  know. I understand what you're saying. I
4  just wanted to make that statement --
5       MR. DAVIS: Okay. That's fine.
6       MS. BATTLE-HODGE: -- that we
7  didn't receive this.
8       MR. DAVIS: Sure.
9       Q. Let's look at number four.
10      A. Uh-huh.
11      Q. Do you remember -- do you have
12  any disagreements with number four?
13      A. I don't remember having --
14  well, okay, yes. He asked about what we
15  could do to improve.
16      Q. Okay.
17      A. Now, standard of performance,
18  no.
19      Q. Well, do you remember comparing
20  a list of some sort?
21      A. Yes.
22      (Whereupon, Defendant's
23      Exhibit 4 was marked

Page 102

1       for identification.)
2       Q. Okay. And let me show you what
3  I've marked as Defendant's Exhibit 4. Is
4  that your handwriting?
5       A. Yes, it is.
6       Q. And I know the copy is not
7  great, but it looks to be a hundred and
8  twenty-seven items. You can count them
9  off, but I think -- look through there and
10  tell me if any of those points or items
11  are not in your handwriting.
12      A. (Reviewing document.) It
13  appears that everything is in my
14  handwriting.
15      Q. Who asked you to do this,
16  prepare it, to prepare Defendant's Exhibit
17  Number 4?
18      A. I'm assuming -- well, Robert
19  Wesphal.
20      Q. Do you know if anybody asked
21  anyone else to do those?
22      A. Not to my knowledge.
23      Q. Where were you when he asked

Page 103

1  you to do this?
2       A. Probably in his office space --
3  I don't -- probably out on the floor. I
4  don't know. I don't remember.
5       Q. You don't know? Tell me
6  everything you can remember about the
7  conversation when he asked you to prepare
8  this list.
9       A. Normally when stuff like this
10  happens and, like I said, I don't know
11  exactly this particular conversation, but
12  Harold Smith probably has, you know,
13  crawled up his butt and turned sideways.
14  Then what they'll do is come out on the
15  floor trying to justify their actions or
16  try to give him a satisfactory answer as
17  to what he wants done. So this probably
18  was part of that task.
19      Q. Well, I appreciate what you're
20  telling me, but I need -- my question was
21  what did he say to you and what was said,
22  if you can remember by Robert Wesphal to
23  you?

Page 104

1       A. Verbatim, I don't remember.
2       Q. Okay. Generally can you tell
3  me what he said when -- how did this list
4  come about?
5       A. Well, like I said, chances are
6  there was some dissatisfaction about how
7  that department was being ran. So he come
8  to me and asked me what can we do to
9  improve it.
10      Q. Okay. Do you believe the fact
11  that there were all these problems with
12  that department that you just identified
13  reflected poorly on your job performance?
14      A. Any time you've got
15  unidentified objects, parts, this much
16  junk laying around, that's not a safe nor
17  a productive environment to be in if --
18      Q. Did the items on this list
19  occur during your shift?
20      A. Oh, absolutely not. There
21  ain't no way in the world. This is an
22  accumulation. Okay. This -- I mean, this
23  is not a one-day operation.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1     Q.   Correct. But this is -- let's
2 just start with -- one of the items says
3 workbench has junk parts underneath top.
4 Are you telling me that that never
5 occurred on your shift?
6     A.   It probably did, but I'm
7 certain that it -- that wasn't the only
8 time that it has occurred and not only on
9 my shift.
10     Q.   Well, I guess my question
11 relates -- did these items -- you worked
12 your shift and you left; right?
13     A.   Correct.
14     Q.   And you came over before your
15 shift had started; right?
16     A.   Yes.
17     Q.   So your experience, work
18 experiences were based upon your
19 perceptions, your work during your shift;
20 right?
21     A.   Okay. Explain.
22     Q.   Well, I mean, you weren't
23 present when other -- you weren't

Page 106

1 present -- when you worked first shift,
2 you weren't around the second shift?
3     A.   In situations you don't have to
4 be present to see the --
5     Q.   Just listen to --
6     A.   -- the outcome.
7     Q.   -- my question. You weren't
8 around on the second shift; right?
9     A.   On occasions that's happened.
10     Q.   On occasions.
11     A.   Yeah.
12     Q.   But generally you worked your
13 shift and left; that's what you just told
14 me.
15     A.   Generally.
16     Q.   Okay. So in developing this
17 list, would it be fair to say that this
18 list was based on your experiences on your
19 own shift?
20     A.   No.
21     Q.   It wasn't?
22     A.   This is -- this is just -- I
23 mean, you can actually see these things.

Page 107

1     Q.   Right.
2     A.   And these are things that has
3 accumulated. I mean, just to kind of give
4 you a perception, there were some things
5 that I identified and I'm almost certain
6 that I didn't identify all of it that was
7 even in this department before I took it
8 over, because these -- some of the parts
9 that was found was no longer being used in
10 the department.
11     Q.   And you identified that based
12 on your experience working on your shift.
13     A.   Right. Right. The things that
14 I -- that's required that goes on, that
15 should or maybe should not be there. And
16 a lot of times you would attempt to try to
17 correct a lot of this. But if everybody's
18 not on the same accord --
19     Q.   What do you -- tell me what you
20 mean by that.
21     A.   Well, identifying baskets.
22 Everybody is required to identify baskets,
23 you know, so -- and -- and that's great.

Page 108

1 Because let's just say that there is an
2 unidentified basket there and I walk in
3 and I see it. Well, I can't identify it
4 simply because I don't know what it is.
5 So, yes, it's going to sit there.
6     Q.   On your shift as well; correct?
7     A.   If I don't -- if my shift did
8 not initiate the basket, then there's no
9 way I can identify it.
10     Q.   So sitting here today, you're
11 being truthful in your testimony when
12 you're telling me that your supervisor
13 comes to you and asks you to list a
14 hundred -- asked you to list all the
15 deficiencies --
16     A.   Uh-huh.
17     Q.   -- in your area, and you don't
18 view this as a negative as it relates to
19 your own job performance?
20     A.   No.
21     Q.   You don't view this
22 whatsoever --
23     A.   No. Because when he came to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 109

1  me, it was asked, what can we do, and I
2  took it that it was based on my work
3  experience and my knowledge and what we
4  needed to do to improve in that area.
5      Q.  Okay.
6      A.  That's what it was based on,
7  not things that were just wrong.
8      Q.  Were you ever counseled or
9  talked to individually or as a group about
10  communicating better with management about
11  production schedules?
12     A.  Maybe.  Maybe.  I don't know.
13  Like I said, there's -- the conditions in
14  that production area changes every thirty
15  minutes.  So if there's some changes that
16  has to be made, like I say, things come
17  down, you find out that you don't have
18  certain parts or there may be a change in
19  schedule or shipping, but --
20     Q.  But my question, and I think
21  you've answered it affirmatively, is that
22  you do recall being talked to individually
23  or collectively about communicating better

Page 110

1  with regard to production schedules;
2  right?
3      A.  I've had discussions.
4      Q.  Okay.  Now, number six, it says
5  respondent, which is Briggs, discharged
6  you on December 10th, 2004 due to
7  substandard job performance.  Is that what
8  you were told?
9      A.  I was told that -- yeah, job
10  performance.
11     Q.  Were you aware that they had
12  also let three other coaches or
13  supervisors go for that same reason?
14     A.  I don't know whether they was
15  the same reason, but they wasn't
16  terminated -- and like I say, I don't see
17  that there's any proof of my performance
18  being substandard, and they was not
19  terminated and replaced with a white guy
20  and then promoted.
21     Q.  All right.  And we'll get to
22  that.  And that's number eight.  Number
23  eight, you contend that Mr. Milby was

Page 111

1  promoted?
2      A.  Is his job title now production
3  supervisor?
4      Q.  Well, I think I get to ask the
5  questions.
6          MS. BATTLE-HODGE:  That's
7  right, he asks the questions.  May we
8  take --
9          MR. DAVIS:  Sure.  Oh, sure.
10         MS. BATTLE-HODGE:  -- just a
11  short break to get some water?
12         MR. DAVIS:  Okay.  Sure.
13         (Whereupon, a short break was
14         taken.)
15     Q.  (BY MR. DAVIS:)  All right.
16  Mr. Tolbert, you were telling me about Mr.
17  Milby.
18         MS. BATTLE-HODGE:  May I make a
19  statement just for the record, if it's
20  okay?
21         MR. DAVIS:  No.  Why don't you
22  ask him afterwards.  That's what I was
23  referring to.  It's kind of distracting.

Page 112

1  There's nothing in the rules, with all due
2  respect, that allows --
3          MS. BATTLE-HODGE:  No, I'm --
4          MR. DAVIS:  -- you to make a
5  statement.  But you can clear anything up,
6  you know --
7          MS. BATTLE-HODGE:  Okay.  I'll
8  just wait.
9      Q.  You were telling me about Mr.
10  Milby as we were -- this is number eight.
11  Tell me -- you contend that Mr. Milby was
12  promoted after you left.  What do you base
13  that on?
14     A.  Conversation.  I mean, talks
15  that -- basically just people in talking
16  to after -- you know, that I may have run
17  into at Wal-Mart or whatever.
18     Q.  So you don't have any personal
19  knowledge if he was promoted, do you?
20     A.  No.
21     Q.  Okay.  And have you seen his
22  personnel records?
23     A.  No.

