

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


ELVIS TOLBERT,

     Plaintiff,

vs.               CIVIL ACTION NO.

                  3:05cv1149-T

BRIGGS AND STRATTON

CORPORATION, et al.,

     Defendants.


\*      \*      \*      \*      \*      \*

**DEPOSITION OF HAROLD SMITH,**

taken pursuant to notice and stipulation on

behalf of the Plaintiff, in the offices of

Juraldine Battle-Hodge, Esquire, 207

Montgomery Street, Suite 215, Montgomery,

Alabama, before Vila Davenport, Judicial

Reporter and Notary Public in and for the

State of Alabama at Large, on Tuesday,

September 19, 2004, commencing at

approximately 9:15 a.m.

HAROLD SMITH -- 9/19/06

```
 1                    A P P E A R A N C E S

 2

 3       FOR THE PLAINTIFF:

 4                 JURALDINE BATTLE-HODGE, ESQUIRE

 5                 Attorney at Law

 6                 207 Montgomery Street, Suite 215

 7                 Montgomery, Alabama   36104

 8       FOR THE DEFENDANT BRIGGS AND STRATTON

 9       CORPORATION:

10                 THOMAS A. DAVIS, ESQUIRE

11                 Constangy, Brooks, and Smith, LLC

12                 One Federal Place, Suite 900

13                 1819 Fifth Avenue North

14                 Birmingham, Alabama   35203

15       ALSO PRESENT:

16                 Elvis Tolbert

17                 Tim Beasley

18

19

20

21

22

23
```

HAROLD SMITH -- 9/19/06

```
 1                        STIPULATIONS
 2              It is hereby stipulated and
 3         agreed by and between counsel representing
 4         the parties that the deposition of HAROLD
 5         SMITH is taken pursuant to notice and
 6         stipulation on behalf of the Plaintiff;
 7         that all formalities with respect to
 8         procedural requirements are waived; that
 9         said deposition may be taken before Vila
10         Davenport, Judicial Reporter and Notary
11         Public in and for the State of Alabama at
12         Large, without the formality of a
13         commission; that objections to questions,
14         other than objections as to the form of the
15         questions, need not be made at this time
16         but may be reserved for a ruling at such
17         time as the deposition may be offered in
18         evidence or used for any other purpose as
19         provided for by the Civil Rules of
20         Procedure for the State of Alabama.
21              It is further stipulated and
22         agreed by and between counsel representing
23         the parties in this case that the filing of
```

HAROLD SMITH -- 9/19/06

1    the deposition of **HAROLD SMITH** is hereby

2    waived and that said deposition may be

3    introduced at the trial of this case or

4    used in any other manner by either party

5    hereto provided for by the Statute,

6    regardless of the waiving of the filing of

7    same.

8         It is further stipulated and

9    agreed by and between the parties hereto

10   and the witness that the signature of the

11   witness to this deposition is hereby

12   waived.

13         *     *     *     *     *     *

14                    **INDEX**

15   **EXAMINATION:**                          **PAGE**

16   By Ms. Battle-Hodge...................    6

17   By Mr. Davis..........................    98

18

19   **EXHIBITS:**                             **PAGE**

20   PX-1      EEOC Summary of Charge,         21
             dated 8/8/05.

21

22

23         *     *     *     *     *     *

HAROLD SMITH -- 9/19/06

```
1              HAROLD SMITH, of lawful age,

2     having first been duly sworn, testified as

3     follows:

4              THE REPORTER:  Usual stipulations?

5              MR. DAVIS:  Usual, yes.

6              THE WITNESS:  What's a usual

7                stipulations?

8              MR. DAVIS:  That means that --

9              THE WITNESS:  I'm trying to learn

10               here.

11             MR. DAVIS:  -- means that the

12               objections that we make are just

13               to the form of the questions so

14               she can ask you questions that

15               might not be -- that she might

16               otherwise not be able to ask in

17               court.

18             THE WITNESS:  Oh, okay.

19             MR. DAVIS:  So she could ask you

20               questions based on hearsay, based

21               on opinion, that in the court,

22               the judge would say, you can't

23               ask those questions.  We reserve
```

1              our objections to those type of

2              questions, but if we don't like

3              the way she asks a question, I

4              have to ask her to rephrase it or

5              object to it, and she could

6              still -- you can actually answer.

7          THE WITNESS:  That's interesting.

8          A learning experience.

9                    **EXAMINATION**

10     **BY MS. BATTLE-HODGE:**

11   Q.   Okay, Mr. Smith, let me introduce myself.

12        I'm Juraldine Battle-Hodge, and I'm the

13        attorney for the Plaintiff.

14   A.   Right.

15   Q.   And, of course, we are here this morning to

16        take your deposition.  Would you state your

17        full name, please?

18   A.   Harold Emmett Smith, Jr.

19   Q.   Okay.  And, Emmett, how do you spell that?

20   A.   E-M-M-E-T-T.

21   Q.   Okay.  And I'll tell you a little bit about

22        myself.  I tend to speak pretty fast.  I'm

23        purposely slowing it down right now.  But

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | | when I get excited, sometimes I will speak |
| 2 | | a little fast.  If I do, just ask me to |
| 3 | | repeat whatever, or was it something you |
| 4 | | don't -- if I don't ask a question just the |
| 5 | | way you understand it, ask me to repeat it, |
| 6 | | and I'll be happy to. |
| 7 | A. | No problem. |
| 8 | Q. | And as your attorney said, if -- and I |
| 9 | | might ask a bad question.  When I say a bad |
| 10 | | question, I mean in form or something like |
| 11 | | that that he might object to it.  But if he |
| 12 | | objects to it, it's to the form, but you do |
| 13 | | have the right -- you should go ahead and |
| 14 | | answer it unless he tells you otherwise, |
| 15 | | but you should answer it.  And if you'd -- |
| 16 | | if you, when you answer me, if you would |
| 17 | | make it audible, because the court reporter |
| 18 | | has to write it down. |
| 19 | A. | I will. |
| 20 | Q. | Yes.  And it shouldn't be a real long |
| 21 | | deposition.  I just have some particular |
| 22 | | questions I want to ask you. |
| 23 | A. | Okay. |

HAROLD SMITH -- 9/19/06

1    Q.    And at any time if you need to take a

2          break -- if you want to take a coffee break

3          or restroom or whatever, just let us know,

4          and we can stop, okay, and just resume

5          right back up.

6    A.    All right.

7    Q.    Okay.  I know you said you have never taken

8          a deposition before.

9    A.    Well, you know, I -- kind of, but it's been

10         a long time ago.  It was -- I was a

11         witness.

12   Q.    Okay.  You were a witness?

13   A.    Yeah.  But they didn't really need me.  I

14         sat there and listened, and they really

15         didn't talk to me.

