HAROLD SMITH -- 9/19/06

```
 1          it's corporate's policy to, if an area

 2          manager gives the plant manager a

 3          recommendation, just to tell the plant

 4          manager to document it properly and then

 5          terminate the person?

 6                   MR. DAVIS:  I think they --

 7                   MS. BATTLE-HODGE:  Let's go off

 8                      the record.

 9                   (Off-the-record discussion.)

10   Q.     The question is -- let's strike that.

11                   (Off-the-record discussion.)

12                   (Brief recess taken.)

13   Q.     Okay.  Mr. Smith, let's just move to a

14          different line of questioning.  Who is

15          Randy -- I might be pronouncing the last

16          name wrong -- Petasi?

17   A.     I'm familiar with him.

18   Q.     Who is that?

19   A.     He's a Milwaukee employee as the best I

20          know.

21   Q.     Oh, okay.  So he doesn't work at the Auburn

22          plant?  Has he ever worked there?

23   A.     I'm just telling you from memory.
```

HAROLD SMITH -- 9/19/06

1   Q.   Oh, that' fine.

2   A.   He worked there before I came.

3   Q.   Oh, before you came?

4   A.   Yeah.

5   Q.   Do you know what his position is?

6   A.   Uh-uh.

7   Q.   Okay.  As far as you are aware, did

8        Mr. Tolbert ever report any problems he had

9        with any of his set-up people, his people?

10  A.   No, I'm not aware of that.

11  Q.   If he had reported something like that, who

12       would he have reported it to?

13  A.   His area manager.

14  Q.   Okay.  Mr. Westfall?

15  A.   Yeah.

16  Q.   Okay.  As plant manager, are you familiar

17       with the policy -- termination policies of

18       Briggs and Stratton?

19  A.   As far as I know, yeah.

20  Q.   Okay.  If an employee directly disobeys a

21       supervisor/manager, is that cause for a

22       termination?

23  A.   Well, you know, in all cases here is due

HAROLD SMITH -- 9/19/06

```
1              process.  You would have to understand what
2              the reasons would be.
3     Q.       When you say there is due process --
4     A.       Yeah, I mean, typically -- are we talking
5              about an hourly employee or an --
6     Q.       Oh, any employee.  Are they different?
7     A.       Well, it really depends on what the -- why
8              someone would disobey.
9     Q.       Okay.  Well, let's just say if -- let's say
10             if they are an exempt salaried employee or
11             just a regular wage employee, if you will,
12             if that person is written up by his
13             supervisor for whatever reason or -- what
14             happens with that -- if a recommendation is
15             made, what happens with that on termination
16             or something like that?
17                      MR. DAVIS:  Objection.
18                      MS. BATTLE-HODGE:  You can answer
19                      it.
20                      MR. DAVIS:  If you can.
21    A.       Well, what do you mean?  I really don't
22             understand --
23    Q.       If, for instance --
```

HAROLD SMITH -- 9/19/06

1   A.    -- where you are going with this.

2   Q.    Well, it's just a question.

3   A.    Well --

4   Q.    For instance, if -- for instance, if -- I'm

5         just going to try to give you a -- it's not

6         a trick question.  For instance, when you

7         answered, you said Mr. Westfall had made a

8         recommendation, and I'm asking you what --

9         was that process different at the lower

10        level or -- from Mr. Westfall you told me

11        that the only thing he had to do was to

12        write something up and show you, satisfy

13        you, and then you terminated him?

14  A.    Actually, we try to be fair to all of our

15        employees.

16  Q.    When you say fair?

17  A.    Fair and equitable and make sure that they

18        are treated the same.  However, when it

19        comes to hourly employees, there's a clear

20        progression that you go through --

21  Q.    Okay.

22  A.    -- for an hourly employee.

23  Q.    Okay.  And that's different when we are

HAROLD SMITH -- 9/19/06

```
1              talking about the exempt salaried employee?
2    A.    Yeah.  Generally speaking, if they are
3          exempt, they are in the leadership, and
4          they are expected to portray good
5          leadership, and they are handled
6          differently than hourly employees.
7    Q.    Are they -- both employees treated fairly
8          or equitably, the salaried employees?
9    A.    We always try to treat any of our employees
10         fair and equitable.
11   Q.    Okay.  And would you consider, if a
12         recommendation has been made to
13         termination, at least investigating the
14         situation, talk to that employee, would
15         that be a part of what you call equitable?
16   A.    Me personally?
17   Q.    As a policy when you say equitable?
18   A.    If -- by the time it gets to me, it should
19         have been -- or would have been equitably
20         investigated.
21   Q.    By?
22   A.    By the area manager.
23   Q.    Okay.  So you are saying that the area
```

HAROLD SMITH -- 9/19/06

```
 1         manager has the --
 2    A.   Along with the human resource manager and
 3         along with our legal group.
 4    Q.   Okay.  So if an area manager makes a
 5         recommendation and can, you know, put it in
 6         writing and show you that -- satisfy you in
 7         writing, then that -- the --
 8    A.   Along with our human resource manager and
 9         our legal group.
10    Q.   Okay.  Then that person that he recommended
11         or she recommended to be terminated is
12         terminated?
13    A.   Right.
14    Q.   Okay.  All right.  And that's how you treat
15         all of your employees?
16    A.   We would attempt --
17              MR. DAVIS:  Objection.  He made a
18                 difference between exempt.
19              MS. BATTLE-HODGE:  Well, okay.
20    Q.   Exempt salaried employees?
21    A.   Yeah.
22    Q.   Okay.  Have you ever had a recommendation
23         from an area manager to terminate a coach
```

