# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **ELVIS TOLBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **3:05cv1149-MHT** |
| | ) | |
| **BRIGGS AND STRATTON** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT BRIGGS AND STRATTON CORPORATION'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Elvis Tolbert ("plaintiff") filed this lawsuit against defendant Briggs & Stratton Corporation ("Briggs" or "defendant"), alleging that Briggs discriminated against him on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended. Specifically, plaintiff alleges that, because of his race, Briggs discriminated against him in promotions, compensation, assignments and the terms and conditions of his employment, as well as discriminatorily terminated his employment. Furthermore, plaintiff makes a claim of intentional infliction of emotional distress against defendant. Pursuant to Fed. R. Civ. P. 56(c), defendant filed a Motion for Summary Judgment on all claims. This Brief is filed in support

64162.2

1

of Briggs' Motion for Summary Judgment. There are no disputed material facts, and defendant is entitled to judgment as a matter of law.

### STATEMENT OF FACTS[1]

### I.    Briggs' Company Background

Briggs & Stratton ("Briggs") is a manufacturer of small gas-powered engines. (Exhibit 4, Beasley Decl. ¶ 1). Briggs' corporate office is located in Milwaukee, Wisconsin, but it has eight (8) plants located throughout the United States. (Exhibit 4, Beasley Decl. ¶ 1). Briggs also has international plants located in China and the Czech Republic. (Exhibit 4, Beasley Decl. ¶ 1). Finally, Briggs has more than 6,000 employees, which include an international sales force that works in various parts of the world. (Exhibit 4, Beasley Decl. ¶ 1).

Briggs has a plant in Auburn, Alabama. (Exhibit 4, Beasley Decl. ¶ 2). There are three (3) general areas in the Auburn plant: (1) Iron Machining, (2) Aluminum Machining and (3) Assembly. (Exhibit 4, Beasley Decl. ¶ 2). Each of these areas is supervised by an Area Manager. (Exhibit 2, Smith Depo. pp. 17:3-18:9).

Beginning in March of 2004, Robert Westphal (white) was the Area Manager over Iron Machining. (Exhibit 4, Beasley Decl. ¶ 3). There are

---

[1] For purposes of this Motion and Supporting Brief only, defendant accepts plaintiff's version of the facts.

two (2) primary areas in Iron Machining:  (1) flywheels and (2) crankshafts. (Exhibit 4, Beasley Decl. ¶ 3).  In March of 2004, there were seven (7) coaches (also known as "Team Leaders") under Mr. Westphal's direct supervision:  Elvis Tolbert, Mallory Covington (black) and Jason Barlow (white) were on the first shift; Michelle Presley (black), James Ashton (white)[2] and Chris Baker (white) were on the second shift; and (7) Tom Hawkins (white) was on the third shift. (Exhibit 4, Beasley Decl. ¶ 3).

Roger Milby (white) was the Manufacturing Specialist in Iron Machining. (Exhibit 4, Beasley Decl. ¶ 8).  Mr. Milby began working for Briggs in 1985, but later left the company.  (Exhibit 4, Beasley Decl. ¶ 8). He subsequently returned to Briggs as a Specialist and resource for all three (3) shifts in Iron Machining; he was responsible for training the employees on repairing and maintaining equipment, as well as the iron machining process. (Exhibit 4, Beasley Decl. ¶ 8).  Mr. Milby's position was a grade higher than that of the coaches. (Exhibit 4, Beasley Decl. ¶ 8).

Coaches are exempt, salaried supervisors who have direct responsibility for hourly employees. (Exhibit 3, Smith Decl. ¶ 2).  Coaches are responsible for training hourly employees, ensuring that hourly employees understand the technical process, making certain that hourly

---

[2] Shortly after Mr. Westphal became Area Manager, Jackie Osborne (white) replaced Mr. Ashton. (Exhibit 4, Beasley Decl. ¶ 3, n. 1).

employees understand the process in order to support quality production and guaranteeing that hourly employees follow policies and procedures. (Exhibit 3, Smith Decl. ¶ 2).

## II.     Briggs' Commitment To Equal Employment Opportunity

In accordance with its Business Integrity Policy, Briggs is committed to conducting business in full compliance with the law and without regard to race, color, religion, sex, age, national origin, disability, veteran status or other protected classification. (Exhibit 4, Beasley Decl. ¶ 10). As part of Briggs' Integrity Policy, employees are given an 800 number to which an employee can call and make complaints, if that employee is not comfortable making such complaints to someone at the plant. (Exhibit 4, Beasley Decl. ¶ 10). During new hire orientation, employees are given a copy of Briggs' Business Integrity Policy, which contains its Equal Employment Opportunity and Prohibition Against Harassment policies, and thoroughly trained on the same. (Exhibit 4, Beasley Decl. ¶ 10). Additionally, Briggs displays its Equal Employment Opportunity poster in its break rooms. (Exhibit 4, Beasley Decl. ¶ 10). Finally, all of Briggs' supervisory employees receive annual EEO compliance training as well as Briggs' Integrity Policy. (Exhibit 4, Beasley Decl. ¶ 10).

