IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ELVIS TOLBERT, | ) |
| Plaintiff, | ) |
| vs. | ) CIVIL ACTION NO. 3:05cv1149-T |
| BRIGGS AND STRATTON CORPORATION, | ) |
| Defendant. | ) |

PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION
OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ATTTORNEY FOR PLAINTIFF

JURALDINE BATTLE-HODGE

# PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Elvis Tolbert in the above styled cause and moves this Honorable Court to deny Defendant's Motion for Summary Judgment. As grounds therefore, the Plaintiff avers that there is a genuine issue of material fact to be submitted to a jury of Plaintiff's peers, and the Defendant is not due summary judgment as a matter of law, as to any claims made by the Plaintiff. In support of his response, Plaintiff relies on the applicable law, pleadings, depositions and affidavits attached hereto and for his complaint against Defendant and its agents and representatives (Defendant) hereby complains as set forth herein below.

**WHEREFORE, THE PREMISIES CONSIDERED,** Plaintiff respectfully requests that this Honorable Court deny Defendant' Motion for Summary Judgment, and allow this cause to move forward and be heard by a jury of Plaintiff's peers.

## I. SUMMARY OF THE CASE

### A. Nature of the Case

This action was filed by Elvis Tolbert against the Briggs & Stratton in violation of Title VII of the Civil Rights Act of 1964, as amended on the basis of race. Additionally, Plaintiff brings state claims for intentional infliction of emotional distress. Plaintiff seeks compensatory and punitive damages allowable under the law. Plaintiff also seeks attorney's fees, court costs and such other and further relief at law and in equity to which Plaintiff is justly entitled.

## B. Course of Proceedings

This case was timely filed in the United States District Court for the Middle District of Alabama, Northern Division on December 6, 2005 (See Exhibit "A" - Plaintiff's Complaint). Defendant filed its answer on December 22, 2005 (See Exhibit "B" - Defendant's Answer). Defendant filed a motion for summary judgment on November 3, 2006 (See Exhibit "C" - Defendant's Memorandum Brief in Support of Motion for Summary Judgment).

## II. PLAINTIFF'S SUMMARY OF FACTS

### A. Statement of the Plaintiff

The Plaintiff avers that the facts are very much disputed. Plaintiff is a 42 tear old black male. Plaintiff began working for Briggs & Stratton (Briggs) as a temporary operator on or about 1996. In May of 1996, Plaintiff was hired as a permanent operator. In November 1996, Plaintiff was promoted to supervisor.

On or about February 2002, Plaintiff was called to active duty. Plaintiff returned to Briggs in July 2003. At which time, Plaintiff was assigned to the machinery department (second shift). October 2003, Plaintiff returned to the first shift machinery department.

In December 2004, Plaintiff was terminated. The reason given to Plaintiff was poor performance. Plaintiff was in line for a promotion to senior supervisor. However, Plaintiff believes that Briggs had "hand picked" the individual it wanted for the position, Roger Milby, white male. Milby was similarly situated to Plaintiff.

Plaintiff filed his EEOC charge within the applicable 180 day statute. The Defendant states that Plaintiff was given an 800 number to contact EEO if

necessary. Plaintiff was never given an 800 number. (See Exhibit "D" – Affidavit of Plaintiff, par. 5). It is well settled law that EEOC decisions are not conclusory. Therefore, Defendant's rendition of EEOC's findings should not be considered by the Court.

B. **Plaintiff's Discharge**

Plaintiff was the coach for the first shift fly wheel department. Defendant contends that it counseled Plaintiff on several occasions about his poor performance. Yet, Harold Smith, plant manager testifies in his deposition that though he has counseled Plaintiff on three occasions about performance, on all three occasions, he counseled all three coaches at the same time. He did not counsel Plaintiff individually. (See Exhibit "E" - Deposition of Harold Smith at p., 31, lines 1-15). Mr. Smith admitted that there were problems on all three shifts. The problems were not just on first shift. (Exhibit E, at p. 44, lines 11-20). Further, Plaintiff also testified in his deposition that he was never disciplined individually by Mr. Smith or Mr. Wesphal. All of the discipline that he received was done in a group setting. The group setting included the first, second and third shifts. (See Exhibit "F" – Deposition of Elvis Tolbert, p. 89, lines 9-23 and p. 90, lines 1-21).

