IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

ELVIS TOLBERT,                  )
                                )
        Plaintiff,              )
                                )        CIVIL ACTION NO.
        v.                      )        3:05cv1149-MHT
                                )            (WO)
BRIGGS and STRATTON             )
CORPORATION,                    )
                                )
        Defendant.              )


OPINION

Plaintiff Elvis Tolbert brings this race-discrimination lawsuit against defendant Briggs and Stratton Corporation (B & S). Tolbert asserts that B & S failed to promote him and eventually fired him, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e to 2000e-17. Additionally, he asserts a state-law claim for intentional infliction of emotional distress. This court has original jurisdiction over the Title VII claims

pursuant to 42 U.S.C. § 2000e-5(f)(3), as well as supplemental jurisdiction over the state-law claim pursuant to 28 U.S.C. § 1367.

This case is currently before the court on B & S's motion for summary judgment. For the reasons that follow, summary judgment will be granted on the Title VII claims, and the state-law claim will be dismissed without prejudice.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita

2

_Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 587 (1986).

## II. FACTUAL BACKGROUND

Viewed in the light most favorable to Tolbert, the admissible evidence reflects the following facts. B & S is a manufacturer of small gas-powered engines. Its plant in Auburn, Alabama has three general areas: iron machining, aluminum machining, and assembly. Each area is supervised by an area manager, and within each area are several team leaders, or coaches. A coach is a salaried supervisor with direct responsibility for hourly employees.

Tolbert, who is black, worked for B & S from 1996 until 2004. He began as a temporary worker, but he was soon hired as a permanent employee. He was quickly promoted from production operator to 'setup,' and then, in November 1996, to coach. From November 1996 until

February 2002, he was a coach in the assembly area of the plant.

During the period of employment from 1996 to 2002, Tolbert experienced several problems that were not resolved to his satisfaction. One such problem was a conflict over his selection of "lead setups," special assistants who would fill in during a coach's absence. According to Tolbert, white coaches were given complete discretion in choosing lead setups, whereas B & S's management initially rejected Tolbert's selection of two black employees to be lead setups. (Ultimately Tolbert was permitted to choose black employees for that role.)

Another significant problem Tolbert experienced involved insubordination by a white hourly employee, Daniel Reeves, who was under his supervision. Reeves refused to carry out duties that Tolbert had assigned him, so Tolbert wrote him up for insubordination. According to Tolbert, such misconduct at B & S ordinarily resulted in termination of the hourly employee. In this

4

case, however, Reeves was not disciplined in any way. Tolbert interprets this incident, as well as the incident involving his selection of lead setups, as evidence that B & S did not give black coaches the same authority and respect that they gave white coaches.

Tolbert recalls several other incidents and complaints that left him dissatisfied with his treatment by B & S during this period. One incident involved Tolbert's struggle to obtain a chair for his office. Another involved an e-mail that used an offensive term unrelated to race. Tolbert also recounts two minor altercations he had with white employees who were not his supervisors. Lastly, Tolbert suspects he received less training and less pay than he deserved, but he has no evidence to support this opinion. However, none of these incidents or complaints, including those involving the selection of lead setups and B & S's failure to terminate Reeves, led Tolbert to file a compaint with the Equal

Employment Opportunity Commission (EEOC) or lodge any other type of formal complaint prior to this lawsuit.

Tolbert had served in the Navy Reserve since his discharge from active service in 1990. In February 2002, when he was still a coach in the assembly area, he was recalled to full-time active duty. Consequently, from February 2002 until July 2003, Tolbert was away from B & S on military leave.

When Tolbert returned to B & S, he remained a coach, but he was reassigned to the iron-machining area of the plant, which manufactures engine parts known as flywheels and crankshafts. Tolbert, who supervised the flywheel unit, was one of seven coaches in iron machining. Three coaches, including Tolbert, were on first shift; three were on second shift; and one was on third shift. Three of the seven coaches, including Tolbert, were black. The area manager for iron machining, Robert Westphal, was white.