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1    Q.   Who at Wal-Mart or wherever
2   told you he was promoted?
3    A.   I don't remember.
4    Q.   Okay.  Do you have any personal
5   knowledge that Mr. Milby was promoted?
6    A.   Personal, no.
7    Q.   It says here, if you look, that
8   Mr. Milby, which is who they're referring
9   to in paragraph eight, was hired as a
10  production supervisor at a Grade 11.  Do
11  you know if that's true or not?
12   A.   No, I don't.
13   Q.   Do you have any reason to
14  dispute that --
15   A.   No.
16   Q.   -- what the EEOC says?
17   A.   No.
18   Q.   Okay.  I'm done with this.
19       Now, when you were terminated,
20  tell me about that meeting.  You can't
21  mark on that.  I'm sorry.  That's the
22  trial exhibit.
23   A.   Okay.

Page 114

1       MS. BATTLE-HODGE:  You can use
2   mine if you need to.
3    Q.   Go ahead.  You can make any
4   mark you want.
5       MS. BATTLE-HODGE:  You can just
6   wait.  He'll just ask you questions.
7       THE DEPONENT:  Okay.
8    Q.   Okay.  You were terminated I
9   have in December of 2004; does that sound
10  right?
11   A.   Yes.
12   Q.   Okay.  What happened when you
13  were terminated?
14   A.   During the termination session?
15   Q.   Yes.  How did it come about?
16  What happened during the meeting and so
17  forth?
18   A.   I was called into a room where
19  Tim Beasley and Robert Wesphal were
20  sitting and basically Tim led off by
21  saying, well, we're going to have to let
22  you go.  I mean, verbatim I don't know
23  exactly what was said quote, but to the

Page 115

1   effect that -- then he went into this
2   little spiel of trying to soften it up.
3   And Robert interjected and said, well, you
4   know, the reason we're letting you go is
5   because of your performance.  And I said,
6   what?  And he was -- he said, as a matter
7   of fact, the straw that broke the camel's
8   back was the flywheel that was laying in
9   the area as you was making reference to
10  earlier, was the straw that broke the
11  camel's back.
12      And, you know, I started to
13  explain that, but, you know, it was
14  already predetermined that that situation
15  had been rehearsed or whatever.  But those
16  flywheels that he was referring to didn't
17  come from my shift.  One way of trying to
18  resolve some of the problems that you see
19  here was we went to -- well, there was
20  already a color code based on the shift
21  and the flywheel that was laying there was
22  not from my shift.  They was from previous
23  shifts.  But that was supposed to be the

Page 116

1   straw that broke the camel's back.  Well,
2   hell, I didn't even put the flywheel
3   there.  They were there when I -- as a
4   matter of fact, it was like seven, eight
5   o'clock in the morning, so the flywheel
6   was already there.
7    Q.   You did not tell them that,
8   explain that to them in the meeting?
9    A.   What is the use?  I mean, they
10  called me in and the first thing they said
11  to me --
12   Q.   Listen to my question.
13   A.   No.  No, I didn't.
14   Q.   But based on what you're
15  telling me, tell me if you agree with
16  this, Robert believed that your
17  performance was not up to standard.  Do
18  you have any reason to disagree with that?
19   A.   What Robert believe?
20   Q.   Yes.
21   A.   I can't attest to what Robert
22  believe.
23   Q.   Okay.  You don't know?

29 (Pages 113 to 116)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 117

1    A.  I don't know.
2    Q.  But based on what he was
3  telling you, you would surmise or, would
4  you --
5    A.  No, I wouldn't.
6    Q.  They were both telling you that
7  your performance was substandard?
8    A.  Okay.  Now, that's what Robert
9  said.
10    Q.  Right.
11    A.  Yes.
12    Q.  Okay.  Did either Tim or Robert
13  say anything about your race at that
14  meeting?
15    A.  No.
16    Q.  Okay.  Their conversations were
17  limited to your poor job performance;
18  correct?
19    A.  That's all it was basically.
20    Q.  Okay.  Now, after you left
21  there, did you -- tell me what happened
22  next.  They terminated you for poor job
23  performance.  Did you have time to get

Page 118

1  your belongings?
2    A.  Not all.  I got a couple of
3  items out of my locker and I left.
4    Q.  And you left.  And what did you
5  do?  Who did go talk to first?
6    A.  While on the premises or once I
7  left?
8    Q.  After you left that room --
9    A.  I don't know.
10    Q.  -- who was the next person you
11  talked to?
12    A.  I don't remember.
13    Q.  On or off the premises?
14    A.  I don't remember.
15    Q.  Who was the first person you
16  told that you had been fired from Briggs &
17  Stratton?
18    A.  I don't remember.
19    Q.  Well, you were living with your
20  mother and your sister at the time;
21  correct?
22    A.  I do not remember.
23    Q.  Where did you go?

Page 119

1    A.  I don't know.  Probably home,
2  but I don't remember.
3    Q.  What did you tell your mother
4  or your sister or anyone about the reason
5  you were no longer working for Briggs &
6  Stratton?
7    A.  I didn't.
8    Q.  Have you to this day told them?
9    A.  No.
10    Q.  Told anyone that you were
11  fired?
12    A.  Well, yes, I have told them
13  that I no longer work there.  They are
14  very much aware of my situation.
15    Q.  What do you mean by that?
16    A.  That I was terminated from
17  Briggs & Stratton.  Now, particulars, I
18  don't remember having any conversation.
19    Q.  Did you ever tell them that you
20  think you were fired from Briggs &
21  Stratton because of your race?
22    A.  Yes.
23    Q.  You told your mother that?

Page 120

1    A.  I don't remember.
2    Q.  Did you tell anyone other than
3  your lawyer?
4    A.  Not -- no.  No.  Wrongfully
5  terminated because of -- I don't know.
6  I -- I can't attest to that.  I don't
7  know.
8    Q.  Do you have a girlfriend?
9    A.  Yeah.
10    Q.  Did you tell her you were fired
11  because of your race?
12    A.  No.
13    Q.  Have you told anyone other than
14  a lawyer that you believe you were fired
15  from Briggs & Stratton because of your
16  race?
17    A.  Not to my knowledge.  Not to my
18  knowledge.
19    Q.  You've used the term
20  "wrongfully fired"?
21    A.  Well, when I talk about the
22  situation, I talk about the circumstances.
23    Q.  Okay.  After you left Briggs &

30  (Pages 117 to 120)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1  Stratton, did you file for unemployment?
2      A.  Yes.
3      Q.  Okay.
4      A.  Not immediately.
5      Q.  At some point in time?
6      A.  Yes.
7      Q.  Did you collect unemployment?
8      A.  Yes.
9      Q.  Did you tell the employment
10 commission that you were fired because of
11 your race?
12     A.  They didn't ask.  No.
13     Q.  I didn't -- did you ever --
14     A.  No.
15     Q.  What did you tell the
16 employment commission as the reason you
17 were fired from Briggs & Stratton?
18     A.  Performance.
19     Q.  What lead you to believe that
20 you were fired from Briggs & Stratton
21 because of your race?
22     A.  Because I was replaced by a
23 white guy and believe that he was promoted

Page 122

1  to a position that I was up for.
2      Q.  Okay.  Do you know if they
3  hired another coach after you left?
4      A.  No, I don't know.
5      Q.  Who was promoted?
6      A.  I'm alleging Robert -- I mean,
7  Milby.
8      Q.  Okay.  You're alleging that he
9  was promoted, but are you -- you're not --
10 we've already gone over this.
11     A.  Exactly.
12     Q.  You don't know that he was
13 promoted, do you?
14     A.  Not for sure.
15     Q.  Okay.  What lead you to believe
16 that you were a candidate for his job or
17 any promotion whatsoever?
18     A.  Well, I don't know whether you
19 would say it was his job, but --
20     Q.  Okay.  Let me rephrase my
21 question.  What lead you to believe, or
22 led you to believe that you were a
23 candidate for any promotion at Briggs &

Page 123

1  Stratton?
2      A.  Because their super -- there
3  were people or candidates or supervisors
4  that was based on certain criteria --
5  well, I won't say based on certain
6  criteria.  But that area was one of the
7  only areas that didn't have a senior
8  supervisor in it.
9      Q.  My question --
10     A.  That's why I believe that I was
11 up for, you know, in that area.
12     Q.  Did any -- did Robert Wesphal
13 or any -- or Harold Smith or anyone in
14 management above the coaching level ever
15 come to you and say you were being
16 considered for a promotion?
17     A.  Nobody ever -- no.
18     Q.  So this was just a subjective
19 feeling on your part?
20     A.  I wouldn't call it a subjective
21 feeling.
22     Q.  Well, let me --
23     A.  It's an observation.