16   Q.    Okay.  So you actually --

17   A.    I was sitting in the room --

18   Q.    Okay.

19   A.    -- but I was only in there about 10 minutes

20         and left so I've never really been

21         disposed -- deposed.

22   Q.    Okay.  But you have had an opportunity to

23         talk to your attorney about what to expect

```
 1          and that type thing?
 2     A.   Oh, yeah.
 3     Q.   Okay.  This morning, are you -- are there
 4          any medications or anything that you're
 5          taking that might affect your ability to
 6          answer questions or anything?
 7     A.   No.
 8     Q.   So there is nothing that would hinder you
 9          from answering truthfully or pointedly or
10          however?
11     A.   Anything to the best of my knowledge,
12          you're going to get.
13     Q.   Okay.  Mr. Smith, where do you live?
14     A.   Where do I live?
15     Q.   Yes, sir.
16     A.   400 Lee Road 683, Opelika, Alabama.
17     Q.   Okay.  So you are in Opelika, and all the
18          streets are Lee Road, and I found that out
19          the hard way.
20     A.   That's a county road; that's correct.
21     Q.   Okay.  So how long have you lived in Lee
22          County?
23     A.   In Lee County, about 6 years I would say.
```

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | Q. | Okay.  And what is your birthday? |
| 2 | A. | 8/6/45. |
| 3 | Q. | Okay.  Are you currently married, |
| 4 | | Mr. Smith? |
| 5 | A. | Oh, yes. |
| 6 | Q. | Okay.  How long have you been married? |
| 7 | A. | Let's see, this October will be 42 years. |
| 8 | Q. | And do y'all have any children? |
| 9 | A. | Three sons. |
| 10 | Q. | Okay.  And what are their names? |
| 11 | A. | Harold, III. |
| 12 | Q. | Okay. |
| 13 | A. | Jeffrey and Matthew. |
| 14 | Q. | Okay.  And how old are they? |
| 15 | A. | My oldest son, he's forty; my middle son is |
| 16 | | probably 38 -- |
| 17 | Q. | Okay. |
| 18 | A. | -- and my youngest son, maybe 34 -- and I'm |
| 19 | | just, you know, I'd have to do some -- |
| 20 | Q. | Okay.  That's fine.  They are all over -- |
| 21 | | they're all adults? |
| 22 | A. | Oh, yes. |
| 23 | Q. | Okay.  Now, where do they live -- where |

HAROLD SMITH -- 9/19/06

```
 1            does Harold live?

 2   A.     He lives in Auburn.

 3   Q.     Okay.  Is Harold married?

 4   A.     Yes.

 5   Q.     Okay.  What's his wife's name?

 6   A.     Paige Smith.

 7   Q.     Okay.  And let me back up just a little

 8            bit.  What's your wife's name?

 9   A.     Patricia Glass Smith.

10   Q.     And Harold, III, and his wife, I would

11            assume, they don't have any adult children?

12   A.     No.

13   Q.     Right.  Okay.  Do you have any adult

14            grandchildren?

15   A.     No.

16   Q.     Okay.  Jeffrey, is he married?

17   A.     Yes.

18   Q.     Okay.  What is his wife's name?

19   A.     Jennifer.

20   Q.     Where does Jeffrey live?

21   A.     He lives in Gurnee, Illinois.

22   Q.     Okay.  He's in Illinois.

23   A.     Currently in China though.
```

HAROLD SMITH -- 9/19/06

| 1 | Q. | In China? |
|---|---|---|
| 2 | A. | Yes. |
| 3 | Q. | Okay.  Is he military, or is he just |
| 4 | | visiting? |
| 5 | A. | No.  He's with Kraft General Foods. |
| 6 | Q. | How wonderful, wonderful.  What about |
| 7 | | Matthew, is he married? |
| 8 | A. | Matthew's married. |
| 9 | Q. | Okay. |
| 10 | A. | He is married to Meg Smith. |
| 11 | Q. | Okay.  And where do they live? |
| 12 | A. | They live in Auburn. |
| 13 | Q. | Okay.  So aside from your wife, Patricia, |
| 14 | | and Harold, III, and Matthew, do you have |
| 15 | | any other relatives who live in Lee County? |
| 16 | A. | No. |
| 17 | Q. | Okay.  What about in Montgomery County? |
| 18 | A. | No. |
| 19 | Q. | Okay.  What about in Pike County? |
| 20 | A. | No. |
| 21 | Q. | Elmore County? |
| 22 | A. | To my knowledge, no. |
| 23 | Q. | Okay.  What about Alabama? |

HAROLD SMITH -- 9/19/06

1   A.   Yeah.  I have some cousins that live in
2        Jefferson County.
3   Q.   Okay.  Birmingham, okay.  No one south of
4        Birmingham?
5   A.   Yes.  My father lives in Panama City.
6   Q.   Okay.  Now, that is south of Birmingham --
7   A.   But that's in Florida.
8   Q.   That's in Florida.  Okay.  Okay.  Let's
9        look at your educational background.
10  A.   Uh-huh.
11  Q.   After high school, would you tell me --
12  A.   I graduated from Birmingham Southern
13       College.
14  Q.   Okay.
15  A.   Okay.  Bachelor's degree.  And I got a
16       master's degree at the University of
17       Memphis.
18  Q.   Okay.
19            THE REPORTER:  University of
20                Memphis?
21            THE WITNESS:  Uh-huh.
22  Q.   When did you get your master's?
23  A.   1980.

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | A. | It's been a long time ago. |
| 3 | Q. | Okay.  Any military? |
| 4 | A. | No. |
| 5 | Q. | Okay.  Let's get to -- |
| 6 | A. | Other than ROTC. |
| 7 | Q. | Okay.  That's military of sorts. |
| 8 | A. | Four years. |
| 9 | Q. | Okay.  Let's look at your employment. |
| 10 | A. | Uh-huh. |
| 11 | Q. | Would you tell me a history of your |
| 12 | | employment, who did you work for? |
| 13 | A. | Prior to Briggs and Stratton? |
| 14 | Q. | Yes, yes, yes, your history, your history. |
| 15 | | THE WITNESS:  Is that okay that |
| 16 | | I -- |
| 17 | | MR. DAVIS:  Yes. |
| 18 | | THE WITNESS:  -- phrase a |
| 19 | | question? |
| 20 | | MS. BATTLE-HODGE:  Yes, that's |
| 21 | | fine, that's fine. |
| 22 | A. | I worked my way through school -- |
| 23 | Q. | Okay. |

HAROLD SMITH -- 9/19/06

1  A.    -- in a steel -- I worked steel mills in

2        Birmingham --

3  Q.    Okay.

4  A.    -- at night.  After I graduated, I went to

5        work for American Air Filter.  I worked for

6        them for about 13 years and moved and went

7        to work for Outboard Marine Corporation.