HAROLD SMITH -- 9/19/06

```
 1             before?

 2    A.   Yes.  Same as this particular situation.

 3    Q.   So you just blind -- not blindly.  You just

 4         on the recommendation just terminated?

 5             MR. DAVIS:  Objection.

 6    A.   No.  I'm not the villain here.  It --

 7    Q.   No, no, no.

 8    A.   -- was actually investigated, and the

 9         recommendation would come to me with

10         whatever evidence and -- that would satisfy

11         our human resource and our legal group.

12    Q.   Okay.  Who investigates?

13    A.   The area manager.

14    Q.   So if -- the area manager investigates then

15         writes up the report?

16    A.   Yes.

17             MR. DAVIS:  He said with the human

18                 resources.

19    A.   Along with the human resource and legal

20         group.

21    Q.   Now, I think we have Mr. Beasley -- who is

22         Mr. Beasley?  What is Mr. Beasley's

23         position?
```

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | A. | Human Resource Manager. |
| 2 | Q. | Okay.  Who is Doug Glass? |
| 3 | A. | He was the area manager some time ago. |
| 4 | Q. | Okay.  Is he still at Briggs? |
| 5 | A. | No. |
| 6 | Q. | Do you -- is he still with Briggs |
| 7 | | Corporate, or is he just somewhere else? |
| 8 | A. | He works with someone else to my knowledge. |
| 9 | Q. | Okay.  When you -- first, did you state |
| 10 | | that Mr. Glass, as far as you are aware, |
| 11 | | was Mr. Tolbert's first manager? |
| 12 | A. | Uh-huh. |
| 13 | Q. | Okay.  Now, was that before you came or |
| 14 | | during the time that you were there? |
| 15 | A. | I think it was when I came.  And shortly |
| 16 | | after I came, I think Elvis went on |
| 17 | | military leave. |
| 18 | Q. | Okay.  So when he came back -- okay, that |
| 19 | | was before he went on military leave? |
| 20 | A. | Uh-huh. |
| 21 | Q. | Okay.  And so did you get an opportunity to |
| 22 | | work with Mr. Glass? |
| 23 | A. | Oh, yeah. |

HAROLD SMITH -- 9/19/06

1   Q.   Okay.  Do you recall -- and you might
2        not -- how long Mister -- you had been at
3        Briggs before Mr. Tolbert left for military
4        duty?
5   A.   I'm --
6   Q.   And I'll represent to you, and you can read
7        here and then you can --
8   A.   I'm not really sure.  Maybe -- maybe --
9   Q.   It said -- and I'm not test -- I'm not
10       asking you to testify, it's just was he --
11       it says that he reported in 2002 to
12       military duty so would that have meant that
13       you had been there about a year or two?
14  A.   About two years.
15  Q.   Okay.  So during that year or so, Mr. Glass
16       was Mr. Tolbert's supervisor -- or manager?
17  A.   Right.
18  Q.   Okay.  And what is Mr. Glass' race?
19  A.   He is white.
20  Q.   Okay.  And what area was Mr. Tolbert
21       working in before he went -- left for the
22       military?
23  A.   Assembly.

HAROLD SMITH -- 9/19/06

```
 1   Q.   Assembly.  Now, how is that different -- is
 2        that different from the flywheel?
 3   A.   Yeah.
 4   Q.   Okay.  Tell me --
 5   A.   It's a model twenty engine assembly.
 6   Q.   Okay.  Model twenty engine assembly.  Then
 7        the flywheel -- and you've explained the
 8        flywheel is the little thing that you put
 9        on top of the motor?
10   A.   It's a part that goes in the engine.
11   Q.   Then the assembly, tell me about -- what
12        does that area do, the assembly?
13   A.   It's assembles engines from the parts.
14   Q.   Okay.  As far as you are aware, did
15        Mr.  Beasley ever report any problems out
16        of Mr. Tolbert?
17   A.   Mr. Beasley?
18   Q.   I'm sorry, Mr. Glass.  I'm sorry.
19   A.   No.  I'm not aware --
20   Q.   Okay.
21   A.   -- of any issues that he had.
22   Q.   Okay.  Okay.  As a coach, what type
23        training would a person who's a coach, what
```

HAROLD SMITH -- 9/19/06

1          type training would that person receive?

2    A.    A --

3    Q.    Is there any training from Briggs, from the

4          Company?

5    A.    Yeah.  We do some training.  I'm not sure

6          whether Elvis attended any of it.

7    Q.    Would you tell me the type training you --

8    A.    Leadership courses, conflict

9          resolution-type courses, injury prevention

10         courses.

11   Q.    So what determines whether a coach will

12         receive that type of training?

13   A.    Generally speaking, it's -- some of it's

14         voluntary.  Others, we put them in the

15         leadership courses.  I'm not really sure

16         whether Elvis was in that.

17   Q.    Okay.  If he was a coach --

18   A.    Those would have been available to him.

19   Q.    Are you saying that it would have been on

20         his own volition to get those?

21   A.    Oh, yeah.  You know, sexual harassment,

22         discrimination courses he would have to

23         go --

HAROLD SMITH -- 9/19/06

1    Q.    Those are optional?

2    A.    No.  They are required.

3    Q.    Oh, required.

4    A.    So he would have had to go to those if he

5          was here at that time.  There are other

6          courses in leadership conflict resolution,

7          and I can't remember all of them, but

8          there's a module of curriculum there that

9          he can select from or schedule to attend.

10   Q.    Okay.  When Mr. Tolbert came back from

11         military service, he went into the flywheel

12         area?

13   A.    I'm not sure when he came back where he was

14         actual -- I think he filled the open

15         coaching position as required by law.

16   Q.    Okay.  But he ultimately went into the

17         flywheel?

18   A.    Yeah.  He moved from there to the flywheel,

19         I think, mainly for shift preference.  He

20         wanted to be on first shift.