64162.2

## III.    Plaintiff's Employment Background

In May of 1996, plaintiff began working for Briggs through a temporary agency. (Exhibit 1, Pl. Depo. pp. 29:17-19, 32:9-33:16). Shortly thereafter, he became a regular employee of Briggs. (Exhibit 1, Pl. Depo. pp. 32:22-33:16). In November of 1996, plaintiff became a coach with Briggs. (Exhibit 1, Pl. Depo. p. 33:12-23).

From 1996 to mid-2003, plaintiff worked in Assembly. (Exhibit 1, Pl. Depo. p. 38:13-21). While employed with Briggs, plaintiff also served in the Navy Reserves. (Exhibit 1, Pl. Depo. pp. 20:13-20, 26:12-27:22). On or about February of 2002, plaintiff was called to active military duty. (Exhibit 1, Pl. Depo. p. 27:7-22). On or about July of 2003, he returned to work at Briggs. (Exhibit 1, Pl. Depo. pp. 27:7-22; 68:22-69:7). Upon his return from active military duty, plaintiff was assigned to work as a coach in Iron Machining under the supervision of Mr. Westphal. (Exhibit 1, Pl. Depo. pp. 61:10-62:1; 64:17-65:9).

## IV.    Events Leading To Plaintiff's Discharge

Shortly after plaintiff arrived in Iron Machining, management began noticing that plaintiff's performance as a coach was unsatisfactory. (Exhibit 3, Smith Decl. ¶¶ 3-4; Exhibit 5, Westphal Decl. ¶¶ 2-5). Harold Smith (white), Plant Manager, and Mr. Westphal observed that plaintiff was not an

effective leader because he could not or refused to enforce defendant's policies and procedures, and it appeared as if his hourly employees did not respect him. (Exhibit 3, Smith Decl. ¶ 3; Exhibit 5, Westphal Decl. ¶ 2). For example, plaintiff's hourly employees were supposed to set up machines for operation and repair and maintain the machines. (Exhibit 3, Smith Decl. ¶ 3; Exhibit 5, Westphal Decl. ¶ 3). When machines went down, however, rather than require a quick response from his hourly employees, plaintiff often attempted to perform the work himself. (Exhibit 2, Smith Depo. pp. 42:18-43:7; Exhibit 3, Smith Decl. ¶ 3; Exhibit 5, Westphal Decl. ¶ 3). However, in an effort to give plaintiff time to improve his performance, Mr. Westphal allowed plaintiff to continue in his role as a coach. (Exhibit 5, Westphal Decl. ¶ 4).

However, plaintiff's continued lack of leadership and control caused production problems in his area. (Exhibit 5, Westphal Decl. ¶ 4). For example, plaintiff's employees often went on breaks early and returned late from these breaks. (Exhibit 5, Westphal Decl. ¶ 4). At the time, the demand for flywheels was very high. (Exhibit 5, Westphal Decl. ¶ 4). Since the flywheel area was the slowest operation and required the most initiative and control, plaintiff's failure to monitor his employees' downtime caused a decrease in production. (Exhibit 5, Westphal Decl. ¶ 4).

6

Toward 2004, sales and production schedules required Iron Machining to improve its quality and production. (Exhibit 3, Smith Decl. ¶ 4; Exhibit 5, Westphal Decl. ¶ 5). Although Mr. Smith and Mr. Westphal had meetings with the coaches about production goals and eliminating the existence of unidentified baskets and unidentified parts in the work areas[3] (Exhibit 1, Pl. Depo. pp. 89:9-92:11, 95:2-22; Exhibit 2, Smith Depo. pp. 30:23-33:4; Exhibit 3, Smith Decl. ¶ 4; Exhibit 5, Westphal Decl. ¶ 5), plaintiff failed to improve in these areas. (Exhibit 2, Smith Depo. pp. 30:23-35:20; Exhibit 3, Smith Decl. ¶ 4; Exhibit 5, Westphal Decl. ¶ 5). Furthermore, Mr. Westphal counseled plaintiff and his employees about failing to meet production goals, their need to improve their performance and communicating better with management about production schedules. (Exhibit 1, Pl. Depo. p. 109:8-110:3; Exhibit 5, Westphal Decl. ¶ 5). However, there was still no improvement in plaintiff's performance. (Exhibit 5, Westphal Decl. ¶ 5). In an effort to assist plaintiff, Mr. Westphal

---

[3] The failure to identify parts and baskets created accounting issues. (Exhibit 3, Smith Decl. ¶ 4). All parts should be identified (*i.e.*, tagged and labeled) as defective, work in progress, good, etc. (Exhibit 3, Smith Decl. ¶ 4). From an accounting standpoint, if a part has not been identified, the company does not know how to classify the cost of the part (*i.e.*, scrap costs or costs of engine). (Exhibit 3, Smith Decl. ¶ 4). More importantly, failing to identify parts is a safety problem. (Exhibit 3, Smith Decl. ¶ 4). Employees would sometimes create parts and place them in a basket within the area. (Exhibit 3, Smith Decl. ¶ 4). Without proper labeling, no one would know whether the part was defective. (Exhibit 3, Smith Decl. ¶ 4). If a defective part went on to assembly, it could cause a malfunction and seriously harm an employee or a customer. (Exhibit 3, Smith Decl. ¶ 4).

took the responsibility for Model 20 flywheels away from plaintiff and gave it to Mr. Covington. (Exhibit 5, Westphal Decl. ¶ 6).