Plaintiff testified in his deposition that the reason he was given for his termination was "poor performance." (Exhibit F, p. 115, lines 3-5). Plaintiff was terminated once a letter of complaint was generated by his area manager, Wesphal. The list was generated on the direction of the plant manager, Harold Smith. Once Mr. Wesphal complained to the plant manager that he wished to

4

terminate Plaintiff, Mr. Smith simply advised Mr. Wesphal to put his reasons in writing. Once the reasons were put in writing, the Plaintiff was terminated. Mr. Smith or other upper management did no investigation into Wesphal's allegations. Mr. Smith simply, "rubberstamped" Mr. Wesphal's recommendation.

Mr. Smith testified that whenever he counseled not Plaintiff he always counseled the other two shifts at the same timed that he "... counseled other coaches that these were safety critical parts, and we had to meet production goal and that we could not allow any unidentified parts to escape to the assembly line. It could be a real safety issue." (See Exhibit "F" – Deposition of Harold Smith at p. 45, lines 7-14). Yet, notwithstanding the fact that all coaches were counseled, Plaintiff was the only coach terminated for poor performance. Plaintiff was never counseled individually. (Exhibit D, par. 11) Smith indicated that the letter that Wesphal generated was the ultimate reason Plaintiff was terminated. (Exhibit E, at p. 45, lines 17-18). It is ironic that no other shift coaches were terminated for poor performance, when it was clear that all three shifts were disciplined for production and safety concerns.

Though Mr. Smith testifies that all coaches were counseled about the problems and that he had personal knowledge of the problem, he allowed Plaintiff to be terminated without regard to the problems that the other shift managers were experiencing. (See Exhibit E at p. 46, lines 8-21). It was obvious that Defendant was considering termination before Wesphal supplied the requested list. (Exhibit F, p. 86, lines 22-23 and p. 87, lines 1-2). The difference between the other shift coaches and Plaintiff was that Plaintiff occupied the

5

position that the Defendant wanted to place Milby in. Defendant ultimately replaced Plaintiff with a white male, Roger Milby.

Defendant testified that the Plaintiff did not receive anything in writing about Plaintiff's unsatisfactory performance. The first written thing that Smith received resulted in Plaintiff's termination. (Exhibit E, at p. 54, lines 12-23 and p. 55, lines 1-4).

In its summary judgment brief, Defendant contends that "When machines went down, however, rather than require a quick response from an hourly employee, Plaintiff often attempted to perform the work himself. (Exhibit C, p. 6). Though Plaintiff might have assisted his employees, it is untrue that Plaintiff attempted to perform the work himself. Briggs had specific individuals assigned to do setup. (Exhibit D, par. 6).

Defendant contends that Plaintiff's "lack of leadership and control caused problems in his area." (Exhibit C, p.16). The problems that may have occurred on the first shift were not caused by a lack of leadership by the Plaintiff. Machine failure was the cause for any significant loss of production. (Exhibit D, par. 7).

### C. Unidentified Parts/ Fly Wheels

Additionally, unidentified parts were not only found on Plaintiff's shift. Mr. Smith testified that parts could have been left on any shift. (Exhibit F, at p. 33, lines 5 -16). Likewise, Mr. Smith testified that there were problems with fly wheels on all shifts. (Exhibit E, at p. 40, lines 9-15).

The Defendant admits that before Plaintiff took the position with the flywheels the shift already had problems. When Mr. Smith was asked if there

6

were any problems on the shift before Plaintiff came to the shift, Defendant answered in the affirmative. The exchange in Smith's deposition went as follows: "Q: Would it be correct to say that there were some problems on the shift already? A: Yeah, there were problems. Q: What kind of problems. A: Some quality and production problems. (See Exhibit E, p. 70, lines 2-6).