In 2004, there were several ongoing problems in the iron-machining area. The problems included the failure to meet production goals and the presence of unidentified parts and baskets in the area. The iron-machining coaches were counseled by Westphal and the plant manager, Harold Smith, about several problems that were occurring in that area. Tolbert was among the coaches counseled, but the counseling took place collectively; Tolbert was not counseled on an individual basis. The parties dispute the extent to which the problems in that area were attributable principally to Tolbert, but it is not disputed that some problems existed prior to Tolbert's arrival in the iron-machining area and that some problems were occurring on all three shifts, not just Tolbert's.

At some point, Westphal began to focus on Tolbert as the source of problems in his area. Westphal transferred some of Tolbert's responsibilities--production of Model 20 flywheels--to another coach, Mallory Covington. (Covington is black.) In December 2004, Westphal asked

7

Tolbert to write a list of issues needing improvement. Tolbert responded with a list of 127 deficiencies. Westphal then approached Smith, the plant manager, and recommended Tolbert's termination. Westphal documented several specific instances of substandard performance by Tolbert that had recently caused problems in the area. On December 10, 2004, B & S terminated Tolbert for poor performance.

Following Tolbert's departure, B & S did not hire another coach to take Tolbert's place. Some of Tolbert's duties had already been transfered to Covington, and B & S reassigned the remaining supervisory duties to Roger Milby, a white supervisory employee in the iron-machining area. Milby was a manufacturing specialist whose pay grade was already a step above Tolbert's and whose responsibilities as a manufacturing specialist covered all three shifts in the iron-machining area. Milby continued in his position as manufacturing specialist in addition to picking up those of Tolbert's

8

duties that had not already been transferred to Covington.

Following the filing of a timely EEOC complaint and receipt of a right-to-sue letter in response, Tolbert brought this suit.

### III. DISCUSSION

#### A. Title VII Claims

Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2 (a)(1). This suit alleges 'disparate treatment' based on race, in violation of that statute. A disparate-treatment suit is one in which the plaintiff alleges he or she was treated differently, and almost always less favorably, because of his or her

9

protected status. <u>Int'l Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 335 n.15 (1977).

In a disparate-treatment case, the plaintiff must prove that the employer acted with discriminatory purpose, motive or intent. <u>Id</u>; <u>see</u> <u>Williams v. Motorola, Inc.</u>, 303 F.3d 1284, 1293 (11th Cir. 2002). The plaintiff may prove discriminatory intent by producing circumstantial evidence. <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998).

A circumstantial case proceeds according to the familiar burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and its progeny. <u>Standard</u>, 161 F.3d at 1331. First, the plaintiff must establish a prima-facie case of discrimination. <u>Id</u>. Next, the employer must produce a legitimate, nondiscriminatory reason for its actions. <u>Id</u>. Lastly, the plaintiff must prove that the employer's articulated legitimate, nondiscriminatory reason was a pretext for

10

unlawful intentional discrimination. <u>Id</u>. (citing <u>McDonnell Douglas</u>, 411 U.S. 802-04).

Under the burden-shifting framework of <u>McDonnell Douglas</u>, the establishment of a prima-facie case creates a presumption of discrimination. <u>Id</u>. The employer can eliminate the presumption by producing a legitimate, nondiscriminatory reason, which then shifts the burden back to the plaintiff to produce "sufficient evidence to find that the employer's asserted justification is false," <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000). Although the prima-facie case shifts the burden of production to the employer, it does not reallocate the burden of persuasion. At all times the burden of persuasion remains with the plaintiff to prove by a preponderance of the evidence that the employer acted with discriminatory intent. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 507 (1993); <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981); <u>Standard</u>, 161 F.3d at 1331. At the summary-

judgment stage, there need not be independent evidence of discrimination; there must simply be sufficient evidence of pretext to send the case to a jury such that the jury could infer the ultimate fact of intentional discrimination from the pretext.  <u>Reeves</u>, 530 U.S. at 146-49.