Page 124

1      Q.  It was an observation based on
2  the fact that there wasn't a senior
3  supervisor?
4      A.  Right.
5      Q.  So you felt that you being a
6  coach in the machine area possibly maybe
7  could fill that senior supervisor job;
8  right?
9      A.  Sure.
10     Q.  Okay.  And was that based on
11 anything other than this possibly maybe
12 kind of feeling?
13     A.  I wouldn't -- like I said, I
14 wouldn't call it a feeling.  I said
15 observation.
16     Q.  Was it based on anything other
17 than that a possibly maybe sort of
18 observation?
19     A.  No.  Other than what I've
20 observed as far as the other areas in the
21 plant is concerned, how they -- each area
22 was being assigned senior supervisors.
23     Q.  Based on the people in that

31  (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1 area?
2     A.  I don't know what it was based
3 on.
4     Q.  Okay.  Do you know who the
5 senior supervisor is in that area today or
6 if there is one?
7     A.  Yeah.  In the area that I --
8     Q.  In the machine area, yes, in
9 your area.
10     A.  Oh, I believe it to be Milby.
11     Q.  Okay.  And we've talked about
12 your beliefs and what your knowledge is
13 with regard to Mr. Milby; correct?
14     A.  Correct.
15     Q.  Okay.  And then at some point
16 you went and filed an EEOC charge; is that
17 right?
18     A.  Yes.
19     Q.  Okay.  How did you locate your
20 lawyer here?
21     A.  Word of mouth.
22     Q.  Whose word of mouth?
23     A.  I have a Navy buddy that I

Page 126

1 guess knows the lawyer that shares the
2 office.
3     Q.  Okay.
4         (Whereupon, Defendant's
5         Exhibit 5 was marked
6         for identification.)
7     Q.  Look through that and tell me
8 if that's a copy of the EEOC charge that
9 you filed in this lawsuit.
10     A.  (Reviewing document.)
11     Q.  I'll represent to you that it
12 is, but I want you to tell me if it is.
13     A.  Yes.
14     Q.  Do you know if the EEOC ever
15 reached a conclusion or determination
16 based on their investigation?
17     A.  As far as, what, issuing a
18 right-to-sue letter?
19     Q.  Well, did they conclude that
20 you had been discriminated against?
21     A.  No, they didn't based on this
22 information that I looked at earlier.
23     Q.  Okay.  I'm going to mark

Page 127

1 Defendant's Exhibit 6.
2         (Whereupon, Defendant's
3         Exhibit 6 was marked
4         for identification.)
5     Q.  Have you ever seen that
6 document before?
7     A.  Yes.  Yes.
8     Q.  And if you look, there's a box
9 checked.  Can you read that, what they say
10 there?
11     A.  The EEOC issues the following
12 determination.  Based upon its
13 investigation, the EEOC is unable to
14 conclude that the information obtained
15 establishes violations of the status --
16 statutes.  This does not certify that the
17 respondent is in compliance with the
18 status -- statutes.  No finding is made as
19 of any other issues that might be
20 construed as being raised by this charge.
21     Q.  Okay.  Have you ever seen that
22 before?
23     A.  I'm pretty sure I have.

Page 128

1     Q.  Now, why did you file an EEOC
2 charge?
3     A.  Because I felt like I was
4 discriminated against.
5     Q.  Okay.  And what facts lead you
6 to believe that you were fired,
7 terminated, as you allege, because of your
8 race?
9     A.  I was terminated and replaced
10 with a white guy and promoted.
11     Q.  Okay.  Anything else, any other
12 facts or evidence?
13     A.  That's the ending, yes -- no.
14     Q.  So the evidence you have to
15 support your claim of racial
16 discrimination with regards to your
17 termination, is that based on what you
18 just told me?
19     A.  As well as the claim that my
20 performance was substandard.
21     Q.  You disagree with --
22     A.  Totally.
23     Q.  What evidence do you have, or

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 129

1  facts, to suggest that Mr. Wesphal didn't
2  believe your performance -- or what
3  evidence do you have that Mr. Wesphal or
4  anyone at Briggs & Stratton was making
5  that up?
6      A.  What evidence do I have?
7      Q.  Yeah.
8      A.  I won't say -- call it
9  evidence.  I would call it experience.
10     Q.  Well, on one hand we have
11 Briggs & Stratton --
12     A.  Uh-huh.
13     Q.  -- saying to you that your
14 performance is unsatisfactory and that's
15 why they're firing you; right?  That's
16 what they told you?
17     A.  That's what they allege, yes.
18     Q.  And Mr. Wesphal and Mr. Beasley
19 told you that; right?
20     A.  Correct.
21     Q.  And we've discussed that
22 that -- you have no reason -- you can't
23 argue with what they believe; right?

Page 130

1      A.  What they believe, no, I can't
2  argue with that.
3      Q.  Okay.  And I want to know what
4  evidence you have, facts to suggest that
5  their belief was manufactured?
6      A.  I don't have any evidence that
7  their -- other than the fact that my
8  actual performance doesn't reflect what
9  they allege.
10     Q.  Okay.  So you disagree --
11     A.  Totally.
12     Q.  -- with their assessment of
13 your performance; correct?
14     A.  Correct.
15     Q.  They believe it was bad, you
16 believe it was good; correct?
17     A.  Correct.
18     Q.  Any other evidence to suggest
19 that their belief was racially motivated?
20     A.  Other than what's already been
21 stated, no.
22     Q.  Okay.  Can you identify anyone
23 else at Briggs who you felt, any other

Page 131

1  area coach -- excuse me, not area coach.
2  Any other coach in the manufacturing of
3  the flywheel area that you contend was
4  treated better than you or worse than you?
5  Do you have any opinions on that?
6      A.  No, I don't.
7      Q.  Okay.  Have you ever filed for
8  bankruptcy?
9      A.  No, I haven't.
10     Q.  Okay.  I'm going to mark
11 Defendant's Exhibit 7.
12         (Whereupon, Defendant's
13         Exhibit 7 was marked
14         for identification.)
15     Q.  These are your -- these are
16 something prepared by your lawyers --
17 excuse me, your lawyer, witnesses who may
18 have knowledge about your employment at
19 Briggs in support of your claim.  Have you
20 spoken with any of them since you left
21 Briggs?
22     A.  No.
23     Q.  Have you spoken with any

Page 132

1  current or former Briggs employees about
2  your lawsuit?
3      A.  Yes.
4      Q.  Who was that?
5      A.  Marion Vines is one person that
6  comes to mind.
7      Q.  Is she currently employed?
8      A.  No.
9      Q.  What did you talk to Ms. Vines
10 about?
11     A.  I just told her that I was
12 going to take my case to court.
13     Q.  Did you tell her that you
14 believe you had been terminated because of
15 your race?
16     A.  No.
17     Q.  What did she tell you or what
18 did she say in response to your statement
19 to her?
20     A.  In our conversation, I told her
21 why I felt like I had -- well, why I had
22 been terminated.  And her response was
23 disbelief after I told her that I was

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 133

1  terminated for performance. And that was
2  just -- she was like, you've got to be
3  kidding me.
4      Q.  Anyone else other than Ms.
5  Vines?
6      A.  Not to my knowledge. Maybe,
7  you know, general conversations, but, no,
8  not -- nobody that pops out at me right
9  now.
10     Q.  Did anyone at Briggs ever
11 say -- make any statements to you that you
12 would consider to be a racially motivated
13 statement, a slur, anything along those
14 lines?
15     A.  Not to my knowledge. Not at
16 this time. I don't think -- I can't think
17 of any.
18     Q.  So you left Briggs. What have
19 you been doing since you left Briggs in
20 '04?
21     A.  Continuing my education.
22     Q.  Is that at Troy in Phenix City?
23     A.  Yes.

Page 134

1      Q.  Okay. How have you been paying
2  your bills and doing that sort of stuff?
3      A.  Student loans for school,
4  depleting what little savings I had.
5      Q.  Have you had any source of
6  income from anywhere?
7      A.  My reserve check.
8      Q.  How much is that?
9      A.  I probably bring home maybe
10 right at three hundred dollars for
11 those -- that drill weekend. And whenever
12 I get deployed for the fourteen or
13 seventeen days, my pay is based on
14 active-duty pay.
15     Q.  Is anyone giving you any money?
16     A.  No.
17     Q.  What kind of vehicle do you
18 have?
19     A.  I have a 4-Runner.
20     Q.  How do you pay that?
21     A.  It's paid for. I bought --
22 that's a 1999 4-Runner, so it was paid for
23 before leaving Briggs.

Page 135

1      Q.  Okay. Do you have any job
2  interviews?
3      A.  Yes.
4      Q.  What was the last one?
5      A.  When was it?
6      Q.  Yeah.
7      A.  Last Tuesday.
8      Q.  Where was that?
9      A.  Union City, Georgia.
10     Q.  Excuse me?
11     A.  Union City, Georgia.
12     Q.  What was the employer's name?
13     A.  Universal Forest Products.
14 Universal Forest Products.
15     Q.  What was the job that you
16 interviewed before that?
17     A.  Before that?
18     Q.  Yeah. Since you left Briggs.
19     A.  There's been no other -- no
20 other interviews.
21     Q.  That was the first one?
22     A.  Yes.
23     Q.  How did that go?

Page 136

1      A.  It went well. That was my
2  second interview.
3      Q.  Second interview?
4      A.  (Witness nodding head
5  affirmatively.)
6      Q.  What job were you applying for?
7      A.  Safety director.
8      Q.  Okay. Did you have to fill out
9  an application there?
10     A.  No, just submitted a resume.
11     Q.  Did they ask you why you left
12 Briggs?
13     A.  Yes.
14     Q.  What did you tell them?
15     A.  Told them I was terminated.
16     Q.  What did you tell them the
17 reason was?
18     A.  I didn't. They didn't -- well,
19 I guess by -- well, I know by law they
20 don't have to -- they can't ask you why.
21     Q.  Okay. Did you say it was
22 because of your race?
23     A.  I didn't say -- it didn't go

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 137

1  any further.
2      Q.  Okay.  So you filled out no
3  paperwork with that application process?
4      A.  No.
5      Q.  Who did you interview with?
6      A.  Initially I interviewed with a
7  young lady by the name of Kuiwi.  And
8  the -- I think the guy's name was Herbert
9  or Albert, the first interview.  And then
10  the second interview was with the VP and
11  the plant manager, which was Mark and --
12  Pete and Mark, Pete being the vice
13  president, Mark being the plant manager.
14      Q.  On your resume, you said
15  references furnished upon request.  Have
16  you been asked to provide any references?
17      A.  No.
18      Q.  Who are your references?
19      A.  Teresa Wright, Raymond Luttery,
20  and Felicia Butler.
21      Q.  Who are they?
22      A.  Felicia is my girlfriend and
23  Chief Luttery is one of my senior

Page 138

1  supervising personnel in my reserve unit.
2  And Teresa is a long-time friend.  She and
3  I have been in the reserves since the
4  early '90s together.
5      Q.  Now, after the EEOC issued its
6  right to sue, you eventually filed a
7  lawsuit; is that right?
8      A.  That's correct.
9      Q.  Is the reason you filed the
10  lawsuit the same reason you filed the EEOC
11  charge?
12      A.  Yes.
13      Q.  Okay.  Any other additional
14  reason?
15      A.  No.
16      Q.  Okay.  I'm just going to mark
17  that as Exhibit 8.
18          (Whereupon, Defendant's
19          Exhibit 8 was marked
20          for identification.)
21      Q.  Now, the complaint makes
22  allegations or alleges that you were
23  wrongfully terminated.