8        Outboard Marine made Johnson Evinrude, and

9        I worked for them for approximately 16

10       years and then I worked for Briggs and

11       Stratton for about six years.

12 Q.    Okay.  So when you moved to Lee County --

13 A.    Uh-huh.

14 Q.    -- in 2000, you -- is that correct?

15 A.    Yes.

16 Q.    Okay.  And I know you told me what you were

17       doing right before you came to Briggs.

18       Where were you then?

19 A.    I was with Outboard Marine Corporation, and

20       I was a manager of a plant in North

21       Carolina.

22 Q.    Okay.  So you managed a plant there as

23       well?

16
HAROLD SMITH -- 9/19/06

```
 1   A.    Yes.

 2   Q.    Okay.  And when you came to Briggs in 2000,

 3         what position did you --

 4   A.    Plant Manager.

 5   Q.    Okay.  You came as plant manager?

 6   A.    Yes.

 7   Q.    And is that the position you have today?

 8   A.    Correct.

 9   Q.    Okay.  As plant manager, what are your

10         duties and responsibilities?  Everything, I

11         know.

12   A.    Good gracious.  You know, I oversee the

13         function of various departments.

14         Everything from human resources to

15         engineering to production, materials

16         management, primarily.  Shipping and

17         receiving.

18   Q.    So if we are looking at Briggs, is it set

19         up that we have a plant manager and then --

20         I mean, you -- what do you have?

21   A.    I have area managers --

22   Q.    Okay.

23   A.    -- human resource manager, production
```

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | | control manager, engineering manager, |
| 2 | | maintenance manager. |
| 3 | Q. | Okay.  So those managers, they report |
| 4 | | directly to you? |
| 5 | A. | That's correct. |
| 6 | Q. | Okay.  And under those managers, tell me |
| 7 | | what we have. |
| 8 | A. | Generally, it depends on the department. |
| 9 | | In a production department, you would have |
| 10 | | coaches which really are the supervisors up |
| 11 | | there.  We call them coaches, because we |
| 12 | | expect them to lead in that fashion.  And |
| 13 | | then under the engineering, you have |
| 14 | | engineers, engineering manager.  Under |
| 15 | | human resources, you have nurse -- plant |
| 16 | | nurse, safety engineer, you know, various |
| 17 | | functions like that.  Does that -- |
| 18 | Q. | Yes.  That's what I'm asking.  And you say |
| 19 | | you have a production manager? |
| 20 | A. | No. |
| 21 | Q. | Did you say that? |
| 22 | A. | No, no.  Each area manager in production |
| 23 | | are responsible for certain areas. |

HAROLD SMITH -- 9/19/06

1    Q.    Okay.  And your people who are on the --

2          for the lack of a better term, on the line

3          who actually --

4    A.    Shop floor.

5    Q.    Yes, sir.  Now, who -- tell me how they fit

6          into the picture?

7    A.    They generally report to the coaches.

8    Q.    Okay.

9    A.    And the coaches in turn report to the area

10         managers.

11   Q.    Managers.  Okay.  Of course, you know, we

12         are here today because the plaintiff, my

13         client, filed a lawsuit against Briggs and

14         Stratton.  Do you know Mr. Tolbert,

15         Mr. Elvis Tolbert?

16   A.    Oh, yeah.

17   Q.    Okay.  Would you tell me in what capacity?

18   A.    Professionally, I knew him.

19   Q.    Okay.  And was Mr. Tolbert employed at

20         Briggs through your entire tenure?

21   A.    There was a break when he was in military

22         service, but, yes.

23   Q.    Okay.

HAROLD SMITH -- 9/19/06

1   A.    And I think before.

2   Q.    Okay.

3   A.    I know before.

4   Q.    Okay.  Do you recall -- do you know what

5         positions he held?

6   A.    Elvis, the whole time that I was familiar,

7         was a coach -- supervisor.

8   Q.    Okay.  So since Mr. Tolbert was a coach, a

9         supervisor, he would have reported to one

10        of your managers; is that correct?

11  A.    Yeah.  One of the managers that reported to

12        me; that's correct.

13  Q.    Okay.  And in the chain, who did

14        Mr. Tolbert -- which of your managers did

15        Mr. Tolbert report to?

16  A.    If my memory serves me, when I came, he

17        originally reported to Doug Glass --

18  Q.    Okay.

19  A.    -- who was the model twenty area manager.

20  Q.    Okay.

21  A.    And then I think during that time frame he

22        went on military leave.

23  Q.    Okay.

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | A. | And then when he returned, I'm not really |
| 2 | | sure who he reported to when he came back |
| 3 | | initially, but he did report to Rob |
| 4 | | Westfall who was his area manager when |
| 5 | | Elvis was terminated -- |
| 6 | Q. | Westfall? |
| 7 | A. | -- discharged. Yeah. |
| 8 | Q. | And what was Mr. Westfall's -- oh, is his |
| 9 | | position -- is he currently employed? |
| 10 | A. | No. |
| 11 | Q. | Okay. |
| 12 | A. | He is no longer with us, but he was the |
| 13 | | area manager of iron machine. |
| 14 | Q. | Okay. The -- of course, are you aware that |
| 15 | | Mr. Tolbert filed an EEOC complaint against |
| 16 | | Briggs and Stratton? |
| 17 | A. | Yes. I read the results. |
| 18 | Q. | Okay. You got -- did you read the |
| 19 | | complaint? You read the results? |
| 20 | A. | I read the complaint, and I read the |
| 21 | | results. It's been some time ago. |
| 22 | Q. | Right. I understand. I understand. I |
| 23 | | have a copy of the results here. And |

HAROLD SMITH -- 9/19/06

1          actually it's Defendant's Exhibit 3 so we

2          talked about it last time, but the

3          plaintiff is going to offer it as his

4          Exhibit 1.  I'm going to -- just to refresh

5          your memory.  I know it's probably been a

6          while.

7                         (The referred-to document was

8                          marked for identification as

9                          Plaintiff's Exhibit No. 1.)

10  A.     Okay.  Do you want me to reread it?

11  Q.     Well, if you want to, or you can look at

12         it.  We're going to -- it's however you

13         want.  Do you want to look over it real

14         quick?  If you want to, that's fine.  It's

15         your Exhibit 3.

16  A.     Who is the general manager they are

17         referring to here?  It must be Rob

18         Westfall.

19                    MR. DAVIS:  If you don't know.

20                    THE WITNESS:  I don't know.

21                    MS. BATTLE-HODGE:  We'll talk

22                       about it.