21   Q.    Okay.  And was that shift running pretty

22         well before Mr. Tolbert took it?

23   A.    If my memory serves me, it was not real

HAROLD SMITH -- 9/19/06

1           well, but it was running.

2    Q.    Would it be correct to say that there were

3          some problems on that shift already?

4    A.    Yeah, there were problems.

5    Q.    What kind of problems?

6    A.    Some quality and production issues.

7    Q.    Okay.  And when Mr. Tolbert took that

8          position, those problems were already

9          there.  So are you saying that -- so the

10         problems that were there, they weren't

11         created by Mr. Tolbert, the shift was

12         already a problem; is that correct?

13   A.    We expect our leaders to improve the

14         situation.

15   Q.    Okay.

16   A.    And that's one of the performance factors.

17   Q.    Okay.  So he came into a pretty bad

18         situation and --

19   A.    I didn't say pretty bad.

20   Q.    Well --

21   A.    There were issues.

22   Q.    With some issues?

23   A.    Issues.  And we expect our leaders to

HAROLD SMITH -- 9/19/06

```
1          improve those issues.

2    Q.    Okay.  So how did Mr. Tolbert perform on

3          that -- in that position?

4    A.    As stated by the area manager, he was not

5          satisfactory.

6    Q.    Okay.  And did you -- you had no personal

7          knowledge of how he performed?

8    A.    I can't evaluate each individual area -- I

9          mean, each individual coach on my own.  I

10         expect my leaders to evaluate equitably and

11         fairly.

12   Q.    Okay.  Who is Jim -- and I might be saying

13         the last name wrong -- Moran, are you

14         familiar with who that is?

15   A.    Jim Moran?

16   Q.    Uh-huh.

17   A.    Yeah, he's a coach at Briggs and Stratton,

18         been with us 30 plus years.

19   Q.    Okay.  And I'm just asking you because

20         these are names that have come up in the

21         information that I have.  I'm just trying

22         to figure out who they are, okay?  Do

23         you -- what position does he -- you said
```

HAROLD SMITH -- 9/19/06

```
 1          he's a --
 2    A.    Coach.
 3    Q.    -- he's a coach?
 4    A.    Uh-huh.
 5    Q.    Now, as a coach, what -- is there a --
 6    A.    It's the traditional supervisor.  We found
 7          it very difficult for a coach to be a team
 8          leader or actually play in the ball game.
 9          We expect them to coach their people to do
10          their work effectively.
11    Q.    Okay.  The position of coach --
12    A.    It's really supervisor.
13    Q.    Supervisor.
14    A.    It's an exempt supervisory position.
15    Q.    Okay.
16    A.    An old traditional term.
17    Q.    Okay.  Are all coaches -- is the coaching
18          position -- is there a pay grade for a
19          coach, or does that vary?
20    A.    There can be two grades.
21    Q.    Okay.  Tell me about that.
22    A.    There is one position that is a grade 10.
23    Q.    Okay.
```

HAROLD SMITH -- 9/19/06

```
 1   A.   And then there's another position that's a
 2        grade 11.
 3   Q.   What's the difference?
 4   A.   Time.
 5   Q.   Okay.
 6   A.   Generally speaking, time and showing
 7        initiative and mobility.
 8   Q.   Okay.  What grade was Mr. Tolbert, if you
 9        recall?
10   A.   To the best of my knowledge, he was a 10.
11   Q.   Okay.  And do you recall, and you might
12        not, what grade Mr. Moran was?
13   A.   Jim Moran?
14   Q.   Yes.
15   A.   I think he was a 10.
16   Q.   Okay.  This is -- you said he had been
17        employed there 30 some odd years?
18   A.   Yeah, right.  Not in that position but --
19   Q.   Right.  I understand.  I understand.  Now,
20        with your coaches, did they have what I
21        would call production goals?
22   A.   Oh, yeah.
23   Q.   Okay.  Did Mr. Tolbert -- did he fail at
```

HAROLD SMITH -- 9/19/06

```
 1           meeting his goals?

 2   A.      As reported by the area manager, yes.

 3   Q.      Did the other shifts hit the goals, or did

 4           they -- he never reported anything on that;

 5           is that correct?

 6   A.      Well, I, you know, they didn't always, no,

 7           to my knowledge.

 8   Q.      Okay.

 9   A.      You know, I'm just speculating.

10   Q.      You're spec -- all right.  And I'm not

11           asking you to speculate, but as far as you

12           know, Mr. Westfall never said that there

13           were production -- never reported to you

14           that the other shift didn't make

15           production?

16   A.      He may have, but, you know, I really --

17   Q.      All right.

18   A.      -- I'm pulling from memory.

19   Q.      Okay.  Are you familiar -- do you know who

20           John Franz is?

21   A.      Franz?

22   Q.      Yes.

23   A.      Yes, I know him.
```

HAROLD SMITH -- 9/19/06

| | | |
|---|---|---|
| 1 | Q. | Who is that? |
| 2 | A. | He is an area manager. |
| 3 | Q. | Now, is there a Jeff, or do -- is this the |
| 4 | | same person?  Do you recall having an area |
| 5 | | manager or coach first name of Jeff? |
| 6 | A. | Jeff Gargus. |
| 7 | Q. | Yes.  What's his position? |
| 8 | A. | He's an area manager also. |
| 9 | Q. | Okay.  These people didn't supervisor |
| 10 | | Mr. Tolbert though? |
| 11 | A. | They may have at some point. |
| 12 | Q. | Okay.  But in the end, Mr. Westfall did? |
| 13 | A. | Right. |
| 14 | Q. | Okay.  Was Mr. Tolbert ever disciplined for |
| 15 | | production, lack of production? |
| 16 | A. | By? |
| 17 | Q. | By -- |
| 18 | A. | Area manager -- |
| 19 | Q. | -- from whomever? |
| 20 | A. | -- Westfall, yes. |
| 21 | Q. | He was? |
| 22 | A. | Yes.  I'm sure he was. |
| 23 | Q. | When you say -- |

HAROLD SMITH -- 9/19/06

1   A.   Well, I sat in a meeting with Elvis

2        present, and Mr. Westfall was counseling on

3        that we had to meet certain production

4        goals.