During the first week of December of 2004, Mr. Westphal asked plaintiff to write a list of items that needed to be improved in his area. (Exhibit 1, Pl. Depo. pp. 96:2-14, 101:11-15, 147:12-148:8 and Exh. 3 to Exhibit 1, Pl. Depo.; Exhibit 5, Westphal Decl. ¶ 7). In response, plaintiff wrote a list, itemizing 127 deficiencies that he observed. (Exhibit 1, Pl. Depo. pp. 101:19-102:14 and Exh. 4 to Exhibit 1, Pl. Depo.; Exhibit 5, Westphal Decl. ¶ 7). Mr. Westphal had previously asked plaintiff to correct these deficiencies. (Exhibit 5, Westphal Decl. ¶ 7).

In early December of 2004, Mr. Westphal recommended the termination of plaintiff to Mr. Smith. (Exhibit 2, Smith Depo. pp. 45:15-47:7; Exhibit 3, Smith Decl. ¶ 5; Exhibit 4, Beasley Decl. ¶ 4; Exhibit 5, Westphal Decl. ¶ 8). Mr. Westphal explained that, on several occasions, he had counseled plaintiff on his performance issues. (Exhibit 2, Smith Depo. pp. 45:15-48:5; Exhibit 3, Smith Decl. ¶ 5; Exhibit 4, Beasley Decl. ¶ 4). Mr. Smith then asked Mr. Westphal to make a list of all of plaintiff's performance deficiencies. (Exhibit 2, Smith Depo. pp. 45:15-49:9; Exhibit 3, Smith Decl. ¶ 5). As such, Mr. Westphal noted several of the most recent

issues that he had with plaintiff's performance. (Exhibit 3, Smith Decl. ¶ 5; Exhibit 4, Beasley Decl. ¶ 4; Exhibit 5, Westphal Decl. ¶ 8).

Specifically, Mr. Westphal explained that, although plaintiff had been repeatedly counseled about production goals for his area and improving his communication with management about production schedules, he did not inform management that his area did not have any production on November 29, 2004. (Exhibit 4, Beasley Decl. ¶ 4). Also, on November 29, 2004, plaintiff did not advise management that additional flywheels were needed to meet assembly line requirements. (Exhibit 4, Beasley Decl. ¶ 4). On November 30, 2004, plaintiff reported that his area produced only 50% of the flywheels required for satisfactory job performance. (Exhibit 4, Beasley Decl. ¶ 4). Then, on December 7, 2004, several unidentified baskets and parts were found in plaintiff's area. (Exhibit 4, Beasley Decl. ¶ 4). These items had not been included in plaintiff's report on the previous day. (Exhibit 4, Beasley Decl. ¶ 4).

As such, on December 10, 2004, plaintiff was called into a meeting with Mr. Westphal and Tim Beasley (white), Human Resource Manager, wherein plaintiff was told that he was being terminated for poor job performance. (Exhibit 1, Pl. Depo. pp. 110:4-10, 114:12-117:19; Exhibit 4, Beasley Decl. ¶ 5). Plaintiff neither disputed the reason for his termination

nor did he offer any explanation for his performance. (Exhibit 1, Pl. Depo. pp. 114:12-116:13; Exhibit 4, Beasley Decl. ¶ 5). Mr. Beasley explained that they were also holding others responsible for the problems in plaintiff's area. (Exhibit 4, Beasley Decl. ¶ 5). There was no mention of plaintiff's race at this meeting. (Exhibit 1, Pl. Depo. p. 117:12-19).

No one replaced plaintiff. (Exhibit 4, Beasley Decl. ¶ 7). As Mr. Covington had already assumed some of plaintiff's duties, plaintiff's remaining duties were assigned to Mr. Milby. (Exhibit 4, Beasley Decl. ¶ 9). Mr. Milby continued in his role as support for all shifts in Iron Machining, but he was not promoted into a higher position. (Exhibit 4, Beasley Decl. ¶ 9). Thereafter, Briggs also terminated Kevin Fluharty (white), the engineer who provided support for plaintiff's area, for poor job performance. (Exhibit 4, Beasley Decl. ¶ 6).

## V.    Plaintiff's EEOC Charge of Discrimination and Complaint

On March 25, 2005, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission. (Exhibit 1, Pl. Depo. p. 126:3-13 and Exh. 5 to Exhibit 1, Pl. Depo.). Plaintiff filed the Charge based on his beliefs that he was replaced by Mr. Milby, who was later promoted (Exhibit 1, Pl. Depo. pp. 128:1-10), and plaintiff's disagreement

with the contention that his performance was poor. (Exhibit 1, Pl. Depo. p. 128:1-22).