When Plaintiff was assigned to the Fly Wheel duties on the first shift, Plaintiff immediately voiced concerns with the deficiencies on the first shift. Plaintiff made his concerns know to Mr. Wesphal. Mr. Wesphal requested that Plaintiff make him a list of the deficiencies. Though Plaintiff made a list of deficiencies, nothing was done to assist Plaintiff; instead, Mr. Wesphal used the list against Plaintiff. The 127 deficiencies in Plaintiff's list were created at the inception of the flywheel department. Plaintiff was assigned to this department around September or October of 2003. (Exhibit D, par. 10). Plaintiff was the one to create procedure to identify and control a situation that was already out of hand before Plaintiff was assigned to fly wheels. The production of fly wheels is a three shift operation. Therefore, it is curious that this problem was only a problem to just Plaintiff, since all three shifts were a part of the process. (Exhibit D par. 9). The shift that Plaintiff occupied was the shift that management wanted to move Mr. Milby into.

Defendant states that "On November 30, 2004, Defendant reported that his area produced only 50% of the fly wheels required for satisfactory job performance. (Exhibit C, p. 9) It is not true that this report was not included in Plaintiff's report on the previous day. The production requirements are monitored

7

by the production control department. 50% could have been a result of down machinery, which can and did happen several times on all shifts. There have been times when the flywheel department was shut down for days, producing zero flywheels. (Exhibit D, par. 12).

### D. <u>Milby as Comparator</u>

Defendant admits that Milby was working in the same position that Plaintiff was working in before Plaintiff was terminated. "Q: Okay. What position was he (Milby) working in before Mr. Tolbert was terminated. A: Well, they're the same position. Q: It's Fly Wheel. A: Yeah, as far as I remember. (Exhibit E, p. 79, lines 22-23 & p. 80, 1-2). Immediately after Plaintiff's termination, Milby was placed in Plaintiff's position. The Defendant admits that it placed Wesphal in the position that Plaintiff occupied before Plaintiff was terminated and very shortly thereafter promoted Mr. Wesphal to the position of senior supervisor, the position that Plaintiff was in line for. (Exhibit E, at p. 82, lines 19-20). At minimum Plaintiff was in line to be considered for the position.

Milby was not only responsible for training; he was also responsible for repairing the machines himself. (Exhibit "D", par. 4). Though Milby was responsible for training and repairing, Milby was not held responsible for any of the articulated problems on the Plaintiff's shift. Unlike Plaintiff, instead of being terminated, Milby was promoted.

It was a well known fact that Milby was not satisfied with his position at Briggs. Milby was applying for supervisory positions outside of Briggs. Plaintiff has reason to believe that he was terminated to "make room" for Milby.

8

After the Plaintiff was terminated, Milby was immediately placed in the position that Plaintiff had held, and very shortly thereafter was promoted to senior supervisor, the position that Plaintiff should have received had he not been wrongfully terminated.

### E. Emails

Plaintiff read an email where one of his supervisors stated that he had a "hard on" for Plaintiff. From the actions that were taken by management, it is clear that the email insinuated that the manager was out to see Plaintiff fail. (Exhibit D, par. 17)

### III. ARGUMENTS AND AUTHORITIES

### A. Standard of Review for Summary Judgment

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law." Rule 56 (c), *Federal Rules of Civil Procedure*; See also *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1966). The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998) (Citing *Cleotex Corp v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 25552-53, 91 L.Ed.2d 265 (1986). That burden is satisfied either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the nonmoving party has failed to make a showing

"sufficient to establish the existence of an element essential to the [nonmovant's] case, and on which that party will bear the burden of proof at trial." See *Cleotex, supra*, 477 U.S. at 322. It is well-settled that the Court, in passing on a motion for summary judgment, must view all evidence and resolve all reasonable inferences in favor of the nonmoving party. *Zipperer v. City of Fort Myers*, 41 F.3d 619, 622 (11th Cir. 1995).