### 1. Discriminatory Discharge

The gravamen of Tolbert's complaint is discriminatory discharge, which the court will address first.  Pursuant to the <u>McDonnell Douglas</u> framework, the court begins its discriminatory-discharge analysis by determining whether Tolbert can establish a prima-facie case.  "To establish a prima facie case of discriminatory discharge, the plaintiff must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class." <u>Cuddeback v. Florida Bd. of Educ.</u>, 381 F.3d 1230, 1235

(11th Cir. 2004).  Here, there is no dispute about the first and third elements: Tolbert is black, and he was fired.  As for the second and fourth elements, however, B & S argues that Tolbert was not qualified for his position and that he was not replaced by anyone.

The court concludes that there is a genuine issue of material fact as to the second element of the prima-facie case, Tolbert's qualification for his position.  He had held the 'coach' position for many years, and there is no evidence that the qualifications for the position changed.  B & S argues that Tolbert's poor job performance renders him unqualified, but of course Tolbert disputes B & S's allegation that his job performance was inadequate.  Furthermore, where the issue of whether the plaintiff was qualified to perform his job is intertwined with the question of whether the employer's reason for terminating him was pretextual, the plaintiff's job performance should not be scrutinized as part of the qualification element of the prima facie

13

stage.  <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997).  In sum, because a reasonable jury could find that Tolbert was qualified, summary judgment against Tolbert is not proper on this element of the prima-facie case.

Although Tolbert's replacement is a closer issue, the court concludes that there is a genuine issue of material fact about this fourth element as well, whether Tolbert was replaced by someone outside the protected class. Tolbert alleges that he was replaced by Milby, a white man.  B & S argues that Tolbert was not replaced but that Milby, a higher-paid worker, merely assumed Tolbert's duties.  In terms of Tolbert's ability to make out a prima-facie case, the question of whether Milby <u>officially</u> replaced Tolbert is immaterial.  If an employer could insulate itself from a Title VII suit merely by reassigning a discharged employee's duties to a white employee but never formally call it a replacement, Congress's intent in enacting Title VII

14

would be thwarted.  See Al-Hashimi v. Scott, 756 F.Supp.
1567, 1579 (S.D. Ga. 1991) (Edenfield, C.J.) ("The
defendant argues that since no new [employee] was hired,
the plaintiff's position has not been 'filled' by anyone.
The Court agrees with the plaintiff that this
technicality should not be used to circumvent the
plaintiff's rights under the statute.").  Insofar as most
of Tolbert's duties were assumed by a white employee, a
reasonable jury could conclude that Tolbert was "replaced
by someone outside the protected class," Cuddeback, 381
F.3d at 1235.  For summary-judgment purposes, therefore,
the fourth element of the prima-facie case has been met.

       There is another reason why the fourth element of the
prima-facie case should not prevent Tolbert from moving
forward:

              "The method suggested in McDonnell
              Douglas for pursuing this inquiry ...
              was never intended to be rigid,
              mechanized, or ritualistic. Rather, it
              is merely a sensible, orderly way to
              evaluate the evidence in light of common
              experience as it bears on the critical
              question of discrimination. A prima

> facie case under <u>McDonnell Douglas</u>
> raises an inference of discrimination
> only because we presume these acts, <u>if</u>
> <u>otherwise unexplained</u>, are more likely
> than not based on the consideration of
> impermissible factors."

<u>Furnco Const. Corp. v. Waters</u>, 438 U.S. 567, 577 (1978)
(emphasis added).  In other words, even if Tolbert does
not strictly satisfy the fourth prima facie element, the
inquiry most faithful to Title VII is whether B & S's
acts, viewed in the light most favorable to Tolbert and
<u>if otherwise unexplained</u>, raise an inference of
discrimination.  It seems clear that they do.  Here,
B & S terminated a qualified black employee who had been
a coach for eight years and reassigned the majority of
his duties to a white employee who, though paid more than
Tolbert, had no experience as a coach.  The court
concludes that these facts, viewed in the light most
favorable to Tolbert and if otherwise unexplained, raise
an inference of discrimination.  Accordingly, summary
judgment is not proper at the prima facie stage of the
<u>McDonnell Douglas</u> inquiry.