Page 139

1      A.  Uh-huh.
2      Q.  Do you know who made the
3  decision to terminate your employment?
4      A.  Who made the decision?
5      Q.  Yes.
6      A.  No, I don't.
7      Q.  Do you know who was involved in
8  the decision?
9      A.  Robert Wesphal and Tim Beasley
10  notified me of my termination, so I can
11  only say that that's who I know.
12      Q.  Okay.  But you have no personal
13  knowledge of who actually made the
14  decision?
15      A.  No.
16      Q.  Do you have any reason to
17  believe that Mr. Beasley, Tim Beasley or
18  Robert Wesphal would want to discriminate
19  against you based on your race?
20      A.  I don't know.
21      Q.  Had they ever done or said
22  anything to you that you believe was
23  racially motivated?

Page 140

1      A.  Terminated -- the termination.
2      Q.  Besides that?
3      A.  No, to my knowledge.
4      Q.  Okay.  Let me just take a break
5  for five minutes.
6          (Whereupon, a short break was
7          taken.)
8      Q.  (BY MR. DAVIS:)  All right.
9  Mr. Tolbert, we're almost done here.
10          After you left Briggs, you
11  suspended your job search or your efforts
12  to find a job so you could go back to
13  school; is that right?
14      A.  I made a decision to continue
15  to pursue, you know, that dream that I've
16  been having for a long time and it -- I
17  had to make a decision.  And having the
18  amount of time that I had left to
19  continue, like I said, I made that
20  decision to do that.  By all means, I was
21  asked to submit a resume, and I don't know
22  whether I was still in school or not, by
23  word of mouth, that they figured I would

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 141

1  be a good candidate and I did that so, you
2  know, the search wasn't completely
3  terminated.  As opportunities presented
4  themselves, you know, I pursued it.
5      Q.  Where did you submit resumes?
6      A.  I don't know the exact name of
7  the company.  All I remember is or know is
8  a person that works at this facility,
9  worked in the HR department.  And like I
10  say, she felt like I was a good candidate
11  for the position, but I haven't heard
12  anything else back from it.  So whether
13  that was during the time that I was in
14  school, I'm not exactly sure.  But that
15  was one of my unofficial job searches.
16      Q.  Right.  But after you left
17  Briggs, you stopped looking for a job so
18  you could go back to school full time;
19  correct?
20      A.  I didn't necessarily stop.  I
21  just continued my education.  And if an
22  opportunity presented itself, I would have
23  taken the job.

Page 142

1      Q.  So if somebody came to you, you
2  would accept, but you weren't out looking
3  for a job; would that be fair to say?
4      A.  Yes.
5      Q.  Okay.  Until the past couple of
6  weeks when you, I think, sent a resume
7  into that place in Georgia?
8      A.  Well, no.  Because I've
9  registered on-line with several different
10  jobsites.
11      Q.  When did that start?
12      A.  I don't know exactly.
13      Q.  This year?
14      A.  Yes.
15      Q.  Okay.
16      A.  Late -- late -- maybe even late
17  last year.
18      Q.  Okay.  But from the time you
19  left until whenever you started applying
20  on Monster.com or whatever, you were
21  generally pursuing your education?
22      A.  Yeah.  My main focus was my
23  education.  Jobs -- I did not turn down

Page 143

1  any job opportunities.
2      Q.  After you left Briggs, have you
3  gone to see any doctors of any sort?
4      A.  I couldn't afford it.
5      Q.  Have you gone to see any
6  counselors of any sort?
7      A.  No.  No.  Like I say, I
8  couldn't afford it.  I didn't have any
9  insurance.
10      Q.  Okay.  Any health care
11  providers of any type?
12      A.  Well, just recently, I
13  re-registered with the VA, and I guess I
14  need to take advantage of some of those
15  opportunities.  I visit them for medical
16  reasons, checkup or whatever, but I have
17  to look into what other options there are,
18  whatever other services that they offer.
19      Q.  Are you a member of a church?
20      A.  Yes.
21      Q.  What church is that?
22      A.  Sardis Baptist Church, Camp
23  Hill, Alabama.

Page 144

1      Q.  Is there a preacher there or
2  pastor?
3      A.  Yes.
4      Q.  Have you talked to him or her
5  about losing your job?
6      A.  No.
7      Q.  Have you talked to anybody to
8  seek any sort of counseling, be it free
9  counseling, about losing your job?
10      A.  I have a friend that's a pastor
11  and we shoot basketball, and we didn't
12  really get into any in-depth details
13  seeking any resolution or, you know, any
14  help as far as my problem.  But, you know,
15  we -- we talk.
16      Q.  What's the name of that friend?
17      A.  King Solomon.
18      Q.  King?
19      A.  King Solomon.
20      Q.  Where is he located?
21      A.  He lives in Auburn.
22      Q.  When's the last time you saw
23  him?

36  (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1    A.  Last Tuesday we shot ball.
2    Q.  Do you play basketball about
3  once a week?
4    A.  Yeah, I try to play twice --
5  whenever the guys open up the gym.
6    Q.  Okay.  What gym is that?
7    A.  We go over to the Auburn Junior
8  High gym.
9    Q.  How would you characterize your
10  mental health today, good, excellent?
11    A.  My -- yeah.  I mean, pretty
12  good.  But the effects that this
13  situation -- it -- I mean, it
14  devastated -- I've not been without a job
15  and to be told that it was a performance
16  issue, you know, I -- it -- that was
17  just -- I was -- I mean, when they called
18  me in, I was actually out on the floor
19  trying to make amends because production
20  was already running short because of
21  previous shifts, counting parts, trying to
22  make ends meet.  So to be told that my
23  performance was substandard was just a

Page 146

1  slap in the face.
2    Q.  Okay.
3        (Whereupon, Defendant's
4        Exhibit 9 was marked
5        for identification.)
6    Q.  Let me show you what's been
7  marked as Defendant's Exhibit 9.  It's
8  just a copy of the deposition notice.  I
9  just want to make sure, do you have any --
10  I've asked your lawyer for any documents
11  you have supporting your lawsuit here
12  today.
13    A.  Uh-huh.
14    Q.  And she's given me some
15  e-mails.  Do you have any records,
16  e-mails, videos, tape recordings, anything
17  in your possession or knowledge that you
18  haven't given to your lawyer?
19    A.  Not at this time.
20    Q.  If you do, you're under a
21  continuing obligation.
22    A.  Absolutely.
23    Q.  Okay.  Is there anything --

Page 147

1  other than what you've told me, is there
2  anything else you want to tell me about
3  your claims against Briggs & Stratton?
4    A.  No.
5    Q.  Anything you want to add or
6  clarify?
7    A.  Everything -- to my knowledge,
8  no.
9    Q.  Okay.
10        MR. DAVIS:  I don't have any
11  other questions.
12        MS. BATTLE-HODGE:  Okay.  I
13  just have one statement --
14        MR. DAVIS:  Sure.  Okay.
15        MS. BATTLE-HODGE:  -- of
16  clarification and just one short
17  question --
18        MR. DAVIS:  Okay.
19        MS. BATTLE-HODGE:  -- and
20  that's it.
21        With regards to Defendant's
22  Exhibit 3 --
23        MR. DAVIS:  Yes.

Page 148

1        MS. BATTLE-HODGE:  -- I
2  represented that I did not have this, but
3  in fact we do have it.
4        MR. DAVIS:  Okay.
5        MS. BATTLE-HODGE:  The address
6  is incorrect, the ZIP Code, but we do have
7  it.
8        MR. DAVIS:  Okay.  Thank you.
9
10  EXAMINATION BY MS. BATTLE-HODGE:
11    Q.  And the one question just for
12  clarification I wanted to ask you, back
13  when Mr. Davis was -- you were in the area
14  of 1996 to 2003, during that time period?
15    A.  Uh-huh.
16    Q.  You listed four incidents that
17  relate to the filing of your lawsuit.
18    A.  Correct.
19    Q.  And Mr. Davis asked you if
20  those were the only incidents.  And just
21  for clarification, were you saying that
22  those were the only incidents, or at this
23  time this is all you can recall?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 149

1    A.  At this time, that's all I can
2  recall.
3        MS. BATTLE-HODGE:  I just
4  wanted to clarify that.  That's --
5        MR. DAVIS:  Yeah, I think he
6  said that.
7        MS. BATTLE-HODGE:  Right.
8  That's -- that's all.
9
10  REEXAMINATION BY MR. DAVIS:
11    Q.  Let me just follow up.  Now, is
12  there any person you know of or any
13  document you can look at that you think
14  would help refresh your memory?
15    A.  No.  No.  No.  Like I say, I --
16  the reason that I don't recall a lot of
17  specifics is because I had no reason to
18  believe that I needed to recall.  However,
19  reflecting back on it, I can see how
20  situations or how it evolved and what
21  effect did it have.
22        MR. DAVIS:  Okay.  Thank you.
23        MS. BATTLE-HODGE:  Thank you.