23                    MR. DAVIS:  Don't speculate.

HAROLD SMITH -- 9/19/06

```
 1              MS. BATTLE-HODGE:  Right.

 2              MR. DAVIS:  If it's not written, I

 3                 mean, it's not --

 4              THE WITNESS:  Okay.

 5              MR. DAVIS:  -- you can just

 6                 testify based on your personal

 7                 knowledge.

 8              THE WITNESS:  Okay.  All right.

 9                 Uh-huh.

10    Q.    (By Ms. Battle-Hodge)  Okay.  Now, this, I

11          guess, is a -- well, is a summary of the

12          EEOC receiving Mr. Tolbert's charge and

13          your response to it, and this is what the

14          investigator brought out of that, okay?

15    A.    Right.

16              MR. DAVIS:  You can ask him these

17                 questions, but I'm just going to

18                 object to the form.

19              MS. BATTLE-HODGE:  Okay.

20              MR. DAVIS:  Because -- I'll just

21                 tell you why.

22              MS. BATTLE-HODGE:  Okay.

23              MR. DAVIS:  The EEOC talked to the
```

1              Company lawyer, and the Company's

2              lawyer prepared the response.

3          MS. BATTLE-HODGE:  Okay.  That was

4              going to be my next question.

5          MR. DAVIS:  It made -- Mr. Smith

6              was made aware, but I don't know

7              that he had been involved in it

8              or knowledge of how the EEOC

9              worked --

10         MS. BATTLE-HODGE:  Okay.

11         MR. DAVIS:  -- or what took place

12             between the Company's lawyer and

13             EEOC.  There are a lot of moving

14             parts so you need to make sure

15             that you ask him what he was

16             actually --

17         MS. BATTLE-HODGE:  Fair enough.

18  Q.    (By Ms. Battle-Hodge)  Now, and I get --

19        and your attorney spoke to my first

20        question -- I was going to ask you who

21        provided information to the EEOC in

22        response to Mr. Tolbert's complaint?

23  A.    As far as I know, I think you were involved

```
 1            in the response.

 2    Q.      When you say --

 3                  MR. DAVIS:  I think Scott --

 4    A.      Scott Langland and --

 5                  MR. DAVIS:  Yeah.  Scott

 6                       Langland --

 7                  THE REPORTER:  Langland?

 8                  MR. DAVIS:  Yeah.  But he -- what

 9                       he asked you -- and that's

10                       privilege.  I think --

11                  MS. BATTLE-HODGE:  Okay.  That's

12                       fine.  I'm just asking --

13                  MR. DAVIS:  Just -- yeah.  I think

14                       he would just say Scott and leave

15                       it at that.

16    A.      Yeah, Scott Langland.

17    Q.      Okay.  So -- now, who is Scott Langland?

18    A.      He's our attorney.

19    Q.      Okay.  So he would have been the person to

20            prepare or submit your response?

21    A.      Right.

22    Q.      Okay.  Where would Mr. Langland have gotten

23            the information to respond?
```

HAROLD SMITH -- 9/19/06

```
 1   A.    He would have --

 2              MR. DAVIS:  If you don't know,

 3                 don't speculate.

 4   A.    No, I don't know.

 5   Q.    Well, I guess I can ask it this way:  When

 6         you received EEOC complaints, does your

 7         attorney just write things up himself, or

 8         does he consult with anyone?  That's my

 9         question.

10   A.    I'm sure he consults with someone.

11   Q.    Okay.  Who does he consult with?

12   A.    I wouldn't know.

13   Q.    Okay.  Would he not consult with you?

14   A.    He would ask -- and I don't remember.

15              MR. DAVIS:  He can -- if this were

16                 to be attorney/client privilege,

17                 he can say -- he can't talk about

18                 what --

19              MS. BATTLE-HODGE:  No.  I'm not

20                 asking what he --

21              MR. DAVIS:  -- but he can say, we

22                 talked, and that is about it.

23              MS. BATTLE-HODGE:  Right.  That's
```

HAROLD SMITH -- 9/19/06

```
 1                        all I'm asking.
 2    A.     Yeah, he would ask me what I know just as
 3           you would.
 4    Q.     Okay.  So -- and I guess -- and my question
 5           is not the -- what was said here, it's just
 6           how the response comes about.  You have an
 7           attorney -- and I understand that because I
 8           worked as a -- on that same side before --
 9    A.     Right.  Right.
10    Q.     -- so -- and my question -- and I think
11           you've answered it.  If your attorney is
12           putting together a response, who does he
13           consult?  That's the question and --
14                  MR. DAVIS:  I don't know that he
15                     is the best person to answer that
16                     even if he knows.
17    A.     Well, I really don't.
18    Q.     Well, okay.
19    A.     I'm sure he asked me some questions, and I
20           told him just as I have you what I know --
21    Q.     Okay.
22    A.     -- and then he would move on.
23    Q.     To whom?
```

HAROLD SMITH -- 9/19/06

1   A.    To whomever that he thought would be

2         appropriate to answer any questions --

3   Q.    Okay.

4   A.    -- about the response or the events.

5   Q.    Okay.  As the plant manager --

6   A.    Uh-huh.

7   Q.    -- and I know that as the plant manager you

8         have to oversee all of these things.  You

9         probably don't have intricate involvement

10        in doing them yourself, but are there any

11        policies or anything -- do you speak with

12        your attorney as the plant manager?

13  A.    I have from time to time in response to

14        certain actions we've done.  I've

15        requested --

16              MR. DAVIS:  You can't talk about

17                that.  You can ask him -- yeah,

18                he talked to the attorney.

19              MS. BATTLE-HODGE:  Can we go off

20                the record real quick?

21              MR. DAVIS:  Well, no, he can

22                talk --

23              MS. BATTLE-HODGE:  No, I want to

HAROLD SMITH -- 9/19/06

```
 1                 go off the record real quick.  Go

 2                 ahead.

 3           MR. DAVIS:  Well, I'd rather be on

 4                 the record.

 5           MS. BATTLE-HODGE:  No, you can say

 6                 that -- okay.  We all -- I will

 7                 go back on and let you say what

 8                 you want to say.

 9           MR. DAVIS:  I'll say what I'm

10                 going to say.

11                 (Off-the-record discussion.)

12           MR. DAVIS:  My concern and my

13                 objection is based on the

14                 attorney/client privilege.  I

15                 just want to be clear that

16                 Mr. Smith is not -- I'm

17                 instructing him not to answer any

18                 questions that even touch on the

19                 content of what he and myself

20                 talk about or he and the company

21                 attorney talked about as it

22                 relates to the charges filed by

23                 Mr. Tolbert.  Okay?
```

```
 1                    MS. BATTLE-HODGE:  Okay.  And I'll
 2               go on the record saying that my
 3               questions are basically to ask
 4               the process, and that's all I
 5               have asked.  His responses -- I
 6               haven't asked about a fact in
 7               this whatsoever, and I will
 8               respect what you've requested,
 9               and if we could just move on.
10                    I got thrown off a little
11               bit, but -- so going back to
12               where we were, I think,
13               Mr. Smith, you were telling me
14               that once a complaint comes in --
15               and I'm not trying to put words
16               into your mouth.  You correct me
17               if I'm wrong or just that the
18               attorney gets it and then he
19               consults with who -- or he or she
20               consults with whomever he deems
21               necessary; is that correct?
22   A.    Yes.  I said appropriate, but that's --
23   Q.    And I said --
```

30

HAROLD SMITH -- 9/19/06

1   A.    -- whomever he feels appropriate.

2   Q.    Correct.  Okay.  And that's what I'm trying

3         to get to.  So let me ask you this:  So as

4         a plant manager, would you -- so you

5         wouldn't have any knowledge on what -- how

6         Mr. Tolbert performed or anything of that

7         sort?