5   Q.   Okay.  But that wasn't to Mr. Tolbert

6        individually, that was with the group?

7   A.   Well, the group -- there were other people

8        in there, but the group was taking

9        leadership from Mr. Tolbert.  They were his

10       people and him.

11  Q.   Oh, so the discipline was just on his

12       shift, it wasn't -- you didn't talk to the

13       other people?

14  A.   Well, I'm sure that if there were problems

15       with other shifts that --

16  Q.   I got you.  So the discipline itself would

17       have just been Mr. Tolbert, but as far as

18       you know, did he discipline the other

19       shifts?

20  A.   No.

21  Q.   Okay.

22  A.   I didn't -- what I said was that I sat in

23       meetings where we failed to meet our

HAROLD SMITH -- 9/19/06

```
 1            production goals, and Mr. Tolbert along

 2            with his crew were counseled to improve

 3            their performance.  Now, that is all I can

 4            say --

 5    Q.      Okay.  That's fine.

 6    A.      -- and did it transpire on the other

 7            shifts, it probably could have.  I'm sure

 8            that it occurred.

 9    Q.      Okay.  But it didn't get to you?

10    A.      Well, I can't remember any exact times, but

11            I'm sure it did.

12    Q.      Okay.  Who is Roger Milby?

13    A.      Who is Roger Milby, he is employed at

14            Briggs.

15    Q.      What's his position?

16    A.      Flywheel machine.

17    Q.      Okay.  What's -- is he a manager, area

18            manager?

19    A.      He's over flywheel machine at Briggs.

20    Q.      Okay.  So is he a coach, or is he a

21            manager?

22    A.      If you want to make it short, he is a grade

23            11 over flywheel machine.
```

HAROLD SMITH -- 9/19/06

| 1  | Q. | Okay.  Is that the same position that |
| 2  |    | Mr. Tolbert had before he -- |
| 3  | A. | No. |
| 4  | Q. | Okay.  So tell me the difference. |
| 5  | A. | He was hired in as that. |
| 6  | Q. | He was hired in as what? |
| 7  | A. | A grade 11 manufacturing tech over flywheel |
| 8  |    | machine. |
| 9  | Q. | Okay.  When he was hired in, did he come |
| 10 |    | from outside the plant? |
| 11 | A. | Yes. |
| 12 | Q. | Where did he come from? |
| 13 | A. | He came from -- to my knowledge, he came |
| 14 |    | from South Alabama. |
| 15 | Q. | Okay.  How long has Mr. Milby been with |
| 16 |    | Briggs? |
| 17 | A. | I can't say.  I really don't know. |
| 18 | Q. | Okay.  Was he there when you came? |
| 19 | A. | No. |
| 20 | Q. | Okay. |
| 21 | A. | He -- I'd say he has been with Briggs 15 -- |
| 22 |    | maybe 15 years -- 10 or 15 years. |
| 23 | Q. | But you came in 2000?  So he was there when |

HAROLD SMITH -- 9/19/06

1              you came?

2    A.    No.  He had left the company and came back

3          with the company -- in total --

4    Q.    Okay.  I'm just trying to be clear.

5          Mr. Milby worked for Briggs before you

6          came.  Okay.  Then -- but when he came

7          back, it was after you had been here for a

8          while?

9    A.    Uh-huh.

10   Q.    Okay.  And when he came back, he was -- is

11         that when he was hired in as a grade 11?

12   A.    Yes.

13   Q.    Okay.  Do you recall when he came back?

14   A.    No.  Not --

15              MR. DAVIS:  Just testify about

16                  what you know if you know.

17   A.    No, I mean, it's of record.  I don't

18         remember.

19   Q.    Okay.  Was he there before Mr. Tolbert was

20         terminated?

21   A.    Yes.

22   Q.    Okay.  What position was he working in

23         before Mr. Tolbert was terminated?

HAROLD SMITH -- 9/19/06

```
1    A.    Well, they're the same position.

2    Q.    It's flywheel?

3    A.    Yeah.  As far as I remember.

4    Q.    Okay.  But he would be on a different

5          shift?

6    A.    No.  He was on first.

7    Q.    So they both worked at the flywheel on

8          first?

9    A.    Yeah.  I'm trying to really -- I'm trying

10         to really remember that.  He was -- I can't

11         remember to tell you the truth, but he was

12         there in that position.

13   Q.    And he was on first shift?

14   A.    Yeah.

15   Q.    Mr. Tolbert's on first shift?

16   A.    Yeah.

17   Q.    Mr. Tolbert worked in this position?

18   A.    Mr. Tolbert was the coach of the first

19         shift hourly employees.

20   Q.    Okay.

21   A.    Roger Milby is the guy that's over all the

22         machinery and people on all --

23   Q.    Oh, got it.  Oh, they were on the same
```