The EEOC dismissed plaintiff's Charge, finding no evidence of discrimination. (Exhibit 1, Pl. Depo. pp. 96:2-14, 126:14-127:23, 147:12-148:8 and Exh. 3 to Exhibit 1, Pl. Depo.). In arriving at this conclusion, the EEOC considered all of plaintiff's performance deficiencies, as outlined by Mr. Westphal. (Exhibit 1, Pl. Depo. pp. 96:2-14, 147:12-148:8 and Exh. 3 to Exhibit 1, Pl. Depo.). The EEOC also considered plaintiff's handwritten admission of more than one hundred (100) items that needed to be improved in his area. (Exhibit 1, Pl. Depo. pp. 96:2-14, 101:11-102:14, 147:12-148:8 and Exhs. 3 and 4 to Exhibit 1, Pl. Depo.). Finally, the EEOC took note of the fact that, between February 25, 2003 and March 15, 2005, Briggs had also terminated three (3) white supervisors for substandard job performance. (Exhibit 1, Pl. Depo. pp. 96:2-14, 147:12-148:8 and Exh. 3 to Exhibit 1, Pl. Depo.).

With respect to plaintiff's claim that he was replaced by Mr. Milby who was later promoted to a position for which plaintiff was in line to receive, the EEOC found that Mr. Milby had not been promoted. (Exhibit 1, Pl. Depo. pp. 96:2-14, 147:12-148:8 and Exh. 3 to Exhibit 1, Pl. Depo.). Specifically, the EEOC noted that the evidence demonstrated that Mr. Milby

was already in a grade higher than plaintiff.     (Exhibit 1, Pl. Depo. pp. 96:2-14, 147:12-148:8 and Exh. 3 to Exhibit 1, Pl. Depo.).

On December 6, 2005, plaintiff filed a federal lawsuit alleging that, in violation of Title VII of the Civil Rights Act of 1964, as amended, he was terminated because of his race and replaced by a white male, who was later promoted to a position for which plaintiff was in line to receive. (Complaint ¶¶ 15, 17).   Plaintiff further alleged that, because of his race, he was discriminated against in promotions, compensation, assignments and terms and conditions of employment. (Complaint ¶ 11).   Finally, plaintiff alleged that, in taking these actions, Briggs caused plaintiff to suffer emotional distress. (Complaint ¶¶ 21-21).

## VI.     **Plaintiff's Deposition Testimony**

### A.     **Termination**

Other than his belief that his performance was good, plaintiff has no facts or evidence to dispute Briggs' claim that his performance was unsatisfactory or the basis for the termination of his employment. (Exhibit 1, Pl. Depo. pp. 128:23-130:17).   Furthermore, plaintiff could not identify any other coach that was treated more favorably than him. (Exhibit 1, Pl. Depo. pp. 130:22-131:6).

**B.    Promotion**

Plaintiff does not dispute the fact that Mr. Milby was hired at a grade higher than that of plaintiff, and plaintiff does not have any evidence or personal knowledge that Mr. Milby was promoted after plaintiff's termination.  (Exhibit 1, Pl. Depo. pp. 112:9-113:17).   Instead, plaintiff admitted that his belief that Mr. Milby was promoted is based on rumor. (Exhibit 1, Pl. Depo. pp. 112:9-113:17).

Furthermore, no one in management ever told plaintiff that he was being considered for a promotion.  (Exhibit 1, Pl. Depo. pp. 122:20-125:3). Plaintiff assumed that he was a candidate for a promotion based on his observation that his area was one of the only areas that did not have a senior supervisor.  (Exhibit 1, Pl. Depo. pp. 122:20-125:3).  Since plaintiff was a coach, he simply assumed that he could possibly fill the senior supervisor position. (Exhibit 1, Pl. Depo. pp. 122:20-125:3).

**C.    Compensation, Assignments and Terms and Conditions**

In his deposition, plaintiff testified that the majority of his lawsuit concerned the following events (most of which occurred from 1996 to mid-2003, which is the period when plaintiff worked in Assembly).  (Exhibit 1, Pl. Depo. pp. 35:22-36:6).

64162.2

13

### 1.    Selecting Lead Setups

Plaintiff alleged that during "ramp up," coaches are given the opportunity to select their lead setups, or people that will fill in during the coaches' absences. (Exhibit 1, Pl. Depo. pp. 36:9-37:8; Exhibit 4, Beasley Decl. ¶ 11). Plaintiff testified that, during a "ramp up" that occurred at some time between 1996 and mid-2003, he selected James Johnson (black) and Robert (last name unknown) (black) to serve as his lead setups. (Exhibit 1, Pl. Depo. pp. 35:22-36:6; 39:3-16, 42:19-43:5). However, one of plaintiff's selections was declined. (Exhibit 1, Pl. Depo. p. 41:4-8).

Plaintiff claimed that white supervisors were allowed to choose whomever they wanted, but he was given instruction and guidance on who he should select as a lead setup. (Exhibit 1, Pl. Depo. pp. 36:9-40:18, 41:4-42:18). Plaintiff further testified that he was asked to select other employees, who were white. (Exhibit 1, Pl. Depo. pp. 36:9-38:1). Ultimately, plaintiff selected James Johnson and Eddie Bridges (black) as his lead setups. (Exhibit 1, Pl. Depo. pp. 43:13-44:20). Plaintiff testified that he was not reprimanded, disciplined or penalized during this process. (Exhibit 1, Pl. Depo. pp. 40:19-41:3).