Where there are questions as to whether the alleged conduct complained of exits, a summary judgment is not appropriate. As per the applicable legal standard for summary judgment, the Plaintiff has presented substantial evidence that a fair-minded person would infer the existence of the fact sought to be proved. Because of the applicable law, pleadings, depositions and affidavits attached hereto, the Agency has not met the standard of review such that summary judgment is proper.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discrimination against an individual such as Plaintiff, as it relates to compensation, terms, conditions or privileges of employment, based on race, color, religion, sex, or national origin. *42 U.S.C.S. Section 2000e-2(a) (1)*. Where there are questions as to whether the alleged conduct of discrimination is in violation of Title VII of the Civil Rights Act of 1964. To establish a prima facie claim of racial or sexual discrimination, the following elements must be met: (1) Plaintiff is a member of the protected group; (2) that she was subjected to an adverse employment action; (3) that the Plaintiff was treated less favorably than

the similarly situated employees who are not members of the protected class; and (4) that the Plaintiff was otherwise qualified for the position.

Once the Plaintiff has met this burden, then the Agency must show that there is a legitimate nondiscriminatory reason for the adverse employment action. Should the Agency meet its burden of production, the presumption is eliminated, and the Plaintiff must then show that the reason given by the Agency for its action is pretextual, and the actual reason for the adverse action is discrimination. *Howard v. EP Oil Co.*, 32 F. 3d 520, 525 (11th Cir. 1994). The Court in *Howard* reasoned that to survive summary judgment, Plaintiff need only prove that a genuine issue exists as to whether the reason for the decision was discrimination. *Howard supra.*

B. **Plaintiff Has Established a Prima Facie Case for Race Discrimination**

As previously discussed where there are questions as to whether the alleged conduct of discrimination in violation of Title VII of the Civil Rights Act of 1964, the Plaintiff must establish a prima facie case. To establish a prima facie claim of racial discrimination, the following elements must be met: (1) Plaintiff belongs to a protect class for race; (2) that he was subjected to an adverse employment action; (3) that Plaintiff was treated less favorably than similarly situated employees who are not members of this protected class; (4) and that Plaintiff was otherwise qualified for the position. A Supreme Court case discussing the burdens placed on the employee in employment discrimination case is *St. Mary's Honor Center v. Hicks.* In that case the court reasoned that the Plaintiff has to demonstrate a prima facie case that raises the presumption of

discrimination. Further, the court reasoned that the prima facie case consists of the elements enunciated in the case of *McDonnell Douglas*, i.e., 1) Plaintiff is a minority, 2) Plaintiff was qualified for the position, 3) Plaintiff was subject to an adverse employment decision, and 4) Agency replaced Plaintiff with a non-minority. *St. Mary's Honor Center v. Hicks*, 125 L. Ed. 2d 407, 113 S. St. 2742 (1993). Once the Plaintiff has demonstrated a prima facie case, the burden is then placed on the Defendant, and the Defendant is required to rebut the presumption by providing a legitimate, nondiscriminatory reason for the adverse employment action. If the Defendant does so, the Plaintiff is required to show that the reason given by the Defendant for the action taken is pretextual, and that the actual reason is that of discrimination.

In this case, Plaintiff is a member of the protected groups, as he is black, and a male. Plaintiff was subjected to a disparate employment treatment. Plaintiff was terminated. Plaintiff was treated less favorably when he was terminated. Mr. Milby was responsible for training and repairing, yet he wasn't held responsible for any of the alleged deficiencies on the first shift. In fact, Milby was promoted, whereas Plaintiff was terminated for the alleged deficiencies. Plaintiff's termination was discriminatory. The termination was as a result of making room for a white male.

Roger Milby is similarly situated to Plaintiff, because Milby and Plaintiff worked in the same job; therefore, their duties and responsibilities were the same. Mr. Milby replaced Plaintiff. They both were supervised by Wesphal and they both worked for the Defendant during the time of the Complaint.

Plaintiff was clearly qualified for the senior supervisor position, as he had worked in management for over 8 ½ years. The Defendant showed complete confidence in Plaintiff with the type of responsibility it entrusted to Plaintiff. There were no complaints against Plaintiff until the need to place Milby in Plaintiff's position arose. Plaintiff has been an employee with Briggs since 1996. Plaintiff has successfully made a prima facie case for discrimination.