16

Now that Tolbert has made out a prima-facie case, the burden of production shifts to B & S to articulate a legitimate, nondiscriminatory reason for having terminated him. As stated, the defendant does not bear the burden of proof on this issue; it need only produce admissible evidence of the legitimate, nondiscriminatory reason. <u>Hicks</u>, 509 U.S. at 507 (citing <u>Burdine</u>, 450 U.S. at 254-55 & n.8). Here, B & S's burden of production is easily met. B & S states that Tolbert was terminated for poor job performance, and this is supported by abundant evidence in the record.

At this point Tolbert's prima-facie case has been rebutted and he has the burden to prove that B & S's stated reason for firing him, poor job performance, is a pretext for intentionally firing him because of his race. Although Tolbert has the burden of proof for the case overall, B & S, as the movant in the summary-judgment stage of the proceeding, has the burden to show that there is no genuine issue as to "the ultimate fact of

17

intentional discrimination," <u>Reeves</u>, 530 U.S. at 147 (quoting <u>Hicks</u>, 509 U.S. at 511).  Tolbert can survive summary judgment if the court finds that there is "sufficient evidence to find that the employer's asserted justification is false." <u>Reeves</u>, 530 U.S. at 148.  As stated, at the summary-judgment stage, there need not be independent evidence of discrimination; there must simply be sufficient evidence of pretext to send the case to a jury such that the jury could infer the ultimate fact of intentional discrimination from the pretext.  <u>Id</u>. at 146-49.

In this case, the court concludes that summary judgment is warranted because there is no evidence in the record to support a reasonable inference by a jury that B & S's stated reason for firing Tolbert, poor job performance, was false.

Tolbert makes three arguments for pretext.  First, he argues that the problems in his area were attributable to other coaches and that these coaches were not fired.

18

Second, he argues that the problems in his area existed before he got there and he was unjustly blamed for a situation he did not create.  Third, he has pointed to other race-related problems he was having at work prior to his military leave that could indicate racial animus on the part of his employer.

Ultimately, none of these points amounts to a genuine issue of material fact that would allow a jury to infer that Tolbert's termination was racially motivated.  With regard to the other coaches, Tolbert never identifies similarly situated white coaches who exhibited equally poor job performance but were not fired.  In fact, Tolbert states in his deposition that he knows of no other coach in his area who was treated better than he was.  B & S, on the other hand, produces evidence that it also fired white supervisors for poor performance, including an engineer in Tolbert's area.  Admittedly, B & S never shows exactly what happened to the white coaches in Tolbert's area.  But B & S does not have to

19

show it fired the white coaches in Tolbert's area unless there is evidence from which a reasonable jury could conclude that the white coaches were, in all relevant respects--that is, in terms of their job performance--similarly situated to Tolbert.  See Smith v. PAPP Clinic, P.A., 808 F.2d 1449, 1451-52 (11th Cir. 1987).

Tolbert points to no such evidence, and the court knows of none.  Based on the record now before the court, no reasonable jury could infer from B & S's treatment of other coaches and employees in Tolbert's area that B & S's stated reason for firing him, poor job performance, was pretext for intentional race discrimination.

Along the same lines, Tolbert's argument that the problems in his area predated his return from military duty also does not create an issue of fact as to pretext. B & S has produced evidence that coaches are expected to improve the problems that predate their arrival.  There is obviously nothing unlawful, under Title VII, with

20

firing supervisors who fail to improve problematic situations, see Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997) ("federal courts do not sit to second-guess the business judgment of employers"), and Tolbert does not point to any evidence in the record that suggests that similarly situated white supervisors failed, to the same extent as Tolbert, to improve equally problematic situations but were nonetheless retained.