Page 150

1    FURTHER THE DEPONENT SAITH NOT
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**



DEFENDANT'S EXHIBIT

1-Tolbert

**Elvis O. Tolbert**
3501 Birmingham Hwy, #1003, Opelika, AL  36801
334-749-6544                                                                    eotolbert@charter.net

---

### PRODUCTION SUPERVISOR

A highly qualified, dedicated, technically skilled production manager seeking to contribute to and grow with a progressive and innovative company

**PROFILE**

- 8.5 years as production supervisor.
- Experienced with high volume international manufacturer in high speed lean production.
- Instrumental in establishing relationships with major OEMs.
- Directed complex projects from concept to operational status.
- Goal-oriented with strong leadership capabilities.
- Organized, detailed problem solver.
- Proven ability as team leader and team member.
- Instrumental in ISO 9000 certification.
- New product rollout experienced.

**RELEVANT EXPERIENCE**

**BRIGGS & STRATTON**                                 **May 1996 to December 2005**
**Supervisor**

- Successfully supervised 135 employees in a assembly production department and maintained minimum defects.
- Trained new and veteran employees on current and new processes and procedures.
- Worked utilizing six sigma standards to improve processes.
- Collaborated with design, engineering and maintenance departments on four new product rollouts.
- Incorporated ergonomics training and facilitation to help reduce on the job injuries.
- Instrumental in successfully building and balancing production lines.
- Coached and evaluated employees performances.

**DIVERSIFIED PRODUCTS**                              **September 1990 to March 1998**
**Metal Fabrication Robot Operator**

- Operated, programmed and maintained a robotic welder.
- Operated plastic mold die machines.

**AUBURN UNIVERSITY**                                September 1991 to March 1998
**Electronic Technician IV**

- Maintained and serviced audio and visual equipment utilizing oscilloscopes, digital volt-meters and other electronic test equipment.
- Supervised up to 10 work projects.
- Managed, schedule, and evaluate eight student work studies.

**Elvis O. Tolbert**
3501 Birmingham Hwy #1003, Opelika, AL 36801
334-749-6544

eotolbert@charter.net

## MILITARY SERVICE

U.S. Navy (Active duty & Reserves)          **September 1982 to Present**

**Shop Supervisor**
- Direct and evaluated military personnel in daily duties
- Supervised the aviation electrical shop ensuring safety measures were being carried out. Performed scheduled and unscheduled maintenance and inspection on military airplanes and helicopters as to aid in successful flight operations.
- Researched diagrams, electrical schematics and charts to trace system operations.

## EDUCATION

Troy University
B.S. in Business Administration,    2006

ITT Technical Institute
Associates of Applied Science- Electronic Engineering,    1990

U.S Navy
Post 911 Duty- Aviation Electrician

## COMPUTER SKILLS

Microsoft Office               SAP

REFERENCES...................Available upon request

# EMPLOYEE HANDBOOK CHECK-OFF

DATE _03 mar 98_

A BRIGGS & STRATTON EMPLOYEE HANDBOOK WAS PRESENTED TO:

EMPLOYEE NAME:

_Elvis Tolbert_

INDEX # _73355_

*I ACKNOWLEDGE THAT I HAVE READ THIS EMPLOYEE HANDBOOK AND UNDERSTAND THE TERMS, CONDITIONS AND POLICIES.  I AGREE TO ABIDE BY THESE POLICIES AND CONDITIONS.*

EMPLOYEE'S SIGNATURE

_Elvis Tolbert_



DEFENDANT'S EXHIBIT

2-Tolbert



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
(205) 212-2132
TTY (205) 212-2112
FAX (205) 212-2105

Elvis Tolbert
c/o Juraldine Battle-Hodge
Attorney at Law
207 Montgomery Street
Suite 215
Montgomery, AL   36121-0243



DEFENDANT'S EXHIBIT

3. Tolbert

Re: Charge #130-2005-03436
Elvis Tolbert   v.  Briggs & Straton Corporation

Dear Mr. Tolbert:

The Commission is in receipt of documents submitted by your employer and is investigating the allegations contained in your charge of discrimination. The following is a summary of the information received to date.

1.  It is undisputed that you were hired in early 1996, as a temporary operator.  You became a permanent operator in May 1996.  In late 1996, you advanced to the position of Team Leader.

2.  You had advanced to the position of supervisor when you left work to report for military duty in February 2002.  In October 2003, you returned to work as a supervisor in the machinery department.

3.  On November 15th and 24th, 2004, you were counseled with reference to production goals for your unit.  On November 29, 2004, you did not inform the Control Manager that your unit had no production for that day. Later that afternoon, you did not advise management that additional flywheels were needed to meet assembly line requirements. On November 30, 2004, you reported that your unit produced 50% of the flywheels required for satisfactory job performance. On December 7, 2004, management found five unidentified baskets of material and twelve parts that you had not included  on your report the previous day.

4.  During the first week of December 2004, the general manager discussed your substandard job performance with you.   You were asked to make a list of all the deficiencies in your area that could be corrected.  You listed 127 deficiencies and work hazards that you observed and submitted the list to the general manager.  It was this manager who directed you to correct the deficiencies that you listed on your report.

5.  Respondent contends that your job performance improved slightly but you did not find it necessary to communicate problems that you were aware of to management.  Respondent contends that your failure to communicate with management impacted production schedules.

6. Respondent discharged you on December 10, 2004, due to the substandard job performance.

7. Respondent discharged three White supervisors due to substandard job performance from February 25, 2003 through March 15, 2005.

8.  The White supervisor who you allege was promoted to the position of senior supervisor was not promoted.  Documentary evidence reveals that this individual had served in Respondent's Georgia facility as the Area Manager in 1999. He resigned on February 22, 2003 and was rehired on September 2, 2003 as a production supervisor, grade 11.  At the time of your discharge, you were a grade 10 supervisor. It is evident that this supervisor was at a higher grade level as compared with you and he earned $800 more per month than you were paid.

9.  Respondent denies it was necessary to discharge you in order that the alleged comparator could advance into a senior supervisory position.

10.  Respondent denies that this White supervisor was promoted or given a wage increase after you were discharged.  Respondent contends that this supervisor continued to perform his own assignments and assumed a portion of your duties.  Your remaining duties were assigned to other supervisors on the staff.

Based on this analysis, the Commission cannot conclude that you were discriminated against in violation of Title VII.

However, if you have additional substantive information which you want to be considered before a final determination is made on these allegations, submit this information on or before August 19, 2005.

If the District Director decides to dismiss your case on the basis of the evidence currently in our possession, the Dismissal and Notice of Rights issued by the Director, will advise that you may pursue this matter in Federal District Court by filing a private suit.  **The Dismissal and Notice of Rights will be mailed to you.**

If you have any questions or if there is a need for discussion, feel free to call me at (205) 212-2132.

Sincerely,

8/8/05
Date

Gaines Elenburg, Jr.
Investigator

FILE COPY


DEFENDANT'S EXHIBIT

4-Tolbert

1. m20 F/w located near 314/1 finish hydram need dispositioning
2. Gerosol can on back of same finish hydram
3. Chips needs to be cleared off same hydram
4. 314/1 trash, glove, books, lying on rAdine.
5. 314/1 operator's instruction not mounted on rAdine.
6. Trash in baskets of parts in 314/1
7. Tools, ~~lying~~ trash lying on top of chip collector behind finish hydram.
· Trash in rivet hopper.
· Card board lying on the floor.
· Card board not neatly stacked in baskets.
· work bench has has-mat all over it. ~~373~~
· work bench not organized.
· work bench has junk parts underneath/Top
· Cabinets not organized, parts not labeled!
 work bench drawers needs cleaning out organized.
 Junk trash on top of cabinets
· Unidentified Guard leaning against Chip hopper behind 314/1 finish hydram.
 Air hoses All over the floor. not properly placed or hung.
 Trash cans buried, out of place
 buckets with trash sitting in area.
 Replacement rollers lying on floor underneath washer conveyor (314/1)
 Unidentified scrap metal leaning against post (L4)
 fire hydram blocked on L4.     ②
 worn or used tooling lying on ...

26. Operator's instruction on work bench

27. Magnet pusher, not ready for use, on work bench

28. Tool boxes needs to be in a centralized location.

29. Inop fan hanging on guard rail behind BTI balancer control Pan

30. extension cord lying in BTI balancer.

31. broom on top of BTI cable rack

32. Chips on roof of BTI balancer guarding/cage.

33. Chips on roof of BTI balancer control panel

34. Chip Collector pipes leading from balancer has holes in
    various joints. (bandaged w/tape).

35. Scrap metal on top of BTI chip collector.

36. Aerosol cans on top of hydraulic oil barrel, clipboard also
    tools.

37. old Computer Cabinet w/computer located at end of
    cooling conveyor. Trash also

38. Unidentified baskets in staging area at cooling conveyors end

39. Chips need to be cleaned from 373 finish hydram back side.

40. Ceiling fans needs clearing.

41. Scrap metal lying on Conveyor, Right of finish hydram

42. Trash in hi-boys @ end of cooling conveyor.

43. Trash on floor at end of cooling conveyor.

44. Inserts on the floor at the end of cooling conveyor.

45. guard rails needs to wiping down.

46. mill cutter on BTI needs new chip guard.

47. used parts a top the ring gear press. (springs & bolts)

48. Operator's instruction Card not mounted on R/G Press.

49. Chip collector inadequate at the finish hydram

50. bucket filled with oil under the finish hydram

51. Pick and place very inadequate. Does always pick up on the f/w. Inserts sometime does not release.

52. loose conduit on controller at oven's entrance.

53. Glue station needs cleaning (273)

54. inserts on conveyor

55. washer exit conveyor needs redesign.

56. used parts on top of washer.

57. floor around drill & tap is wet. needs to be contained

58. Roller replacement at washer entrance. (273)

59. broken tools lying on drill & tap.

60. Chip accumulation on drill & tap.

61. bucket filled with (water?) behind washer.

62. Trash, tools on BTI balancer.

63. fan at BTI conveyor exit needs cleaning

64. parts, trash on top of Vid-mar cabinet near step drill.