8   A.    Oh.  I'd have knowledge, yes.

9   Q.    Okay.  If you have that here?

10              MR. DAVIS:  I think you are

11                  referring to Plaintiff's Exhibit

12                  1.

13              MS. BATTLE-HODGE:  Yes, yes,

14                  Exhibit 1, Plaintiff's Exhibit 1.

15  Q.    In paragraph one, you know, it just says

16        that he was hired in 1996; is that correct?

17  A.    As far as I know.

18  Q.    Okay.  That's fine.  You can only answer

19        what you know.  That's fine.

20              MR. DAVIS:  Don't get hung up on

21                  dates.  If you know, you know.

22  A.    No, I don't.

23  Q.    And we can really move from this a little

HAROLD SMITH -- 9/19/06

```
 1              bit now.  Are you familiar with Mr. Tolbert
 2              being counseled at all?
 3    A.        I can only say what I am familiar with.
 4    Q.        Yes, sir.
 5    A.        I counseled all three coaches.
 6    Q.        Okay.  All three, who are you talking
 7              about?
 8    A.        The coaches on all three shifts.
 9    Q.        Oh, you do coach all three, okay.
10    A.        Well, no.  I didn't say that.  I said I
11              counseled with all three during this
12              particular time if my memory --
13    Q.        Yes, sir.  Okay.
14    A.        Elvis being one and then we had had some
15              performance issues --
16    Q.        Okay.
17    A.        -- and we had had some safety critical
18              issues --
19    Q.        Okay.
20    A.        -- that had come up, and I told each of the
21              coaches that it was unacceptable for them
22              to allow parts to go to our assembly line
23              that could possibly self-destruct and put
```

HAROLD SMITH -- 9/19/06

1       other people in jeopardy.

2   Q.  Okay.

3   A.  And I personally coached him and the other

4       coaches.

5   Q.  Who are the other coaches?

6   A.  I don't remember their names.

7   Q.  Okay.

8   A.  And that it was so imperative that they not

9       allow unidentified parts to be within their

10      facility that it was incumbent upon them to

11      come in early and get with the coach that

12      was handing off to make sure none of that

13      occurred and that they had to be in

14      control.

15  Q.  Okay.  Now, the counseling -- you counseled

16      all three shifts?

17  A.  Yes.  In a performance meeting.

18  Q.  Okay.  Now --

19  A.  Now, I'm telling you what I did personally.

20  Q.  No, that's okay.  That's all you could tell

21      me what you did personally.  So you coached

22      all three so was there a problem on all

23      three shifts?

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | A. | I was going to make sure that there wasn't. |
| 2 | | I didn't identify a problem on all of them. |
| 3 | | I wanted to make sure they understood what |
| 4 | | was expected of them and they understood. |
| 5 | Q. | Okay.  So was there a problem? |
| 6 | A. | There obviously was a problem, because if |
| 7 | | still my memory serves me that Rob Westfall |
| 8 | | came to me and said that Elvis at the |
| 9 | | beginning of the shift of his people that |
| 10 | | there were some unidentified parts, and he |
| 11 | | was very frustrated with it. |
| 12 | Q. | Okay.  So at the beginning of Mr. Tolbert's |
| 13 | | shift -- so would that have been left from |
| 14 | | the shift before? |
| 15 | A. | They could have been left from any shift. |
| 16 | Q. | Right. |
| 17 | A. | The point is that they were supposed to be |
| 18 | | identified prior to them beginning their |
| 19 | | shift, meaning the hourly people.  The |
| 20 | | coaches don't really have a shift.  They |
| 21 | | are supposed to come in prior to the shift. |
| 22 | Q. | Okay.  So no -- what did you call them, |
| 23 | | parts, unidentified parts? |

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | A. | Unidentified parts. |
| 2 | Q. | Okay.  So no unidentified parts were ever |
| 3 | | found on any other shift? |
| 4 | A. | I think initially they were, but after a |
| 5 | | period of time, it seemed to be prevalent |
| 6 | | on one -- on one shift more than the other |
| 7 | | according to Mr. Westfall. |
| 8 | Q. | Okay.  When you said prevalent, but there |
| 9 | | were some unidentified -- |
| 10 | A. | Early -- early in the process. |
| 11 | Q. | Okay.  But are you saying that -- |
| 12 | A. | This was reoccurring. |
| 13 | Q. | Okay.  Are you saying that -- |
| 14 | A. | That's all I can say is what I have said. |
| 15 | Q. | Okay.  If I could finish my question -- |
| 16 | A. | All right. |
| 17 | Q. | Okay.  Are you saying that near the end of |
| 18 | | Mr. Tolbert's tenure that there were no |
| 19 | | unidentified parts on other shifts? |
| 20 | A. | No, I didn't say that.  There were, and |
| 21 | | that was a problem. |
| 22 | Q. | Okay.  But on all shifts; is that correct? |
| 23 | A. | It happened early on, on all shifts. |

HAROLD SMITH -- 9/19/06

1    Q.    I guess what I'm getting confused.  When

2          you say happened early on, on all shifts,

3          are you saying that later it didn't happen

4          on all shifts?

5    A.    That's correct.

6    Q.    So by the end, it was only happening on

7          Mr. Tolbert's shift, is that what you are

8          saying?

9    A.    As far as I know, per Mr. Rob Westfall, it

10         was only one shift.

11   Q.    Okay.  And Mr. Westfall, did he supervise

12         Mister -- manage Mr. Tolbert's shift only,

13         or did he manage all shifts?