HAROLD SMITH -- 9/19/06

```
 1            shift, but they did different jobs?
 2    A.      Yes.
 3    Q.      Okay.  He was over machinery so is it -- so
 4            when did he assume the position over the
 5            flywheel?
 6    A.      He had been in the flywheel the whole time
 7            and responsible.  He became in charge of
 8            the hourly people over the fly wheels after
 9            Mr. Tolbert left.
10    Q.      Okay.  So he was placed in the position
11            that Mr. Tolbert had before he left?
12    A.      I don't -- yeah.  He actually assumed
13            responsibility for all three shifts.
14    Q.      Okay.  So he worked first, second, and
15            third shift?
16    A.      No.  He has the second and third shift
17            people that report to him.
18    Q.      Okay.  So is he --
19    A.      It's not an area manager, but he's -- what
20            we call a senior --
21    Q.      I got you.  So what you're saying is
22            that --
23    A.      He's a senior guy.
```

HAROLD SMITH -- 9/19/06

| 1 | Q. | So the coaches report to him? |
|---|----|-------|

1  Q.  So the coaches report to him?

2  A.  They do.

3  Q.  On all the shifts?

4  A.  Along with the area manager.

5  Q.  Did they do that before Mr. Tolbert left?

6  A.  I can't remember.

7  Q.  Do you remember or recall if Mr. Tolbert

8      reported to Mr. Milby?

9  A.  I don't think so.

10 Q.  Okay.  So immediately after Mr. Tolbert was

11     terminated --

12 A.  Uh-huh.

13 Q.  -- tell me what happened with his -- at

14     that point, what happened with the position

15     he held?

16 A.  As far as I know, we didn't fill the

17     position that he held.

18 Q.  Uh-huh.

19 A.  In addition to his current duties, Milby

20     assumed those on first shift.

21 Q.  Okay.  Are you aware that Mr. Milby before

22     he -- was he looking for other employment

23     before he was placed into the position --

HAROLD SMITH -- 9/19/06

```
 1          finally placed where he is now?
 2                  MR. DAVIS:   Objection.
 3   A.     I don't think.
 4   Q.     I'm asking you, do you -- were you -- are
 5          you aware that he was looking for other
 6          employment?
 7   A.     No.
 8   Q.     Okay.  And Mr. Milby is still currently in
 9          that position?
10   A.     Yes.
11                  MR. DAVIS:   Objection.
12   Q.     Okay.  What's Mr. Milby's race?
13   A.     He is white.
14   Q.     So how did Mr. Milby come to get the
15          position that Mr. Tolbert had?
16   A.     He reported to the area manager, and he
17          assumed the responsibility vacated by
18          Tolbert.
19   Q.     Did Mr. Westfall -- well, was Mr. Westfall
20          a superior?
21   A.     Yeah.
22   Q.     Okay.  So did Mr. Westfall place him in
23          that position that he assumed?
```

HAROLD SMITH -- 9/19/06

```
 1   A.    Yes.

 2   Q.    Okay.

 3   A.    He assumed the additional responsibility.

 4   Q.    Okay.  And then he was ultimately put where

 5         he is now; is that correct?

 6   A.    No, that's where he's been.

 7   Q.    Okay.

 8              MR. DAVIS:  That is where he was.

 9                 He was not moved.

10              MS. BATTLE-HODGE:  Right.  And

11                 I -- right.

12   A.    He was in that position, and when the

13         position was vacated, he assumed the

14         initial responsibilities and to his current

15         position.

16              MR. DAVIS:  There was no status

17                 change.

18   A.    No.  I mean, he is still grade 11.

19   Q.    Okay.

20   A.    To my knowledge.

21   Q.    Just for clarification, who actually

22         terminated Mr. Tolbert?

23   A.    I don't know who was in the meeting that
```

```
 1              actually took place.  I speculate that the
 2              human resource manager was.
 3     Q.       Okay.  And just for my clarification, the
 4              termination was had after Mr. Westfall
 5              reported his concerns to you; is that
 6              correct?
 7     A.       Uh-huh.
 8     Q.       And I think you testified -- and tell me if
 9              I'm wrong.  You testified that you required
10              Mr. Westfall to give you something more
11              than just his word on why he should be
12              terminated; is that correct?
13     A.       I asked him to enumerate his --
14     Q.       Right.  And he did that?
15     A.       -- and that's why I got the letter.
16     Q.       That's why you got that letter, and once
17              you got that letter, you assured --
18     A.       I asked him to make sure that the human
19              resource manager had a copy of it --
20     Q.       Okay.
21     A.       -- and I expect him to get with the human
22              resource manager --
23     Q.       Uh-huh.
```

HAROLD SMITH -- 9/19/06

1    A.    -- to do the proper thing and be fair and

2          equitable and carry it through our process

3          to termination if this is what they found.

4    Q.    Okay.  And when an area manager gets with

5          the human resource department, what does

6          the human resource -- how do they find --

7          determine if something is equitable or not,

8          do they --

9    A.    My instructions and what human resource

10         managers do is make sure that we follow our

11         policies stated legally, fairly, and he can

12         confer with our legal group.

13   Q.    Right.  I got you.  And once all of that

14         was done then termination was implemented;

15         correct, after everything was checked out

16         with the HR and legal?

17   A.    Yes.

18   Q.    And Mr. Tolbert wasn't --

19   A.    Did I personally sit in, no.

20   Q.    Okay.  That's fine.  That's fine.

21   A.    And I explained why.

22   Q.    Uh-huh.

23                   MR. DAVIS:  Just answer the

HAROLD SMITH -- 9/19/06

```
 1                         question.

 2   A.    Okay.

 3   Q.    And why was Mr. Tolbert -- was Mr. Tolbert

 4         told why he was being terminated?

 5               MR. DAVIS:  He just said he wasn't

 6                    in the meeting.

 7   A.    I wasn't in the meeting.

 8   Q.    Was he -- was anything given to him or --

 9         but Mr. Tolbert wasn't in a meeting after

10         or was he?

11   A.    Yeah, he was in the meeting.

12   Q.    Oh, he was in the meeting.  Okay.  Did they

13         tell him he was terminated at that time?

14   A.    I wasn't there.

15   Q.    Okay.  And I'm almost done.  Let me just,

16         kind of, recap a little bit.  After

17         Mr. Tolbert was terminated the position,

18         Mr. Milby assumed his duties; is that

19         correct?

20   A.    In addition to his current duties.

21   Q.    Right, right, that's correct; is that

22         correct?

23   A.    Uh-huh.
```

HAROLD SMITH -- 9/19/06

1    Q.    The coach's position, after that position,

2          are there any other opportunities for

3          advancement after that?