64162.2

### 2.     Selecting Furniture

When plaintiff arrived in Assembly, the office that he was going to occupy was not set up. (Exhibit 1, Pl. Depo. pp. 44:21-45:10). The office did not have a desk or chairs. (Exhibit 1, Pl. Depo. pp. 44:21-45:10). After plaintiff found a desk in the plant, his supervisor, Randy Petasi (white), gave plaintiff a chair from the conference room. (Exhibit 1, Pl. Depo. pp. 44:21-46:11, 62:2-15). Plaintiff does not know how chairs were assigned to other coaches or how their chairs were selected. (Exhibit 1, Pl. Depo. p. 49:1-10).

Plaintiff used this chair for two (2) to three (3) years, until he was advised that the chair was missing from inventory and should not have been in his office. (Exhibit 1, Pl. Depo. pp. 44:21-47:15). Plaintiff complained to Mr. Petasi and/or Douglas Glass (white) about this situation. (Exhibit 1, Pl. Depo. pp. 58:1-59:13). Thereafter, Mr. Glass gave plaintiff permission to purchase a chair. (Exhibit 1, Pl. Depo. p. 59:2-6). So, plaintiff purchased a chair, and Briggs reimbursed plaintiff for his purchase. (Exhibit 1, Pl. Depo. pp. 47:16-48:16).

### 3.     E-mail Message

Plaintiff testified that, during this same period, he read an e-mail, wherein one of his managers stated that he had a "hard-on" for plaintiff.

15

(Exhibit 1, Pl. Depo. p. 49:11-20).   Plaintiff did not understand what was meant by the e-mail. (Exhibit 1, Pl. Depo. p. 49:11-20).

### 4.   Disciplining Employees

Plaintiff testified about an incident concerning one of his hourly employees, Daniel Reeves (white).   (Exhibit 1, Pl. Depo. pp. 49:21-50:6). Mr. Reeves refused to carry out certain duties that were assigned to him by plaintiff. (Exhibit 1, Pl. Depo. p. 50:5-10).

In plaintiff's opinion, Briggs' policy required that Mr. Reeves be terminated. (Exhibit 1, Pl. Depo. p. 50:11-13).   However, Mr. Reeves was not terminated.   (Exhibit 1, Pl. Depo. p. 51:3-10).   According to plaintiff, nothing was placed in Mr. Reeves' personnel file concerning the incident. (Exhibit 1, Pl. Depo. pp. 51:3-10).

Plaintiff believed that Mr. Beasley did not agree with the termination of Mr. Reeves. (Exhibit 1, Pl. Depo. p. 54:1-13).   Plaintiff never spoke to Mr. Beasley about this incident (Exhibit 1, Pl. Depo. p. 54:10-12), and plaintiff does not know what factors influenced Mr. Beasley's decision not to discipline Mr. Reeves. (Exhibit 1, Pl. Depo. p. 54:14-16).

Plaintiff had taken disciplinary actions against other employees, but he had never recommended termination for any other employee. (Exhibit 1, Pl. Depo. p. 52:11-16).   Plaintiff testified that he did not know of any other

64162.2

coaches who had recommended the termination of an employee. (Exhibit 1, Pl. Depo. pp. 52:17-53:17).

### 5.    Additional Training

Plaintiff testified that, in retrospect, he possibly did not get all of the support or training that he needed. (Exhibit 1, Pl. Depo. pp. 63:2-10; 64:2-4). Plaintiff testified that other people may have had more access to resources, although he could not identify those people. (Exhibit 1, Pl. Depo. p. 64:5-13).

### 6.    Pay Raises

Plaintiff stated that he believed that raises may not have been "applied equally or justified." (Exhibit 1, Pl. Depo. p. 68:7-15). Plaintiff went on to testify, however, that was just his opinion and he did not have any facts or evidence to support that opinion. (Exhibit 1, Pl. Depo. p. 68:16-21).

### 7.    Incident With John Frantz

Plaintiff also testified that, while he worked in Iron Machining, he once had a problem with John Frantz (white). (Exhibit 1, Pl. Depo. pp. 83:9-86:21). Plaintiff's complaint concerned a day when Mr. Westphal was absent, and plaintiff had to report to Mr. Frantz. (Exhibit 1, Pl. Depo. pp. 84:5-86:21). On that day, plaintiff did not agree with an order issued by Mr. Frantz. (Exhibit 1, Pl. Depo. pp. 84:5-86:21).

64162.2

Plaintiff told Mr. Frantz that, if he wanted something done, he could do it, but plaintiff refused to sign off on the order. (Exhibit 1, Pl. Depo. pp. 84:5-86:21). Mr. Frantz told plaintiff to do it or resign. (Exhibit 1, Pl. Depo. pp. 84:5-86:21). Plaintiff complained to Mr. Smith about the situation. (Exhibit 1, Pl. Depo. pp. 84:5-86:21). Mr. Smith met with plaintiff and Mr. Frantz, but plaintiff was not satisfied with the meeting. (Exhibit 1, Pl. Depo. pp. 84:5-86:21). Other than this situation, plaintiff did not have any complaints about Mr. Frantz. (Exhibit 1, Pl. Depo. p. 86:17-21). Plaintiff also did not have any complaints about Mr. Smith. (Exhibit 1, Pl. Depo. p. 87:6-8).