## C. The Defendant did not Present Legitimate Business Reasons for Its Discrimination Against Plaintiff

The Defendant offered what it has labeled as legitimate business reasons for the disciplinary action it took against Plaintiff when it terminated Plaintiff. However, the reasons given to Plaintiff were pretextual. In particular, the Defendant reported to the Plaintiff that the reason they disciplined Plaintiff was due to "poor performance." Evidence has shown that Plaintiff was never disciplined for performance problems on an individual basis. All counseling was made as a group to all three shifts at the same time.

At the time that Plaintiff was terminated, Mr. Covington (black male) did not take on a portion of Plaintiff's responsibilities. At the time that Plaintiff was terminated, Covington was assigned to Model 20 flywheels. (Exhibit D, par. 13). Additionally, Kelvin Fluharty, (white male) was terminated long before Plaintiff was terminated. Fluharty had been reassigned to a different department. After Fluharty was reassigned, he was terminated. He was not terminated from the shift and department that Plaintiff was terminated from. (Exhibit D, pars. 14,15). The reasons that Defendant brings forth for terminating Plaintiff are merely pretext for the real reason it terminated Plaintiff, race discrimination.

### D. Plaintiff has successfully made a claim for failure to Promote

In the case before this Honorable Court, Plaintiff is a member of the protected group, as he is black and he was subjected to a disparate employment treatment. Plaintiff was terminated under the guise of poor performance, however the real reason Plaintiff was terminated was due to race discrimination. Plaintiff was replaced by Roger Milby.

In December 2004, Plaintiff was terminated. The reason given to Plaintiff was poor performance. Plaintiff was in line for a promotion to senior supervisor. However, Plaintiff believes that Briggs had "hand picked" the individual it wanted for the position, Roger Milby, white male. Milby was similarly situated to Plaintiff. Plaintiff was subjected to disparate treatment, as he was fired. Whereas, even though Milby was responsible for training and repairing on this same shift, he was not terminated or even disciplined. Milby in fact replaced Plaintiff and was ultimately promoted to senior supervisor.

### E. EEOC Claims Were Timely Filed

Based on the fact that Defendant's treatment of Plaintiff was continuing, Plaintiff has a right to bring in the claims that occurred between 1996 and mid-2003. Since these actions by the Defendant were a continuing violation, Plaintiff is allowed to bring all of his complaints in if at least one of his claims falls within the applicable 180 day window. The last action of termination occurred December 2004; this charge of discrimination was timely filed well within 180 days. Therefore, the charges between 1996 and 2003 are timely filed.

### CONCLUSION

The evidence presented by Plaintiff as to wrongful termination is such that Plaintiff was timely when he filed his EEOC complaint based on a continuing violation. The question of legitimacy of Defendant to replace the Plaintiff with Mr. Milby is certainly at issue, and is a question that should be decided by a jury of Plaintiff's peers. As such Plaintiff contends that he was wrongfully terminated and denied a promotion.

Based on the facts, caselaw and evidence that is in direct dispute to Defendant' claims; there is a genuine issue of material fact to be submitted to the jury. Where there are questions, the case must go to trier of fact.

**WHEREFORE PREMISIES** considered, Plaintiff request that this Honorable Court deny Defendant' request for summary judgment.

Respectfully submitted this the ___21st___ day of ___November___

_____
JURALDINE BATTLE-HODGE (BAT033
Attorney for Plaintiff

LAW OFFICES OF JURALDINE BATTLE-HODGE
207 Montgomery Street, Suite 215
Montgomery, Alabama 36104
Telephone: (334) 262-1177, 263-5575
Facsimile: (334) 263-5569

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of November 2006, the foregoing document was served upon the following counsels of record by placing a copy of the same in the U.S. Mail, First Class postage prepaid, addressed as follows:

Thomas A. Davis
**CONSTANGY, BROOKS & SMITH, LLC**
Suite 1410, AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203

_____
Of Counsel