With regard to Tolbert's experiences before his military leave, these simply do not rise to the level of permitting a reasonable jury to infer that he was terminated based on race or that B & S's stated reason for terminating him, poor job performance, was pretextual. In general, plaintiffs can prove pretext with direct evidence of racial animus by the employer in previous incidents. See, e.g., Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1522-23 (11th Cir. 1991); Sennello v. Reserve Life Ins. Co., 872 F.2d 393, 394 (11th Cir. 1989). However, Tolbert has no direct evidence of racial

21

discrimination.  He has only circumstantial evidence--
which, in candor, is quite weak--that he <u>ever</u> was treated
differently based on his race.  These incidents, which
occurred sometime between 1996 and 2002, do not amount to
evidence that would permit a reasonable jury to infer
that Tolbert was terminated in November 2004 on the basis
of race.  <u>See</u> <u>Burrell v. Bd. of Trustees</u>, 125 F.3d 1390,
1393 (11th Cir. 1997).

In sum, B & S has produced evidence that Tolbert was
fired based on poor performance.  Tolbert raises no
genuine issue of material fact to suggest that the stated
reason was a pretext for termination based on race.
Accordingly, summary judgment on Tolbert's
discriminatory-discharge claim will be granted.


### 2. Failure to Promote

In addition to discriminatory discharge, Tolbert
claims that B & S violated Title VII by failing to

promote him because of his race. There is practically no evidence to support this claim.

"Under the McDonnell Douglas framework, to prevail on a claim of failure to promote, a plaintiff may establish a prima facie case of ... discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified and applied for the promotion; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004). Here, of course, it is undisputed that Tolbert meets the first element, membership in a protected class. The remaining three elements, however, are in dispute.

According to Tolbert, he was in line to become a senior supervisor in the iron-machining area and that position went to Milby instead. But B & S's evidence shows that Tolbert was never considered for promotion, that Milby occupied a different position (manufacturing

23

specialist), and that Milby was not promoted. Tolbert does nothing to rebut this evidence. In fact, the evidence suggests that there was no senior supervisor in Tolbert's area, either before or after his termination.

The senior-supervisor position existed in other areas of the plant, so it was not inconceivable that Tolbert or another coach in his area could have been promoted. But in order to make out a prima-facie case, Tolbert would have to establish facts that, if otherwise unexplained, would raise an inference that B & S's failure to promote Tolbert to the senior-supervisor position was racially motivated. See Furnco, 438 U.S. at 577. The record cannot support a prima-facie case here.

Because Tolbert does not establish a prima face case, there is no need to pursue the McDonnell Douglas framework past the first inquiry. Accordingly, summary judgment on Tolbert's failure-to-promote claim will be granted.

24

### 3. Other Conditions of Employment

As for Tolbert's allegations regarding various incidents that occurred between 1996 and 2002, it does not appear from the face of Tolbert's complaint in this suit that he intends for those allegations to represent independent claims for relief under Title VII. This was confirmed by Tolbert's counsel at the pretrial conference in this case. As such, the court considers those allegations only in the context of Tolbert's claims of discriminatory discharge and failure to promote--which, as stated, do not survive summary judgment.

### B. Supplemental State-Law Claim

This court "may decline to exercise supplemental jurisdiction over a claim if ... [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because summary judgment is due to be granted on Tolbert's Title VII claims, the court declines to exercise supplemental jurisdiction over his

25

state-law claim against B & S for intentional infliction of emotional distress.  Accordingly, the state-law claim will be dismissed, albeit without prejudice.  See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726-27 (1966); L.S.T., Inc. v. Crow, 49 F.3d 679, 685 (11th Cir. 1995).  Pursuant to 28 U.S.C. § 1367(d), the applicable statute of limitations under state law will be tolled 30 days so as to allow Tolbert time to refile that claim in state court.

* * *

For the foregoing reasons, the court concludes that summary judgment should be granted in favor of B & S on Tolbert's Title VII claims, while his remaining state-law claim for intentional infliction of emotional distress should be dismissed without prejudice.

An appropriate judgment will be entered.

DONE, this the 8th day of February, 2007.

   /s/ Myron H. Thompson   
UNITED STATES DISTRICT JUDGE