65. trash in reject f/w bin near step drill.

66. Chip dump piping loose on rivet drill. chip accumulation also.

67. Counter doesn't work on rivet drill.

68. no chip dump for hydram #2 (broken off)

69. no chip dump for step drill. (manual process using a bucket

70. Chip accumulation on hydrams #1 & #2

71. Chip accumulation underneath grating at hydrams #1 & 2 needs a redesign or an adequate chip collection process.

72. exhaust cover for BTI control panel needs flying.

73. Over head light installed at BTI balancer exit Conveyors

74. We need a new or better cabinet for the gloves & aprons.

75. Standup desk needs to be cleaned or discarded.

76. Step drill pulley belt needs to be re-installed.

8. All trash cans needs a designated area and kept there.

9. All machines needs tool holders and spare tools ready to g

10. An accumalation of barrel behind hydram #2 (6 barrells)

11. Organize work bench area near rotor clone.

12. All parts in work bench area needs to be place in desgn area.

3. Can-ban shelves needs labeling and organizing.

4. The floor between 314/2 & 273 needs to be cleaned.

5. Stand up desk behind manual balancer needs clearing organizing.

16. Deburrer needs to be put in work or taken to cat-com.

17. mill cutter (314/2) has a hydraulie-leak.

18. A drive on a pallet next to the oven needs a proper home.

19. rework area needs complete overhaul.

10. Cabinets in rework area needs to be gone through.

11. Radyne (314/2) needs to be cleared of all trash.

12. Scrap metal bin in rework area filled w/trash

13. pallet bases stacked against cooling conveyor fence.

14. All hollow mill and heads to be placed on a rack.

15. Used gloves throughout

16. Part bins needs labeling in 314/2 gluing station.

17. Chip accumulation on 314/2 finish hydram.

18. parts on floor behind vertical oven.

19. A spool of cable located behind the vertical oven

1. M12 (314/2) work bench organized.
2. Cabinets behind glueing station (314/2) needs organizing and clear or organize whats on top.
3. Accumaled chips on drill & tap. (314/2)
4. Pulley guard. missing on drill & tap (314/2)
5. Chip accumatation on rabbit hydran
6. M12 hydrans has chip accumulation.
7. Guard rails not properly installed behind (314/2) work bench.
8. Water fountain missing.
9. ceiling fan need installation.
10. Staging areas needs painted outline and labeling.
1. 314/1 gauging table needs cleaning & organizing above & below
2. Cleaning need behind all Okunas
3. Chip/drip pans need installation at Okunas
14. tool setting table need organizing & cleaning.
5. hydraulic fluid and coolant on floor.
6. balancer in 314/1 needs cleaning inside & out, & top, behind
17. Parts of machine parts underneath balancer needs to be installed or discarded.
18. Spool of cable located on table, back of balancer.
19. Gauge station behind balancer need proper storage.
20. railing part lying at the base of the balancer's control panel doors.
21. Parts lying on top of balancer's chip collector.

22. Trash & Old parts lying on top of R/3 fixture machi

23. Trash, gloves, unidentified parts in un used side of
     Semi automated gluing station in 314/1 (top of machine also)

24. backside of 314/1 need house keeping.

25. washer (314/1) has trash & containers on top.

26. Okuma's need wiping down.

27. Gloves throughout All department not in designated are

EEOC FORM 131 (5/01)

## U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| ⌐ Harold Smith<br>**Plant Manager**<br>**BRIGGS & STRATTON CORPORA**<br>150 Technology Parkway<br>Opelika, AL 36801 ⌐ | **Elvis Tolbert** |
| | THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| L ⌐ | EEOC CHARGE NO.<br>**130-2005-03436** |

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act    [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act    [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by    **06-MAY-05**    a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by    to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by    **21-APR-05**
to    **Debra B. Leo, ADR Coordinator, at (205) 212-2033**
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Donald P. Burris,**
**Deputy Director**

*EEOC Representative*

Telephone: **(205) 212-2146**

**Birmingham District Office**
**Ridge Park Place**
**1130 22nd Street, South**
**Birmingham, AL 35205**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [ ] DISABILITY  [ ] RETALIATION  [ ] OTHER

**See enclosed copy of charge of discrimination.**

**DEFENDANT'S EXHIBIT**

5-Tolbert

| Date<br><br>**Apr 06, 2005** | Name / Title of Authorized Official<br><br>**Bernice Williams-Kimbrough,**<br>**District Director** | Signature<br>*Bernice Williams Kimbrough*<br>(RZM) |
|---|---|---|

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form

ENTER CHARGE NUMBER
___ FEPA
X  EEOC  130 2005 03436

_____ and EEOC
*(State or local Agency, if any)*

NAME *(Indicate Mr., Ms., or Mrs.)*

Mr. Elvis Tolbert

TELEPHONE NUMBER *(Include Area Code)*
(334) 749-6544

STREET ADDRESS          CITY, STATE AND ZIP CODE          COUNTY
3501 Birmingham Hwy, Apt. 1003, Opelika, AL 36801, Lee County

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below)*

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| Briggs & Stratton Corporation | 15+ | (334) 821-7999 |

STREET ADDRESS          CITY, STATE, AND ZIP CODE
150 Technology Paryway, Auburn, AL 36830

CAUSE OF DISCRIMINATION BASED ON *[Check appropriate Box(es)]*

X  RACE  __ COLOR  __ SEX  __ RELIGION  __ NATIONAL ORIG

__ AGE  ___ RETALIATION  ___ OTHER *(Specify)*

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE
*(Month, day, year)* 12/09/04

THE PARTICULARS ARE *(If any additional space is needed, attach extra sheet (s))*:

## (See Attached)

MAR 2 5 2005

*I declare under penalty of perjury that the foregoing is true and correct.*

DATE:  2/16/05

I declare under penalty of perjury that the foregoing is true and correct.

*(signature)*

SIGNATURE OF COMPLAINT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(Month, day, year)*

Elvis Tolbert
5-24-64

Charging Party (CP), Elvis Tolbert, is a 40 year old black male. CP began working for Briggs & Stratton Corporation (Briggs) as a temporary operator on or about 1996. In May of 1996 CP was hired as a permanent operator. In November 1996, CP was promoted to supervisor.

On or about February 2002, CP was called to active duty. CP returned to Briggs in July 2003. At which time, CP was assigned to a machinery department (2nd shift). October 2003, CP returned to the 1st shift machinery department.

December 2004, CP was terminated. The reason given to CP was "poor performance." CP has never been written up for poor performance. CP was in line for a promotion to senior supervisor. However, CP believes that Briggs hand picked the individual it wanted for the position, Roger Milby, white male. Milby was similarly situated to CP.

It was known that Milby was not satisfied with his position at Briggs. Milby was applying for supervisory positions outside of Briggs. CP has reason to believe that Briggs terminated him to "make room" for Milby.

After CP was terminated, Milby was immediately placed in the position that CP had held, and very shortly thereafter was promoted to senior supervisor, the position that CP should have received had he not been wrongfully terminated.

CP believes that he has been discriminated against because of his race, black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

2 5 2005

EEOC Form 161 (3/98)  U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Elvis Tolbert<br>c/o Juraldine Battle-Hodge, Attorney<br>207 Montgomery Street<br>Suite 215<br>Montgomery, AL  36121-0243 | From: | Birmingham District Office<br>Ridge Park Place<br>1130 - 22nd Street South<br>Suite 2000<br>Birmingham, AL  35205 |

[ ] *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 130-2005-03436 | Gaines Elenburg, Jr., Investigator | (205) 212-2132 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____    September 06, 2005
Bernice Williams-Kimbrough, District Director    *(Date Mailed)*

Enclosure(s)

cc:  **Scott Langelin, Senior Counsel-Employment Law
& Relations
BRIGGS & STRATTON CORPORATION**

**DEFENDANT'S EXHIBIT**
6-Tolbert

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**DEFENDANT'S EXHIBIT**

7-Tolbert

| | |
|---|---|
| ELVIS TOLBERT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )    CASE NO. 3:05cv1149-T |
| v. | ) |
| | ) |
| BRIGGS AND STRATTON | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF'S PRE-DISCOVERY DISCLOSURES

Pursuant to the parties' planning meeting, Plaintiff provides the following information required by Federal Rule of Civil Procedure 26(a)(1). Plaintiff presently expects that the following individuals may have discoverable information that the Plaintiff may use to support his claims.

1.    Plaintiff reserves the right (1) to supplement this list; (2) not to offer and/or to object to testimony in whole or part of any of the following individuals; and (3) to call any individual identified in subsequent discovery.

a) Elvis Tolbert - information regarding the treatment of Plaintiff.
Plaintiff
3501 Birmingham Highway, Apt. 1003
Opelika, AL 36801

b) Ron Popperwell - will testify to the quality of work that was produced on Plaintiff's shift. No longer employed with Defendant.
Briggs & Stratton, Quality Supervisor
Tallassee, AL

c) Bobby Moore - worked with Plaintiff. Will testify to Plaintiff's management skills and abilities.
Briggs & Stratton, Setup B
150 Technology Parkway
Auburn, AL 36830

d) David Powell - will testify to Plaintiff's quality of work.
Briggs & Stratton, Planner and scheduler
150 Technology Parkway
Auburn, AL 36830

e) Tim McCormick - worked with Plaintiff, can testify to quality of work.
Briggs & Stratton, Production Manager
150 Technology Parkway
Auburn, AL 36830

f) Dave DeBaets - will testify to quality of work.
Briggs & Stratton, Vice President
150 Technology Parkway
Auburn, AL 36830

g) Dave Golate - will testify to quality of work.
Briggs & Stratton, Supervisor
150 Technology Parkway
Auburn, AL 36830

h) Linda Hand - will testify to quality of work.
Briggs & Stratton, Operator
150 Technology Parkway
Auburn, AL 36830

i) Kelly Etris - will testify to quality of work
Briggs & Stratton, Maintenance
150 Technology Parkway
Auburn, AL 36830

j) Daryl Jackson - will testify to character and quality of work.
Briggs & Stratton, Maintenance
150 Technology Parkway
Auburn, AL 36830

k) James Johnson - quality of work and character.  Former employee.

l) Ralph Black - will testify to work of Plaintiff and situation relating to Plaintiff's last days at
Briggs.
Briggs & Stratton, Operation
150 Technology Parkway
Auburn, AL 36830

m) Any person identified on Defendants' witness list filed herein or any later witness list of the Defendants.

n) Any person sufficiently identified prior to trial so as not to prejudice the Plaintiff herein.

o) Any person necessary to rebut testimony by any witness whose identity is not presently known to the Plaintiff, but can be ascertained based upon the testimony or exhibits proffered.

p) Any person necessary to rebut any document or exhibit proffered at trial.