14   A.    He -- all three.

15   Q.    He managed all three shifts and -- but he

16         only reported that there were problems on

17         Mr. Tolbert's shift.

18   A.    That, among other things.

19   Q.    Okay.  But these other shifts were fine?

20   A.    As far as I know.

21   Q.    Okay.

22   A.    You would have to ask him.

23   Q.    Okay.  Now, you said that when

HAROLD SMITH -- 9/19/06

```
1           Mr. Tolbert -- well you didn't say -- when
2           Mr. Tolbert came back from military
3           service, what position did he come into?
4    A.     Oh, we returned him as a coach.
5    Q.     Okay.  He came -- so in that position, he
6           held the whole time; is that correct, from
7           military?
8    A.     Right.
9    Q.     Okay.  What are the qualifications of a
10          coach?
11   A.     I'm not really -- I'm not, you know,
12          specifically as I read the manual -- I saw
13          on the job description -- I could say that
14          generally, we are looking for someone with
15          a higher education or demonstrate some
16          knowledge of the process of leadership.  We
17          also look for a person that can work with
18          many types of people and communicate
19          clearly and effectively.
20   Q.     Okay.
21   A.     We also look for some technical knowledge,
22          mechanically inclined, and a good work
23          history.  I mean, you have that they are
```

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | | fairly clear about attendance and have a |
| 2 | | good work ethic.  That is one of the |
| 3 | | qualities. |
| 4 | Q. | Okay.  So Mr. Tolbert -- so these were |
| 5 | | characteristics that Mr. Tolbert possessed? |
| 6 | A. | I can't really say whether he actually |
| 7 | | possessed them.  I can say that for him to |
| 8 | | be the coach, at one time he convinced |
| 9 | | someone that he had those qualities. |
| 10 | Q. | Okay.  So at least in the beginning someone |
| 11 | | was convinced that he had those qualities? |
| 12 | A. | That's correct. |
| 13 | Q. | Okay.  Are you saying that those qualities |
| 14 | | weren't shown in his performance? |
| 15 | A. | No.  What I'm saying is, is that at a point |
| 16 | | in time, evidently those qualities were |
| 17 | | deficient according to his area manager. |
| 18 | Q. | Okay.  And -- okay.  And the other coaches, |
| 19 | | you say you don't recall who they were? |
| 20 | A. | You know, I have difficulty -- |
| 21 | Q. | If you don't that's fine.  You can only |
| 22 | | testify to what -- |
| 23 | A. | I can't remember who was on second and |

1          third during that time.

2    Q.    Okay.

3    A.    I have roughly 85 salaried employees.

4    Q.    Okay.  That's fine.  Okay.  So how long did

5          Mr. Tolbert work in the coaching -- coaches

6          position?  How long did he work in that

7          position after he came back from the

8          military until he was terminated?

9    A.    I don't know the exact time.

10   Q.    All right.  Just a --

11   A.    Year or two maybe.

12                   MR. DAVIS:  Don't guess, if you

13               don't know.

14   A.    I don't know.

15   Q.    Okay.  So was he a problem during this --

16         the whole time from the time you gave him

17         the position when he came back -- well, to

18         the time he came back to that position

19         until he was terminated, was he a problem

20         employee?

21   A.    You would have to ask the area manager.

22   Q.    Okay.  What -- well, okay.  I -- okay.  And

23         I respect that.  Did the area manager

1          report to you that he was a problem for

2          you?

3     A.   Yes.

4     Q.   The whole while?

5     A.   No, not the whole time.

6     Q.   Okay.  When did it start?

7     A.   I think primarily, it started when he was

8          in flywheel machine.

9     Q.   I read about that and -- but can you

10         explain that?

11    A.   What?

12    Q.   That area when you say flywheel machine,

13         what is that?  Tell me.

14    A.   Well, it's a heavy piece of cast iron that

15         has to be machined, and in order -- and

16         magnets go inside to generate an electrical

17         pull.  It has to have a rein gear on the

18         outside, and it has a pole piece and a

19         magnet on the outside that generates the

20         pull for the ignition of an engine.  And if

21         they are not done right, they are not made

22         correctly, that could be a serious problem.

23    Q.   Okay.  Where do these fly wheels go?

HAROLD SMITH -- 9/19/06

1           What --

2    A.     They go on the top of an engine.

3    Q.     Okay.

4    A.     On the end of the crank shaft.

5    Q.     Oh, flywheel.  I've heard of that.  Well,

6           okay.  So Mr. Tolbert was the sole coach

7           for fly wheels?

8    A.     First shift.

9    Q.     Okay.  There were three shifts -- all three

10          shifts did flywheel, okay.  Now, there were

11          problems with -- were there problems with

12          Mr. Tolbert's producing the flywheel?

13   A.     As reported by the area manager.

14   Q.     Okay.  And were there problems on any other

15          shift?

16   A.     There were some problems.

17   Q.     Okay.  There were some?  Were those

18          reported?

19   A.     I can't recollect all of them, but

20          certainly there were.  I'm sure there were

21          as in any manufacturing.

22   Q.     Okay.  Now, there were -- he was on first

23          shift; is that correct?

HAROLD SMITH -- 9/19/06

1   A.    Uh-huh.

2   Q.    There were problems with first shift, and

3         you say that there were some problems with

4         second and third shift?

5   A.    Maybe the machine uptime and, you know,

6         different things, and in manufacturing,

7         it's not a perfect world.  You are dealing

8         with a magnitude of problems.

9   Q.    So the problems or concerns that were on

10        first shift, they were much different than

11        the ones on second and third shift?

12  A.    As reported by the area manager, yes.

13  Q.    The area manager is Mr. Westfall; right?

14  A.    That's correct.

15  Q.    And what's his race?

16  A.    He's white.

17  Q.    White, okay.

18  A.    Caucasian.

19  Q.    Yes, sir.  When your area managers report

20        things to you, do you investigate them?

21  A.    I do do some personal observations and

22        confer with other people, yeah.

23  Q.    Okay.  When you say you confer with other

1      people, what do you mean?

2  A.   Well, I walk around the area and look and

3       see for myself some of the issues that I've

4       been noted about.

5  Q.   Okay.

6  A.   I certainly wouldn't do it as thoroughly as

7       an area manager.

8  Q.   Okay.  Right.  Right.  So when Mr. Westfall

9       was reporting that Mr. Tolbert was a

10      problem, did you ever personally counsel

11      Mr. Tolbert about the problem that -- the

12      problem you reported?

13              MR. DAVIS:  Objection.  I don't

14          know he reported detecting the

15          problem.  I think the problem was

16          problems with his job performance

17          didn't improve.

18  Q.  Okay.  Well, did -- okay.  Well, did you

19      ever counsel Mr. Tolbert with regard to the

20      performance that was reported to you?