4    A.    Yes.  I -- in fact, I encourage all the

5          coaches to further their education and

6          prepare themselves to become area manager.

7    Q.    Okay.

8    A.    We like to have depth, bench strength.

9    Q.    Right.  Was Mr. Tolbert -- if he had not

10         received these -- had never been

11         terminated, would he have been considered

12         for any other positions or in line for any

13         other position?

14               MR. DAVIS:  Objection.

15   A.    It would be difficult for me to say.

16         That's based on performance.

17   Q.    Okay.  That's fair enough.  That's fair

18         enough.  And, again, what performance

19         issues were found to be insufficient with

20         regard to Mr. Tolbert due to his -- when he

21         was terminated?

22   A.    It's enumerated in the letter to me by the

23         area manager.  I haven't reviewed the

HAROLD SMITH -- 9/19/06

```
 1              letter.

 2      Q.      You mean the letter that you asked him to

 3              give you?

 4      A.      Yes.

 5      Q.      Okay.  And as compared to other

 6              supervisors -- I guess there weren't any

 7              other reports of other supervisors being --

 8      A.      There have been in the past.

 9      Q.      When you say in the past, when?

10      A.      I can't say right off the head, but there

11              have been other supervisors terminated for

12              poor performance.

13      Q.      Okay.  And you say that Mr. Westfall

14              reported to you that he did counsel

15              Mr. Tolbert about his performance problems?

16      A.      Uh-huh.

17      Q.      Okay.  And you testified that as far as

18              performance, you did speak with the group.

19              When I say the group, I mean the shift

20              coaches about the importance of --

21      A.      I only spoke to all three coaches of the

22              importance of unidentified parts and

23              meeting their production goals.
```

90

HAROLD SMITH -- 9/19/06

1   Q.   Okay.  And, again, is there any

2        documentation with regard to poor

3        performance on Mr. Tolbert's part other

4        than the letter that Mr. Westfall gave you

5        at the end?

6   A.   I have read some, yes, and I think you're

7        privy to it also.

8   Q.   No, I'm not.  What have you read?  Oh, I

9        might be, just what is it?

10  A.   As far as I know, there is a list of

11       deficiencies.

12  Q.   Deficiencies?

13  A.   Yeah.  In the department that the letter

14       was actually drawn up.

15  Q.   There was discipline?  These were some

16       disciplinary things he received?

17  A.   That's all.

18  Q.   Okay.  But I'm saying, did he receive --

19  A.   It's in the document.

20  Q.   But is that discipline that you are

21       referring to?

22  A.   I think it indicates deficiencies, that's

23       all.

HAROLD SMITH -- 9/19/06

```
 1    Q.    Who wrote it?

 2    A.    I think Elvis wrote it.

 3    Q.    Okay.  Elvis wrote it.  Were those not

 4          concerns he had?

 5    A.    I --

 6    Q.    Okay.  But I guess my question is:  Were

 7          there any documentation from management,

 8          from Briggs, on his poor performance other

 9          than the letter that Mr. Westfall gave you?

10    A.    I'm not privy to that.  No, I don't know.

11                    MS. BATTLE-HODGE:  If you would

12                    give us a second to consult here,

13                    we are about done.  I know your

14                    attorney probably has some

15                    questions, but we are going to

16                    just step outside for a second.

17                    THE WITNESS:  Okay.

18                    (Brief recess taken.)

19    Q.    I have just a few other questions,

20          Mr. Smith, and my part -- our part will be

21          done, okay?  Before Mr. Tolbert came to the

22          flywheel department or whatever -- the work

23          in the fly wheels, did you hear any
```

HAROLD SMITH -- 9/19/06

```
 1        problems with him before that?
 2   A.   I'm not aware of any.
 3   Q.   Okay.  And I know we talked about the
 4        unidentified parts.
 5   A.   Uh-huh.
 6   Q.   Are there any markings or anything on the
 7        parts that identify which shift they come
 8        from?
 9   A.   Actually, we don't as to -- well, let me
10        answer it this way.  Actually, if there are
11        parts that are outside the flow of the
12        process, they probably are shift marked,
13        but if they are outside the flow of the
14        process regardless of the shift, some parts
15        may be started on one shift and finished on
16        another.  If they are unidentified outside
17        the process, we consider those to be
18        unidentified parts that are of suspect
19        quality.
20   Q.   Okay.  So just whatever shift they're
21        marked?
22   A.   Yeah, they could have come from other
23        shifts, but it was the responsibility at
```

HAROLD SMITH -- 9/19/06

```
 1            the beginning of the shift to make sure

 2            that there were no unidentified parts

 3            carried in from the previous shift.

 4    Q.     And I think you answered this, but are --

 5    A.     I did answer that earlier.

 6    Q.     No.  Are -- okay.  Are you -- and I know

 7            you have answered this, I think.  The

 8            unidentified parts, you said that you were

 9            just made aware of the unidentified parts

10            on the first shift, are you saying that

11            there were no unidentified parts on the

12            other shifts?

13    A.     I'm not aware of any.

14    Q.     Okay.  Are you -- do know if Mr. Westfall

15            was present on a daily basis on the other

16            shifts?

17    A.     He was in the plant on other shifts, yes.

18    Q.     What shift did he actually work on?

19    A.     He -- officially, he was first shift --

20    Q.     Okay.

21    A.     -- but I know he was on second and came in

22            early on third from time to time.

23    Q.     But during the whole shift, he probably
```