## Summary Judgment Standard

Summary judgment is appropriate only if this Court finds that there exists no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant's initial burden is to "show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). When the burden of proof at trial belongs to the nonmovant, as is the case here, the moving party need not "support its motion with affidavits or other similar material negating the opponent's

claim," Celotex, 477 U.S. at 323, but nevertheless "may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." Id. at 331.

Once the moving party meets its burden, the nonmoving party must then "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. While the Court will resolve all doubts as to whether the non-movant has met its burden against the moving party, Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987), neither "[m]ere general allegations which do not reveal detailed and precise facts," Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir.), cert. denied, 516 U.S. 817 (1995), merely colorable evidence, see Brown v. City of Clewiston, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory statements, see Peppers v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989), nor conjecture will create a genuine issue of material fact. Furthermore, while "claims of employment discrimination . . . present fact-intensive issues[,] . . . motions for summary judgment or judgment as a matter of law are appropriate to 'police the baseline'" for such claims. Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (quoting Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264 n.8 (5th Cir. 1999)).

64162.2

## Argument

### I.    Plaintiff Cannot Establish A *Prima Facie* Case Of Race-Based Discrimination In His Discharge

Absent direct evidence of discrimination, a plaintiff must first establish a *prima facie* case. In a discharge case, a plaintiff must demonstrate that (1) he is in a protected class; (2) he was qualified to perform his job; (3) his employment was terminated; and (4) he was replaced with someone outside of the protected class. Walker v. NationsBank of Florida, 53 F.3d 1548, 1556 (11th Cir. 1995) (citing Rollins v. TechSouth, Inc., 833 F.2d 1525, 1532 n.14 (11th Cir. 1987)).

If a plaintiff establishes his *prima facie* case, then the employer must articulate a legitimate, nondiscriminatory reason for its decision or actions. Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000). To ultimately prevail, the plaintiff must then show that the employer's articulated reason was false and that the real reason was the plaintiff's race. Id.; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 519 (1993).

While plaintiff is a member of a protected class and was discharged, he cannot establish the remaining elements of his *prima facie* case – that he was qualified for his position and that there is any evidence creating an inference of race discrimination. Other than plaintiff's own belief that his performance was good, he does not have any evidence demonstrating that he

was performing satisfactorily in his position. (Exhibit 1, Pl. Depo. pp. 128:23-130:17). His unsubstantiated beliefs cannot support his discharge claim.

To the contrary, however, the evidence shows that plaintiff was repeatedly counseled about his performance, but he failed to improve. (Exhibit 1, Pl. Depo. pp. 109:8-110:3; Exhibit 2, Smith Depo. pp. 30:23-35:20, 42:18-43:7; Exhibit 3, Smith Decl. ¶¶ 3-5; Exhibit 5, Westphal Decl. ¶ 5). In fact, when asked about deficiencies in his area, plaintiff wrote out 127 deficiencies that existed in his area. (Exhibit 1, Pl. Depo. pp. 101:11-102:14; Exhibit 5, Westphal Decl. ¶ 7). Plaintiff was clearly not qualified for his position.

Plaintiff has attempted to argue that he was replaced with someone outside of the protected class – Mr. Milby. However, it is undisputed that Mr. Milby did not replace plaintiff. (Exhibit 4, Beasley Decl. ¶¶ 7-9). Prior to his termination, a portion of plaintiff's duties were assumed by Mr. Covington, a black male. (Exhibit 4, Beasley Decl. ¶ 9; Exhibit 5, Westphal Decl. ¶ 6). When plaintiff was terminated, his remaining duties were assumed by Mr. Milby. (Exhibit 4, Beasley Decl. ¶ 9). Mr. Milby was already in a higher position than plaintiff. (Beasley Decl. ¶ 8). Mr. Milby took over plaintiff's remaining duties, while continuing to serve in his role

64162.2

as a resource for all three (3) shifts in Iron Machining. (Exhibit 4, Beasley Decl. ¶¶ 8-9).

Furthermore, plaintiff cannot demonstrate that he was treated less favorably than persons outside of his protected class. (Exhibit 1, Pl. Depo. pp. 130:22-131:6). To the contrary, the evidence shows that white supervisors were also terminated for poor job performance. (Exhibit 1, Pl. Depo. pp. 96:2-14; 147:12-148:8 and Exhibit 3 to Exhibit 1, Pl. Depo.; Exhibit 4, Beasley Decl. ¶ 6). In fact, during the termination meeting, Mr. Beasley told plaintiff that others were going to be held accountable for problems as well. (Exhibit 4, Beasley Decl. ¶ 5). Thereafter, defendant terminated Mr. Fluharty, a white engineer who provided support for plaintiff's area. (Exhibit 4, Beasley Decl. ¶ 6). Because plaintiff cannot establish his *prima facie* case, his claim is due to be dismissed as a matter of law.