2. The attached documents (See Attachment A) constitute all non-privileged documents in the Plaintiff's custody and control that are relevant to disputed facts.

Respectfully submitted this the 11th day of May 2006.

Juraldine Battle-Hodge (3072-G-61-J)
Attorney at Law

OF COUNSEL:
Law Offices of Juraldine Battle-Hodge, P.C.
207 Montgomery Street, Suite 215
Montgomery, AL 36104
Telephone:    (334) 262-1177
Facsimile:    (334) 263-5569

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon the following counsels of record on May 11, 2006, by placing a copy of the same in the U.S. Mail, First Class postage prepaid, addressed as follows:

Thomas A. Davis
Robbie Steele Martin
CONSTANGY, BROOKS & SMITH, LLC
Suite 1410, AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203

OF COUNSEL

# ATTACHMENT
# "A"

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form

**ENTER CHARGE NUMBER**

___ FEPA

_X_ EEOC

_____ and EEOC

*(State or local Agency, if any)*

| NAME *(Indicate Mr., Ms., or Mrs.)*  Mr. Elvis Tolbert | TELEPHONE NUMBER *(Include Area Code)*  (334) 749-6544 |
|---|---|

| STREET ADDRESS  3501 Birmingham Hwy, Apt. 1003, Opelika, AL 36801, Lee County | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below)*

| NAME  Briggs & Stratton Corporation | NO. OF EMPLOYEES/MEMBERS  15+ | TELEPHONE NUMBER *(Include Area Code)*  (334) 821-7999 |
|---|---|---|

| STREET ADDRESS  150 Technology Paryway, Auburn, AL 36830 | CITY, STATE, AND ZIP CODE |
|---|---|

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate Box(es))*  _X_ RACE __ COLOR  SEX  __ RELIGION __ NATIONAL ORIG  __ AGE  ___ RETALIATION  ___ OTHER *(Specify)* | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE  *(Month, day, year)* 12/09/04 |
|---|---|

THE PARTICULARS ARE *(If any additional space is needed, attach extra sheet (s)):*

## (See Attached)

| *I declare under penalty of perjury that the foregoing is true and correct.* | DATE: 2/16/05 |
|---|---|

| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINT |
|---|---|
| *[signature]* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE  *(Month, day, year)* |

Elvis Tolbert
5-24-64

Charging Party (CP), Elvis Tolbert, is a 40 year old black male. CP began working for Briggs & Stratton Corporation (Briggs) as a temporary operator on or about 1996. In May of 1996 CP was hired as a permanent operator. In November 1996, CP was promoted to supervisor.

On or about February 2002, CP was called to active duty. CP returned to Briggs in July 2003. At which time, CP was assigned to a machinery department (2nd shift). October 2003, CP returned to the 1st shift machinery department.

December 2004, CP was terminated. The reason given to CP was "poor performance." CP has never been written up for poor performance. CP was in line for a promotion to senior supervisor. However, CP believes that Briggs hand picked the individual it wanted for the position, Roger Milby, white male. Milby was similarly situated to CP.

It was known that Milby was not satisfied with his position at Briggs. Milby was applying for supervisory positions outside of Briggs. CP has reason to believe that Briggs terminated him to "make room" for Milby.

After CP was terminated, Milby was immediately placed in the position that CP had held, and very shortly thereafter was promoted to senior supervisor, the position that CP should have received had he not been wrongfully terminated.

CP believes that he has been discriminated against because of his race, black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

EEOC Form 161 (3/98)

U.S. ... J. ... EMPLOYMENT OPPORTUNITY COMM ... C

# DISMISSAL AND NOTICE OF RIGHTS

To: Elvis Tolbert
c/o Juraldine Battle-Hodge, Attorney
207 Montgomery Street
Suite 215
Montgomery, AL  36121-0243

From: Birmingham District Office
Ridge Park Place
1130 - 22nd Street South
Suite 2000
Birmingham, AL  35205

[ ] On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 130-2005-03436 | Gaines Elenburg, Jr., Investigator | (205) 212-2132 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Enclosure(s)

_____
Bernice Williams-Kimbrough, District Director

September 06, 2005
(Date Mailed)

cc: **Scott Langelin, Senior Counsel-Employment Law
& Relations
BRIGGS & STRATTON CORPORATION**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Birmingham District Office

Ridge Park Place
1130 22ⁿᵈ Street South, Suite 2000
Birmingham, AL 35205
(205) 212-2132
TTY (205) 212-2112
FAX (205) 212-2105

Elvis Tolbert
c/o Juraldine Battle-Hodge
Attorney at Law
207 Montgomery Street
Suite 215
Montgomery, AL   36121-0243

Re: Charge #130-2005-03436
Elvis Tolbert   v.   Briggs & Straton Corporation

Dear Mr. Tolbert:

The Commission is in receipt of documents submitted by your employer and is investigating the allegations contained in your charge of discrimination. The following is a summary of the information received to date.

1.  It is undisputed that you were hired in early 1996, as a temporary operator.  You became a permanent operator in May 1996.  In late 1996, you advanced to the position of Team Leader.

2.  You had advanced to the position of supervisor when you left work to report for military duty in February 2002.  In October 2003, you returned to work as a supervisor in the machinery department.

3. On November 15ᵗʰ and 24ᵗʰ, 2004, you were counseled with reference to production goals for your unit.  On November 29, 2004, you did not inform the Control Manager that your unit had no production for that day. Later that afternoon, you did not advise management that additional flywheels were needed to meet assembly line requirements. On November 30, 2004, you reported that your unit produced 50% of the flywheels required for satisfactory job performance. On December 7, 2004, management found five unidentified baskets of material and twelve parts that you had not included  on your report the previous day.

4.  During the first week of December 2004, the general manager discussed your substandard job performance with you.   You were asked to make a list of all the deficiencies in your area that could be corrected.  You listed 127 deficiencies and work hazards that you observed and submitted the list to the general manager.  It was this manager who directed you to correct the deficiencies that you listed on your report.

5.  Respondent contends that your job performance improved slightly but you did not find it necessary to communicate problems that you were aware of to management.  Respondent contends that your failure to communicate with management impacted production schedules.

6. Respondent discharged you on December 10, 2004, due to the substandard job performance.

7. Respondent discharged three White supervisors due to substandard job performance from February 25, 2003 through March 15, 2005.

8.  The White supervisor who you allege was promoted to the position of senior supervisor was not promoted.  Documentary evidence reveals that this individual had served in Respondent's Georgia facility as the Area Manager in 1999. He resigned on February 22, 2003 and was rehired on September 2, 2003 as a production supervisor, grade 11.  At the time of your discharge, you were a grade 10 supervisor.  It is evident that this supervisor was at a higher grade level as compared with you and he earned $800 more per month than you were paid.

9. Respondent denies it was necessary to discharge you in order that the alleged comparator could advance into a senior supervisory position.

10. Respondent denies that this White supervisor was promoted or given a wage increase after you were discharged. Respondent contends that this supervisor continued to perform his own assignments and assumed a portion of your duties. Your remaining duties were assigned to other supervisors on the staff.

Based on this analysis, the Commission cannot conclude that you were discriminated against in violation of Title VII.

However, if you have additional substantive information which you want to be considered before a final determination is made on these allegations, submit this information on or before August 19, 2005.

If the District Director decides to dismiss your case on the basis of the evidence currently in our possession, the Dismissal and Notice of Rights issued by the Director, will advise that you may pursue this matter in Federal District Court by filing a private suit. **The Dismissal and Notice of Rights will be mailed to you.**

If you have any questions or if there is a need for discussion, feel free to call me at (205) 212-2132.

Sincerely,

_August 8, 2005_
Date

Gaines Elenburg, Jr.
Investigator

Enclosure with EEOC
Form 161 (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS  --  Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90**
**days** of the date you **receive** this Notice.  Therefore, you should **keep a record of this date**.  Once this 90-day
period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an
attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the
date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent
that your suit be filed **within 90 days of the date this Notice was** mailed to you (as indicated where the Notice is
signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate
State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after
talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement
of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the
charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.
Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be
brought where relevant employment records are kept, where the employment would have been, or where the
respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk
of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy
decisions for you.

**PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.  For
example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before
7/1/02 – not 12/1/02 -- in order to recover unpaid wages due for July 2000.  This time limit for filing an EPA suit is
separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above.  Therefore, if you also
plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90
days of this Notice __and__ within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION -- Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above,
because such requests do __not__ relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have
any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need
to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

2005 DEC -6 P 1: 38

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT, A.