21  A.  There are a couple of times that I

22      personally would counsel Mr. Tolbert in

23      that he was not leading his group.  He was

```
 1            doing the work while his people watched him
 2            work and that his responsibilities were to
 3            lead other people to do the work correctly.
 4   Q.       Okay.  So is that the problem or --
 5   A.       There were many problems --
 6   Q.       Okay.  That's fine.
 7   A.       -- and they were listed in a letter to me.
 8                     MS. BATTLE-HODGE:  Okay.  If I can
 9                  ask the questions.
10                     MR. DAVIS:  He's finishing
11                  answering.
12                     THE WITNESS:  I'm finishing --
13                     MS. BATTLE-HODGE:  If I can -- no,
14                  if I -- I haven't even asked a
15                  question.  If I can just ask a
16                  question, and you can talk about
17                  that.  Maybe we'll come back to
18                  that.
19   Q.       The problems that Mister -- or the
20            concerns -- however you want to word it,
21            that Mr. Westfall reported to you, were
22            they that Mister -- was the concern that
23            Mr. Tolbert was doing the work, is that
```

44

HAROLD SMITH -- 9/19/06

```
 1        what was reported to you.

 2   A.   There were several --

 3   Q.   No.  Okay.  Is that -- was that a problem?

 4   A.   That was one of them.

 5   Q.   Okay.  And that -- is that the thing that

 6        you counseled Mr. Tolbert about?

 7   A.   Actually, I observed that myself --

 8   Q.   Okay.

 9   A.   -- and had been told by the area manager

10        that that was an issue.

11   Q.   Okay.  What else did you counsel

12        Mr. Tolbert about, if anything?

13   A.   The only other thing that I can say is when

14        the -- we had the responsibility to meet

15        our production goal with quality parts,

16        and, of course, I told him and all three

17        shifts.

18   Q.   Right.  You counseled all three shifts

19        about it, but did you -- was it directly --

20   A.   All three shift coaches.

21   Q.   Right.  All three shift coaches, but did

22        you counsel Mr. Tolbert specifically about

23        it that it was just on his shift or
```

HAROLD SMITH -- 9/19/06

```
 1            anything like that, or was it discussed as

 2            a group, as the company?

 3   A.   No.   That's about the extent of that, yeah.

 4   Q.   What?   What?   About what?

 5   A.   What I just told you.

 6   Q.   What was that?

 7   A.   That I counseled not only him --

 8   Q.   Right.

 9   A.   -- but the other coaches that these were

10            safety critical parts, and we had to meet

11            production goal and that we couldn't allow

12            any unidentified parts to escape to the

13            assembly line.  It could be a real safety

14            issue.

15   Q.   Okay.  Now, is that what ultimately caused

16            Mr. Tolbert's termination?

17   A.   Ultimately what caused it was the list that

18            was generated by Rob Westfall.

19   Q.   Okay.  I know you been wanting to talk

20            about that.  Why don't you talk about it?

21   A.   Well, no, he -- and I can tell y'all how he

22            came to me and said he was frustrated on a

23            number of issues that he had discussed with
```

```
 1          Elvis and that he was at his wit's end.
 2   Q.     When you say he, you mean --
 3   A.     Robert Westfall.
 4   Q.     Okay.
 5   A.     And I asked him had he counseled Elvis, and
 6          he said numerous times.
 7   Q.     Okay.
 8   A.     And I guess you attached the letter that
 9          was sent to me, a copy to Tim Beasley.  I
10          asked him, I said, well, you are going to
11          have to be more specific than that to make
12          absolutely certain that the man understands
13          the issue better.  He sent me a letter and
14          copied Tim Beasley and at which time I
15          asked him to make sure that we -- Tim is my
16          human resource manager.
17   Q.     Uh-huh.
18   A.     To make sure everything is kosher and
19          confer with whomever he had to before he
20          was actually terminated, and that's the
21          chain of events.
22   Q.     Okay.  So you were considering termination
23          even before you received the list?
```

1    A.    No.  I didn't say I was.

2    Q.    What did you just say?

3    A.    No.  He came to me with the recommendation.

4    Q.    Oh, okay.  Mr. Westfall came to you with a

5          recommendation?

6    A.    That's correct.  And that's what generated

7          the letter to me with Tim Beasley copied.

8    Q.    When was that?

9    A.    I think eight or ten hours, I don't --

10   Q.    No, no, no.  When was the -- when did he

11         come to you, Mr. Westfall?

12   A.    Whenever the -- it was during the time that

13         he wrote the letter to me.

14   Q.    Okay.  So you knew at that time that

15         Mr.  Westfall wanted to terminate

16         Mr. Tolbert?

17   A.    Yes.

18   Q.    Okay.  So you had -- and how did the list

19         come about, the list of concerns that you

20         have been talking about?

21   A.    That Rob Westfall put together?

22   Q.    Right.

23   A.    Just what I said.  I asked him -- I said,

HAROLD SMITH -- 9/19/06

```
 1              Look, I want to make absolutely certain

 2              that you have given him every opportunity

 3              to perform, so enumerate what the issues

 4              that you feel you have with this gentleman,

 5              and let me see them.

 6    Q.        Okay.  And so -- and you've testified

 7              earlier that Mr. Westfall is really the

 8              area manager over the shifts?

 9    A.        He was over, yeah, Elvis and the other

10              shifts.

11    Q.        And the other shifts.  But he only reported

12              to you that there were problems, major

13              problems, with Mr. Tolbert?

14    A.        That's correct.

15    Q.        Okay.  Was this done after he attempted to

16              have him -- or recommended that he be

17              terminated?

18    A.        No.  He had mentioned that he had had major

19              problems and then he came to me and said

20              that he was frustrated and that he was not

21              taking the leadership that he felt that he

22              should be taking in that area --

23    Q.        Right.
```

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | A. | -- and his performance was not to the |
| 2 | | standard, whatever the standard that he had |
| 3 | | set -- |
| 4 | Q. | Right. |
| 5 | A. | -- and I said, Well, I want to make |
| 6 | | absolutely certain that you have grounds, |
| 7 | | and you should enumerate what your issues |
| 8 | | are, and he sent me a letter to that effect |
| 9 | | with Tim Beasley copied. |
| 10 | Q. | Right.  And Mr. Westfall continued to |
| 11 | | report that there were problems with |
| 12 | | Mr. Tolbert; is that correct? |
| 13 | A. | No.  After that, that was it.  That was |
| 14 | | the -- |
| 15 | Q. | He didn't -- |
| 16 | A. | -- that was the letter that prompted the |
| 17 | | termination. |
| 18 | Q. | Oh, so you terminated him right after you |
| 19 | | received the letter? |
| 20 | A. | No. |
| 21 | Q. | When did you terminate him? |
| 22 | A. | No, I -- |
| 23 | Q. | Well, no, I got -- and pardon me, I'm not |

HAROLD SMITH -- 9/19/06

1           saying you, I'm saying when was he

2           terminated?

3   A.      He was terminated right after that.

4   Q.      Right after you received the letter?

5   A.      Yeah.

6   Q.      Okay.  As a coach, what was -- tell me the

7           responsibilities of a coach.