HAROLD SMITH -- 9/19/06

```
1            wasn't there, because he didn't work 24

2            hours a day; is that correct?

3                    MR. DAVIS:  Objection.  Telling

4                      him what he knew.

5    Q.      The people who were supervising prior to

6            Mr. Tolbert being terminated from that

7            department he was working in, are they

8            still -- do they still work at Briggs?

9    A.      I'm sorry.  Say that again, because I was

10           thinking something else while you were

11           talking.

12   Q.      That's fine.  Prior to Mr. Tolbert being

13           terminated, I know that there were

14           supervisors.  He was one supervisor.  Are

15           those people still working there?

16   A.      On the other two shifts?

17   Q.      Yes.

18   A.      You know, I don't remember whether they

19           were the same.

20   Q.      Okay.  That's fair enough.

21                   MS. BATTLE-HODGE:  And I'll ask

22                     your attorney, and then you

23                     probably already have it.  I
```

HAROLD SMITH -- 9/19/06

```
 1                    don't in my records -- can you
 2                    give me a copy of the letter that
 3                    Mr. Westfall ultimately gave
 4                    Mr. Smith on the recommendation
 5                    of termination?
 6              MR. DAVIS:  Sure.  That's part of
 7                    our initial discovery.
 8              MS. BATTLE-HODGE:  Okay.  Well,
 9                    I'll go back through and make
10                    sure it's there.  If it's not
11                    then I'll call you, if that's
12                    okay.
13  Q.    Are you aware that the majority of the
14        usable fly wheels came from the first
15        shift?  Are you aware that the majority of
16        the fly wheels that were usable were the
17        ones that were produced on first shift?
18  A.    I'm not sure that anybody is aware of which
19        shift the most useable...
20  Q.    Okay.  So in that same line, would anyone
21        know which shift would have the most
22        problems of putting together fly wheels?
23  A.    I would suspect that one would, if they
```

HAROLD SMITH -- 9/19/06

```
 1           were on top of it, would know which shift
 2           was producing --
 3    Q.     Right.
 4    A.     -- the most and which one had the highest
 5           problems, yes.  I don't know that.
 6    Q.     Okay.  And that's what I was asking that
 7           it be -- okay.  But you don't know whether
 8           it was first shift of not?
 9    A.     No.
10    Q.     You don't know, okay.  Last question.
11    A.     No, it's not.
12    Q.     It's a lawyer, right?  You stated that
13           Mr. Milby worked in the area that he is
14           currently in before Mr. Tolbert was
15           terminated?
16    A.     Yes.
17    Q.     Okay.  Did he have any dealings with fly
18           wheels beforehand?
19    A.     Yes.
20    Q.     Okay.  And what was his position?
21    A.     He was in charge of all the technical
22           aspects of the flywheel machines, uptime
23           tooling specification processes, you know,
```

1            that type of --
2    Q.    And you are right, I have another question.
3          So would it not be fair to say that if
4          there was a problem with the flywheel,
5          Mr. Milby should have shared some of that?
6    A.    No.  I don't think it's a question of
7          sharing.  I think it's a question of what's
8          the process with using a good part, the
9          expectations given there, the amount of
10         constraints that were put on the tooling
11         and everything, that's the coach's
12         responsibility to make that concept work.
13   Q.    So Mr. Milby had nothing to do with that?
14   A.    When he identifies the process then that is
15         his responsibility.
16   Q.    Okay.  I guess what I'm asking you is the
17         problems that were alleged that
18         Mr. Westfall brought forward, Mr. Milby
19         wouldn't have had any say into any of that?
20   A.    Not to my knowledge.
21   Q.    Right.  That's fine.
22                MS. BATTLE-HODGE:  I have no
23                    further questions.

HAROLD SMITH -- 9/19/06

```
 1              MR. DAVIS:  All right.  A couple

 2           of questions.

 3                   EXAMINATION

 4      BY MR. DAVIS:

 5  Q.   Mr. Smith, who would be the best person to

 6       talk to about Elvis's job performance?

 7  A.   The area manager.

 8  Q.   And that is somebody that reports to you?

 9  A.   Yes.

10  Q.   And that is Robert Westfall?

11  A.   That's correct.

12  Q.   And the purpose of asking him to write this

13       letter -- or a purpose was to make sure

14       that Elvis was aware of the problem and had

15       been talked to, is that one of your

16       concerns, you wanted to be sure that that

17       had been done?

18  A.   Absolutely.  That he had it clear thought.

19  Q.   And then the human resources department is

20       another step in that process to make sure

21       that the employee or supervisors are aware

22       of a problem they had been told about in

23       advance?
```

HAROLD SMITH -- 9/19/06

```
1   A.    Yes.  And to explore any other ramification
2         that may come up.
3   Q.    Now, we talked about Mr. Milby.  Mr. Milby
4         worked in his job before Elvis was
5         terminated; isn't that right?
6   A.    Correct.
7   Q.    And he just assumed Elvis's
8         responsibilities after Elvis left.
9   A.    In addition to his current.
10  Q.    Did he get a pay increase?
11  A.    To my knowledge, no.
12  Q.    Is that considered a promotion?
13  A.    No.
14  Q.    Did Mr. Milby work on computers, some sort
15        of a technical position?
16  A.    Well, he will, he can, yeah.
17  Q.    And that's not what Mr. Tolbert did, is it?
18  A.    I -- you -- when you say work on the
19        machine, are you talking about repairing
20        the machine or run the machine?
21  Q.    Mr. Milby worked on a different job than
22        Mr. Tolbert?
23  A.    Right.
```

HAROLD SMITH -- 9/19/06

1    Q.    Not until Mr. Tolbert left?

2    A.    Right.

3    Q.    But the point is that Mr. Milby was working

4          for the company before Mr. Tolbert was

5          terminated?