## II.    Plaintiff Cannot Demonstrate Pretext In Briggs' Legitimate, Nondiscriminatory Reason For His Discharge

Even if plaintiff can prove a *prima facie* case of race discrimination, Briggs has offered a legitimate, non-discriminatory reason for his discharge. As explained above, Briggs terminated plaintiff for poor job performance. Furthermore, as demonstrated above, plaintiff has failed to point to anyone

(white or black) who was not discharged for poor performance. (Exhibit 1, Pl. Depo. pp. 130:22-131:6). Therefore, plaintiff cannot demonstrate pretext in Briggs' legitimate, nondiscriminatory reason for her discharge. Thus, plaintiff's discharge claim must fail as a matter of law.

### III.  Plaintiff Cannot Establish A *Prima Facie* Case Of Discriminatory Failure To Promote, And He Cannot Demonstrate Pretext In Briggs' Legitimate, Nondiscriminatory Reason

In order to establish a *prima facie* case of discriminatory failure to promote under Title VII, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for and applied for the promotion; (3) he was rejected in spite of his qualifications; and (4) the individual who received the promotion is outside of the protected class. White v. Sears, Roebuck and Co., No. CIVA 1:03CV00002 GET, slip op. at 22 (N.D. Ga. August 21, 2006) (citing Walker v. Mortham, 158 F.3d 1177, 1193, reh'g denied, 167 F.3d 542 (11th Cir. 1998)). Moreover, the Eleventh Circuit has recently held that "[a] plaintiff must show that the disparities between the successful applicant's and [his] own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" Brooks v. Jefferson County Commn., 2006 WL 997725, at *2 (11th Cir. Apr. 18, 2006) (quoting Cooper v. Southern Co., 390 F.3d 695, 732 (11th Cir. 2004)).

Plaintiff has satisfied the first element of his *prima facie* case (*i.e.*, he is a member of a protected class). However, plaintiff cannot satisfy the remaining elements.

Most importantly, Mr. Milby was <u>not promoted</u> after plaintiff's termination. (Exhibit 4, Beasley Decl. ¶ 9). Rather, Mr. Milby's position was already a grade higher than plaintiff and he was acting as support for all of the coaches in Iron Machining, so he assumed some of plaintiff's duties and continued performing his own. (Exhibit 4, Beasley Decl. ¶¶ 8-9). Furthermore, plaintiff was not being considered for a promotion, and he had not been promised a promotion by management. (Exhibit 4, Beasley Decl. ¶ 9). Other than rumors and his own beliefs, plaintiff has not produced any evidence to dispute these facts. (Exhibit 1, Pl. Depo. pp. 112:9-113:17). Plaintiff's unsubstantiated allegations cannot support his promotion claim.

IV.  <u>Plaintiff's Claims That Occurred Between 1996 and Mid-2003 Fail As A Matter Of Law Under Title VII, As He Failed To Exhaust Title VII's Administrative Prerequisites</u>

A prerequisite to the maintenance of a Title VII action is the timely filing of a charge with the EEOC. <u>United Air Lines, Inc. v. Evans</u>, 431 U.S. 553 (1977); <u>Mitchell v. Jefferson County Board of Education</u>, 936 F.2d 539, 543 (11th Cir. 1991). The 180-day charge filing period contained in Title VII reflects a preference for the administrative resolution of claims and the

"Congressional purpose to achieve remediation primarily by conciliation."
Welty v. S.F.&G., Inc., 605 F. Supp. 1548 (N.D. Ala. 1985). While the
requirement that an EEOC charge be timely filed is not jurisdictional in
nature, see Zipes v. Trans World Airlines, 455 U.S. 385, 393 (1982), the
requirement is a condition precedent to the maintenance of an action, and
plaintiff bears the burden of demonstrating that the conditions precedent
have been satisfied. Jackson v. Seaboard Coast Line Railroad, 678 F.2d 992,
1010 (11th Cir. 1982). As to any claims that arose between 1996 and mid-
2003, plaintiff has failed to satisfy that burden.

Pursuant to Title VII, plaintiff was obligated to file an EEOC charge
within 180 days of learning of any alleged disparate treatment. Based on
plaintiff's deposition testimony, he believed that he was being treated
differently from other employees during the period between 1996 and mid-
2003. However, plaintiff did not file a charge until March 25, 2005, which
was well outside of the 180 day period. (Exhibit 1, Pl. Depo. p. 126:3-13
and Exhibit 5 to Exhibit 1, Pl. Depo.). Because plaintiff did not timely file
such a charge, all claims arising between 1996 and mid-2003 under Title VII
fail as a matter of law.