ELVIS TOLBERT,

    Plaintiff,

BRIGGS AND STRATTON,
CORPORATION, ROBERT WESPHAL
in his individual capacity and official
capacity as immediate area manager,
HAROLD SMITH in his individual capacity
and official capacity as plant manager,
and Defendants "A," "B,"and "C," whether
singular or plural, those other persons,
corporations, firms or other entities whose
true and correct names are unknown to
Plaintiff at this time, but will be substituted
by amendment when ascertained,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO. 3:05cu1149-T

*Jury Demand*

**DEFENDANT'S EXHIBIT**

8 -Tolbert

RECEIV

2005 DEC -6

DEBRA P. HACKE
U.S. DISTRICT C
MIDDLE DISTRIC

## COMPLAINT

    COMES NOW Elvis Tolbert, Plaintiff, and for his complaint against Defendants and their

agents and representatives (Defendants) hereby complains as set forth herein below.

## JURISDICTION

2.    Subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. Sections

1331 and 1343 and 42 U.S.C. Section 2000e. Plaintiff is alleging a violation of his

rights under Title VII of the Civil Rights Act of 1964 as amended. Plaintiff invokes this

Court's pendent jurisdiction of the laws of the State of Alabama regarding intentional

infliction of emotional distress.

## VENUE

3.        Defendants are located and/or doing business within this judicial district (Middle

District and the Eastern Division of Alabama). This action is brought within the judicial

district wherein the unlawful employment practices were committed and continue to be

committed, making venue proper under 42 U.S.C. Section 2000(e)-5(f)(3) and 28

U.S.C. Section 1391(b) and U.S.C.A. Section 1391(b).

## PARTIES

4.        The Plaintiff, Elvis Tolbert, hereinafter referred to as "Plaintiff" is a forty (41) year

old African- American male resident of the United States and the State of Alabama,

residing in Lee County, Alabama. Plaintiff is a resident of this judicial district, and has

been employed by Defendants at all times material hereto. Plaintiff is a member of the

protected class for race within the meaning of Title VII. Plaintiff was also an employee

of Defendants' within the meaning of Title VII.

5.        The Defendant, Briggs and Stratton Corporation, hereinafter referred to as "Briggs"

is a private entity organized under the laws of the State of Alabama within Lee County,

Alabama.

6.        The Defendant, Robert Wesphal, hereinafter referred to as "Wesphal" was employed

with Briggs at all times material hereto. Wesphal was Plaintiff's immediate area

supervisor.

7.        The Defendant, Harold Smith, hereinafter referred to as "Smith" is employed by

Briggs as plant manager and Smith acted as plant manager at all times material hereto.

2

PROCEDURAL REQUIREMENT

8.       Plaintiff has fulfilled all conditions precedent to the institution of this action.

9.       Plaintiff timely files this action within ninety (90) days of receipt of his Notice of Right to Sue from the Equal Employment Opportunity Commission (EEOC).

10.      The incidents described below are part of discriminatory incidents which constitute a violation of Plaintiff's Title VII rights.

## NATURE OF THE CASE

11.      This lawsuit is brought by Elvis Tolbert, (Plaintiff) seeking permanent relief from unlawful discriminating practices by Defendants. Plaintiff has been adversely affected by discrimination involving promotion, compensation, assignments, and other terms and conditions of employment as a result of Defendants failing to remedy systemic employment discrimination on the basis of race. The practices committed, and continuing to be committed, by Defendants violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, et seq. ("Title VII").

12.      Additionally, Plaintiff brings state claims for intentional infliction of emotional distress. Plaintiff seeks compensatory and punitive damages allowable under the law. In addition, Plaintiff seeks claims for attorney's fees as allowed under the law and court costs and such other and further relief at law and in equity to which Plaintiff is justly entitled.

## FACTUAL BACKGROUND

13.      Plaintiff is a 41 year old black male. Plaintiff began working for Briggs & Stratton Corporation (Briggs) as a temporary operator on or about 1996. In May of 1996

Plaintiff was hired as a permanent operator. In November 1996, Plaintiff was promoted to supervisor.

14.    On or about February 2002, Plaintiff was called to active duty. Plaintiff returned to Briggs in July 2003. At which time, Plaintiff was assigned to a machinery department (2nd shift). October 2003, Plaintiff returned to the 1st shift machinery department.

15.    December 2004, Plaintiff was terminated. The reason given to Plaintiff was "poor performance." Plaintiff has never been written up for poor performance. Plaintiff was in line for a promotion to senior supervisor. However, Plaintiff believes that Briggs hand picked the individual it wanted for the position, Roger Milby, white male. Milby was similarly situated to Plaintiff.

16.    It was known that Milby was not satisfied with his position at Briggs. Milby was applying for supervisory positions outside of Briggs. Plaintiff has reason to believe that Briggs terminated him to "make room" for Milby.

17.    After Plaintiff was terminated, Milby was immediately placed in the position that Plaintiff had held, and very shortly thereafter was promoted to senior supervisor, the position that Plaintiff should have received had he not been wrongfully terminated. Plaintiff believes that he has been discriminated against because of his race, black, in violation of Title VII of the Civil Rights Act of 1964, as amended

<u>COUNT ONE</u>

<u>RACE DISCRIMINATION - TITLE VII</u>

18.    Plaintiff adopts, realleges, and incorporates by reference paragraphs one through seventeen above, the same as if more fully set forth herein, and further alleges, anew.

4

19.    In taking the above-described actions, Defendants intentionally discriminated against Plaintiff on the basis of his race, African-American, in violation of Title VII. White employees were not, and are not treated in a similar fashion.

20.    As a proximate consequence of the violations of Title VII based on race by Defendants, Plaintiff has suffered and will continue to suffer damage to his professional life, and current and future career opportunities.  Further, Plaintiff has suffered future pecuniary losses, emotional pain, inconvenience, mental anguish, loss of enjoyment of life, and non-pecuniary damages.

## COUNT TWO

## PENDENT CLAIMS

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

21.    Plaintiff adopts, realleges, and incorporates by reference paragraphs one through twenty above, the same as if more fully set forth herein, and further alleges, anew.

20.    In taking the above-described actions, Defendants intentionally discriminated against Plaintiff causing him severe emotional distress

21.    As a proximate consequence of the violations of Title VII based on race by Defendants, Plaintiff has suffered and will continue to suffer damage to his professional life, and current and future career opportunities.  Further, Plaintiff has suffered future pecuniary losses, emotional pain, inconvenience, mental anguish, loss of enjoyment of life, and non-pecuniary damages.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this Honorable Court grant the following:

(a)  Assume jurisdiction over this action;

(b)  A judgment declaring that Defendants violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000(e), et seq. based on race;

(c)  A judgment declaring Defendants liable for intentional infliction of emotional distress;

(d)  All backpay and fringe benefits from the date of his wrongful denial of said promotion, with interest;

(e)  Attorney's fees;

(f)  Costs;

(g)  Prejudgment interest; and

(h)  An award of such compensatory damages for any loss of wages, and loss of benefits, including, but not limited to, retirement pension benefits, mental anguish, emotional distress, and embarrassment, both past, present and future to which Plaintiff may be entitled; and such further, other and different legal or equitable relief as the Court may deem appropriate to effectuate the purposes of Title VII, or which he may be entitled.

Respectfully submitted,

_____

Juraldine Battle-Hodge (BAT033)

PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON ALL CLAIMS SO TRIABLE.

OF COUNSEL

PLAINTIFF'S ADDRESS

Mr. Elvis Tolbert
3501 Birmingham Highway, Apt. 1003
Opelika, AL 36801

PLEASE SERVE Defendants BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ELVIS TOLBERT, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.:** |
| | ) | **3:05cv1149-MHT** |
| | ) | |
| BRIGGS AND STRATTON | ) | |
| CORPORATION, ROBERT | ) | |
| WESPHAL, HAROLD SMITH, | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT'S EXHIBIT**

9-Tolbert

<u>**NOTICE OF DEPOSITION AND REQUEST**</u>
<u>**FOR PRODUCTION OF DOCUMENTS**</u>

Please take notice that beginning on **Tuesday, June 27, 2006 at 10:00 a.m.**, and continuing from day to day until completed, **at the Law Offices of Juraldine Battle-Hodge, P.C., 207 Montgomery Street, Suite 215, Montgomery, Alabama 36104**, defendant Briggs and Stratton will take the deposition of plaintiff **Elvis Tolbert** before an officer authorized by law to administer oaths and record testimony.

Pursuant to the Federal Rules of Civil Procedure, defendant requests that plaintiff bring the following documents with him to the deposition:

1. Any documents, writings, notes, tapes (video or audio), or correspondence which plaintiff contends support his claims.

1

2.    Any documents, writings, notes, tapes (video or audio), or correspondence which plaintiff has that relate to or concern his employment with defendant Briggs and Stratton

3.    Any and all documents, writings, notes, or correspondence reviewed by plaintiff or utilized by plaintiff to refresh his recollection in preparation for his deposition and/or the allegations in his Complaint.

4.    All income tax returns filed by plaintiff for the last four years or any and all other documents or writings, including but not limited to W-2 forms, which show plaintiff's wages, earnings, and hours worked for the last four years.

Respectfully submitted,

Thomas A. Davis (ASB-5877-S56T)
E-Mail: tdavis@constangy.com
Tamula R. Yelling (ASB-9447-E61T)
E-Mail: tyelling@constangy.com
**CONSTANGY, BROOKS AND SMITH, LLC**
One Federal Place, Suite 900
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 252-9321
Facsimile: (205) 323-7674

**Counsel for Defendant**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all counsel of record by United States Mail, postage pre-paid and properly addressed, as follows:

> Juraldine Battle Hodge, Esq.
> Law Offices of Juraldine Battle-Hodge, P.C.
> 207 Montgomery Street, Suite 215
> Montgomery, AL  36104
> E-Mail:  battleb@bellsouth.net

This 15th day of May, 2006.


_____
Tamula R. Yelling