8   A.      I thought I told you that earlier.

9   Q.      If you would, just refresh my memory.

10  A.      Oh, okay.  The coach is responsible to

11          train.

12  Q.      Okay.

13  A.      A coach is responsible to make sure that

14          they understand the process technically.

15  Q.      Okay.

16  A.      Understand the process to support

17          production.

18  Q.      Okay.

19  A.      Quality production.

20  Q.      Okay.

21  A.      And to assure that the employees are

22          following the policies and procedures.

23  Q.      Okay.

HAROLD SMITH -- 9/19/06

```
 1    A.    And lead them to those goals, those

 2          production goals.

 3    Q.    Okay.  Do your -- are your coaches have any

 4          authority to choose different people to do

 5          different jobs under them?

 6    A.    I'm sure they do, yes.

 7    Q.    Okay.  Was -- did Mr. Tolbert -- was he

 8          given the free ability -- the ability to

 9          choose people he wanted to -- to do certain

10          things?

11    A.    I'm sure as with any coach.

12    Q.    Okay.  So you're saying that generally a

13          coach, if he was a coach, he should have

14          been given the ability, the leverage to

15          make certain decisions?

16                 MR. DAVIS:  Objection.

17                 MS. BATTLE-HODGE:  You can answer

18              it.

19                 MR. DAVIS:  You can answer it.  I

20              mean, he can answer it.  If you

21              know what she is talking about.

22              I mean, I think what you are

23              trying to say, and I don't mean
```

```
 1                     to try to take over your
 2                     deposition, he couldn't pick the
 3                     people that work on his team.
 4   Q.   That's a good question, could he?
 5   A.   Well, actually -- actually, we have
 6        policies that protect the individual
 7        employee from coaches being capricious, and
 8        that's an important function of our
 9        policies and procedures.
10   Q.   Okay.
11   A.   If you follow the policies and procedures,
12        you can pick the people within the
13        guidelines of the policies.
14   Q.   Were there any problems with Mr. Tolbert in
15        this area?
16   A.   I wouldn't know.
17   Q.   Okay.  Now, you say that Mr. Tolbert was --
18        Mr. Westfall reported there were problems
19        with Mr. Tolbert, and I know you said you
20        couldn't just list all of them, whatever,
21        but there were problems.  Was Mr. Tolbert
22        ever formally disciplined?
23   A.   I was told by Robert Westfall that he was
```

HAROLD SMITH -- 9/19/06

```
 1              counseled.

 2   Q.    When you say counseled, do you mean

 3         verbally?

 4   A.    Yes.

 5   Q.    Okay.

 6   A.    An exempt salaried employee is not like an

 7         hourly employee --

 8   Q.    Okay.

 9   A.    -- where they are carried through various

10         steps.

11   Q.    Okay.  So are you saying that a salaried --

12         his position was salaried?

13   A.    Exempt.

14   Q.    Exempt, I'm sorry.  An exempt salaried

15         employee.  He only receives verbal

16         reprimand, he doesn't get anything written

17         on him?

18   A.    He could, or he could receive it in a

19         performance review that he would be

20         getting, or that, you know, it could be

21         verbal, it could be something written or a

22         note jotted to the file, but there's no

23         formal disciplinary --
```

HAROLD SMITH -- 9/19/06

```
 1   Q.    Right.   Right.   So during the -- and I know

 2         I'm not saying that you said that he was in

 3         this position for a year, but for however

 4         long Mr. Tolbert was in the position he

 5         had, did any of his performances reflect

 6         the problems he was having?

 7   A.    The only thing that I can testify to is

 8         what I have already told you.

 9   Q.    Which is?

10   A.    The area manager saying that Mr. Tolbert

11         had unsatisfactory performance as a coach.

12   Q.    Okay.  So verbally, as far as you know --

13   A.    Well, I think there were some written

14         things too?

15   Q.    Well, what were they?

16   A.    Well, the letter I got was one.

17   Q.    Oh, that -- when that -- where you

18         terminated him?

19   A.    Yes.

20   Q.    Okay.  So the first written thing you

21         received, you terminated him?

22              MR. DAVIS:  Objection.

23   A.    I didn't.
```

1   Q.   Well, the company.  He was terminated?

2   A.   I wouldn't know that.  I just said to my

3        knowledge, the first written thing that I

4        had seen --

5   Q.   Okay.

6   A.   -- there could have been others.

7   Q.   Okay.  After you received the written

8        response or -- from Mr. Westfall, did you

9        speak with Mr. Tolbert after that, did you

10       ask him what was going on?

11  A.   No, I didn't.  I normally would not do

12       that.

13  Q.   Okay.

14  A.   Because I'm -- generally speaking, if

15       someone takes issue, I try to stay out of

16       the process so they can come and appeal or

17       complain to me.

18  Q.   Okay.

19  A.   And the employees have done that.

20  Q.   Okay.  But if a --

21  A.   It's very difficult for me to be in the

22       process yet be somewhat unbiased if an

23       employee has a complaint after they've been

HAROLD SMITH -- 9/19/06

1           terminated.

2    Q.    So the process is if an area manager can

3           show you in writing that an employee should

4           be --

5    A.    Oh, it didn't stop there.  I asked our

6           human resources to get with our legal group

7           and everybody to make sure that we had

8           followed a due process --

9    Q.    Uh-huh.

10   A.    -- so to speak, before an employee is

11          actually terminated.  That goes all the way

12          from an hourly employee to an exempt or

13          whatever.

14   Q.    Okay.  So in essence, you take the

15          recommendation of the area manager -- and

16          granted you did say he needed to show you,

17          you know, you would just take it by saying

18          he needed to show you something?

19   A.    Right.

20   Q.    And if he satisfactorily gives you what you

21          ask, and you sent it to HR --

22   A.    Actually, my human resource manager and his

23          group and whoever he calls in have to -- it

HAROLD SMITH -- 9/19/06

1           really takes three people.

2    Q.     Got you.  But the process doesn't include

3           ever looking at what the employee did, just

4           whatever the -- you're just taking into

5           consideration what the manager says.

6    A.     Right.  I'm not sure what the process is.

7           I can't get involved and get down to

8           everyone of them, but I do know that --

9           that I asked them to make absolutely

10          certain that we had covered everything we

11          possibility could with the gentleman before

12          he is terminated.

13   Q.     So as the plant manager, do you set those

14          policies?

15   A.     No.

16   Q.     Who sets --

17   A.     Actually, our corp -- we have corporate

18          policies.

19   Q.     Okay.  So Briggs is more than just in --

20   A.     Auburn.

21   Q.     -- Auburn.  Okay.  Okay.  So -- but as the

22          plant manager, you just, kind of, take the

23          policy of corporate.  And are you saying