6    A.    That's correct.

7    Q.    Okay.

8                 MR. DAVIS:  That's it.

9                 MS. BATTLE-HODGE:  That's it.

10                    Thank you all.

11

12          (The deposition of **HAROLD SMITH** concluded

13           at approximately 11:05 a.m., on September

14           19, 2006.)

15

16

17

18

19

20

21

22

23

HAROLD SMITH -- 9/19/06

```
 1                    *  *  *  *  *  *  *  *  *  *  *

 2                  REPORTER'S   CERTIFICATE

 3                    *  *  *  *  *  *  *  *  *  *  *

 4

 5     STATE OF ALABAMA

 6     COUNTY OF MONTGOMERY

 7

 8               I, Vila Davenport, Judicial

 9     Reporter and Notary Public in and for the

10     State of Alabama at Large, do hereby

11     certify that on Tuesday, September 19,

12     2006, pursuant to notice and stipulation on

13     behalf of the Plaintiff, I reported the

14     deposition of HAROLD SMITH, who was first

15     duly sworn by me to speak the truth, the

16     whole truth, and nothing but the truth, in

17     the matter of ELVIS TOLBERT, Plaintiff,

18     versus BRIGGS AND STRATTON CORPORATION, et

19     al., Civil Action No. 3:05cv1149-T, now

20     pending in the United States District Court

21     For The Middle District of Alabama,

22     Northern Division, that the foregoing 100

23     pages contain a true and accurate
```

HAROLD SMITH -- 9/19/06

1          transcription of the examination of said

2          witness by counsel for the parties set out

3          herein; that the reading and signing of

4          said deposition was waived by witness and

5          counsel for the parties.

6                    I further certify that I am

7          neither of kin nor of counsel to the

8          parties to said cause, nor in any manner

9          interested in the results thereof.

10                    This 4th day of October, 2006.

11

12

13          Vila Davenport
            Reporter and Notary Public
14          State of Alabama at Large

15          My Commission Expires
            September 6, 2009
16

17

18

19

20

21

22

23

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Birmingham District Office

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
(205) 212-2132
TTY (205) 212-2112
FAX (205) 212-2105

Elvis Tolbert
c/o Juraldine Battle-Hodge
Attorney at Law
207 Montgomery Street
Suite 215
Montgomery, AL  36121-0243



Re: Charge #130-2005-03436
Elvis Tolbert   v.  Briggs & Straton Corporation

Dear Mr. Tolbert:

The Commission is in receipt of documents submitted by your employer and is investigating the allegations contained in your charge of discrimination. The following is a summary of the information received to date.

1.  It is undisputed that you were hired in early 1996, as a temporary operator.  You became a permanent operator in May 1996.  In late 1996, you advanced to the position of Team Leader.

2.  You had advanced to the position of supervisor when you left work to report for military duty in February 2002.  In October 2003, you returned to work as a supervisor in the machinery department.

3.  On November 15th and 24th, 2004, you were counseled with reference to production goals for your unit.  On November 29, 2004, you did not inform the Control Manager that your unit had no production for that day.  Later that afternoon, you did not advise management that additional flywheels were needed to meet assembly line requirements.  On November 30, 2004, you reported that your unit produced 50% of the flywheels required for satisfactory job performance.  On December 7, 2004, management found five unidentified baskets of material and twelve parts that you had not included  on your report the previous day.

4.  During the first week of December 2004, the general manager discussed your substandard job performance with you.   You were asked to make a list of all the deficiencies in your area that could be corrected. You listed 127 deficiencies and work hazards that you observed and submitted the list to the general manager.  It was this manager who directed you to correct the deficiencies that you listed on your report.

5.  Respondent contends that your job performance improved slightly but you did not find it necessary to communicate problems that you were aware of to management.  Respondent contends that your failure to communicate with management impacted production schedules.

6.  Respondent discharged you on December 10, 2004, due to the substandard job performance.

7.  Respondent discharged three White supervisors due to substandard job performance from February 25, 2003 through March 15, 2005.

8.  The White supervisor who you allege was promoted to the position of senior supervisor was not promoted.  Documentary evidence reveals that this individual had served in Respondent's Georgia facility as the Area Manager in 1999. He resigned on February 22, 2003 and was rehired on September 2, 2003 as a production supervisor, grade 11.  At the time of your discharge, you were a grade 10 supervisor. It is evident that this supervisor was at a higher grade level as compared with you and he earned $800 more per month than you were paid.

9. Respondent denies it was necessary to discharge you in order that the alleged comparator could advance into a senior supervisory position.

10. Respondent denies that this White supervisor was promoted or given a wage increase after you were discharged. Respondent contends that this supervisor continued to perform his own assignments and assumed a portion of your duties. Your remaining duties were assigned to other supervisors on the staff.

Based on this analysis, the Commission cannot conclude that you were discriminated against in violation of Title VII.

However, if you have additional substantive information which you want to be considered before a final determination is made on these allegations, submit this information on or before August 19, 2005.

If the District Director decides to dismiss your case on the basis of the evidence currently in our possession, the Dismissal and Notice of Rights issued by the Director, will advise that you may pursue this matter in Federal District Court by filing a private suit. **The Dismissal and Notice of Rights will be mailed to you.**

If you have any questions or if there is a need for discussion, feel free to call me at (205) 212-2132.

Sincerely,

8/8/05
Date

Gaines Elenburg, Jr.
Investigator

FILE COPY