V.   **Plaintiff Cannot Establish A *Prima Facie* Case Of Race-Based Discrimination In Compensation, Assignments or The Terms And Conditions Of His Employment**

Assuming that the Court finds these claims to be timely, they still fail as a matter of law.  In his complaint, plaintiff generally alleged that Briggs discriminated against him in compensation, assignments and the terms and conditions of his employment.   In his deposition, plaintiff went on to identify those facts that he believed gave rise to those claims.  Specifically, plaintiff complained about the following matters:   (1) selecting his lead setups (Exhibit 1, Pl. Depo. pp. 35:22-36:6, 36:9-40:18, 39:3-16, 40:19-41:3; Exhibit 4, Beasley Decl. ¶ 12); (2) selecting his furniture (Exhibit 1, Pl. Depo. pp. 44:21-48:16, 49:1-10, 58:1-59:13, 62:2-15); (3) an e-mail message (Exhibit 1, Pl. Depo. p. 49:11-20); (4) disciplining his hourly employees (Exhibit 1, Pl. Depo. pp. 49:21-50:13, 51:3-10, 52:11-53:17, 54:1-16); (5) additional training (Exhibit 1, Pl. Depo. pp. 63:2-10, 64:5-13); (6) pay raises (Exhibit 1, Pl. Depo. pp. 68:7-21) and (7) an incident with John Frantz. (Exhibit 1, Pl. Depo. pp. 83:9-86:21, 87:6-8).

For plaintiff to prove a *prima facie* case of discrimination, he must prove: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees who were not members of his protected class more favorably;

64162.2

26

and (4) he was qualified for the job or benefit at issue. <u>Silvera v. Orange County School Board</u>, 244 F.3d 1253 (11th Cir. 2001). Further, to prove an adverse employment action, plaintiff must have suffered a material or substantial change to the terms, conditions or privileges of his employment. <u>See</u> <u>Davis v. Town of Lake Park</u>, 245 F.3d 1232, 1239 (11th Cir. 2001).

Plaintiff cannot establish a *prima facie* case of discrimination in compensation, assignments and terms and conditions of employment. Although plaintiff complains about differential treatment in selecting his lead setups, selecting his furniture, disciplining his hourly employees, receiving additional training, receiving pay raises, an incident concerning an e-mail message and an incident with Mr. Frantz, plaintiff did not suffer an adverse employment action as a result of either of these events because there was no change to any term, condition or privilege of his employment. <u>See</u> <u>Davis</u>, 245 F.3d at 1239.

Furthermore, other than rumors and his own beliefs, plaintiff has no evidence establishing that he was qualified for his job. (Exhibit 1, Pl. Depo. pp. 112:9-113:17). Whereas, the record is replete with evidence indicating that plaintiff's performance was unsatisfactory. (Exhibit 1, Pl. Depo. pp. 109:8-110:3, 101:11-102:14; Exhibit 2, Smith Depo. pp. 30:23-35:20, 42:18-

43:7; Exhibit 3, Smith Decl. ¶¶ 3-5; Exhibit 4, Beasley Decl. ¶ 4; Exhibit 5,
Westphal Decl. ¶¶ 2-7).

Finally, other than his uncorroborated beliefs, plaintiff has presented
no evidence that any white employees were treated more favorably in regard
to selecting their lead setups, selecting their furniture, disciplining their
hourly employees, receiving additional training, receiving pay raises or in
resolving any dispute with their supervisor(s). (Exhibit 1, Pl. Depo. pp.
35:22-39:16, 40:18-54:16, 58:1-59:13, 63:2-10, 64:5-13, 68:7-21, 83:9-
87:8). With respect to the e-mail message that he read, plaintiff did not even
know what it meant. (Exhibit 1, Pl. Depo. p. 49:11-20). As such, plaintiff's
compensation, assignments and terms and conditions claims must fail as a
matter of law.

## VI.  Plaintiff's Claim For Intentional Infliction Of Emotional Distress Should Be Dismissed

To prove intentional infliction of emotional distress, or outrage,
plaintiff must show that Briggs' conduct went beyond the bounds of human
decency. Ex parte Crawford & Co. v. Crawford & Co., 693 So. 2d 458, 459
(Ala. 1997). The only instances in which an Alabama court has found
outrageous conduct have involved (1) wrongful conduct in the context of
burials, (2) insurance companies employing heavy handed and barbaric

means to coerce settlement and (3) egregious sexual harassment. <u>See Ex parte Crawford</u>, 693 So. 2d at 460 n.1. The instant case does not fall within any of these categories.

As demonstrated above, plaintiff has made no showing that Briggs' conduct was wrongful much less that it went beyond the bounds of human decency. Furthermore, Briggs had legitimate, nondiscriminatory reasons for any employment action taken regarding plaintiff, and, even if Briggs had no legitimate, nondiscriminatory reasons for its actions regarding plaintiff, Briggs' conduct did not go beyond the bounds of human decency. Therefore, plaintiff's claim for intentional infliction of emotional distress is clearly due to be dismissed.

Respectfully submitted,

*s/ Thomas A. Davis*
Thomas A. Davis (ASB-5877-S56T)
E-Mail: tdavis@constangy.com
Tamula R. Yelling (ASB-9447-E61T)
E-Mail: tyelling@constangy.com

***Counsel for Defendant***

**CONSTANGY, BROOKS & SMITH, LLC**
One Federal Place, Suite 900
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 252-9321
Facsimile: (205) 323-7674

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Juraldine Battle Hodge, Esq.
Law Offices of Juraldine Battle-Hodge, P.C.
207 Montgomery Street, Suite 215
Montgomery, AL 36104
E-Mail:  battleb@bellsouth.net

*s/ Thomas A. Davis*
Counsel of Record

64162.2